Richard M. Pachulski (CA Bar No. 90073)
John D. Fiero (CA Bar No. 136557)
John W. Lucas (CA Bar No. 271038)
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415.263.7000
Facsimile: 415.263.7010
Email: rpachuslki@pszjlaw.com
jfiero@pszjlaw.com
jlucas@pszjlaw.com

Proposed Attorneys for Sedgwick, LLP

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>SEDGWICK, LLP,<br><br>Debtors. | Case No.: 18-31087<br><br>Chapter 11<br>**DECLARATION OF GREGORY C. READ IN SUPPORT OF FIRST DAY MOTIONS** |

I, Gregory C. Read, hereby declare as follows:

1. Sedgwick, LLP, a California limited liability partnership ("**Sedgwick**" or the "**Debtor**"), adopted a Plan of Dissolution effective as of December 31, 2017 (the "**Dissolution Plan**"). The Dissolution Plan was adopted by the affirmative vote of the Debtor's equity partners who were eligible to vote. Immediately before Sedgwick's adoption of the Dissolution Plan, I was a non-equity partner. During my career, I had been a non-equity partner for approximately 10 years, an equity partner for 32 years, and an attorney at Sedgwick for a total of 47 years.

2. I am knowledgeable about, and familiar with, the business and financial affairs of the Debtor and am authorized to submit this declaration on behalf of the Debtor. If called upon to testify, I can competently testify to the facts set forth in this Declaration.

3. This Declaration is divided into three parts: The first part contains general background information regarding the members of the Dissolution Committee. The second part describes the Debtor's former business operations and current financial condition. The third part contains information relevant to the various motions for relief filed on or about the Petition Date (collectively, the "**First Day Motions**").

## I.

## Background of Dissolution Committee Members

4. Shortly after the adoption of the Dissolution Plan, I became a member of the dissolution committee (the "**Dissolution Committee**"), along with Curtis D. Parvin (Chair) and Bruce D. Celebrezze (collectively, the "**Dissolution Committee Members**"). Pursuant to the Dissolution Plan, the Dissolution Committee is authorized to, among other things, wind up the Debtor's business and affairs and to cause the ultimate dissolution of the Debtor, including through the filing of a voluntary petition under the Bankruptcy Code. Pursuant to the Dissolution Plan, the members of the Dissolution Committee are compensated at a rate of $395 per hour, except to the extent any Dissolution Committee Member elects to waive any payment.

5. I received both my B.A. (1964) and J.D. (1967) from the University of Illinois. After law school, I clerked with a Central Illinois Federal District Judge, and then served three years (1968-1970) in the United States Navy as a JAGC officer, and was ultimately appointed chief prosecutor for the Fifth Naval District Law Center in Norfolk, Virginia. I joined Sedgwick in January 1971 as its twenty-ninth attorney, and have extensive experience in the areas of complex litigation, aviation, products liability and mass tort. I was a Fellow of the American College of Trial Lawyers (2005-2018) and am a member of the American Board of Trial Advocates. I served as the president of the International Association of Defense Counsel (IADC), and was one of three managing directors of the IADC's National Jury Trial Innovations Project. I was fortunate to be listed as Lawyer of the Year for Product Liability in Northern California (*Best Lawyers*, 2013 and 2018), and as one of the top 25 product liability attorneys in the United States (*The Best of the Best Guide*, 2008).

6. Mr. Parvin obtained his B.S. from the University of California at Irvine in 1980 and his J.D. *cum laude* from Pepperdine University School of Law in 1984. He joined Sedgwick in September of 1984, and he has focused his practice on business, transportation, products liability, professional liability, environmental litigation and the defense of serious personal injury cases. Mr. Parvin also has substantial experience handling appellate matters, as well as considerable trial experience. In October 2016, he was elected to membership into the American Board of Trial

Advocates (ABOTA). Mr. Parvin has been awarded an "AV Preeminent" rating by the Martindale Hubbell Peer Review Rating system, as well as being selected as one of the Top Attorneys in Orange County by *Orange Coast Magazine* in 2010. Curtis also served as the office managing partner of the Orange County Office and was thus a member of the Sedgwick Management Committee, served as Chair of the firm's Commercial Division, and served on the Sedgwick Executive Committee.

7. Mr. Celebrezze obtained his A.B. with high honors from Notre Dame in 1976, followed by his J.D. from the University of Michigan Law School in 1979. He joined Sedgwick in October, 1982, remained at the firm until 1991, and then returned to the firm in 2002, and has been practicing in the field of insurance law for virtually his entire legal career. As one of the country's leading insurance industry litigators, he has represented a wide variety of international, national and regional insurers. Mr. Celebrezze has received many honors and recognitions for his insurance work and excellence. He currently serves as the Immediate Past President of the prestigious American College of Coverage Counsel. He has repeatedly been recognized by the pre-eminent legal directory Chambers USA as a leader of insurance held in the highest esteem by his peers. Mr. Celebrezze has served as a former senior director and member of the Executive Committee of the Federation of Defense and Corporate Counsel. He served on the Civil Grand Jury for the City and County of San Francisco and for sixteen years was a member of the board, including four years as President, of the Mechanics' Institute in San Francisco. He served on Sedgwick's Management Committee, as Chair of the Firm's Insurance Division, on the Executive Committee, and most recently as Sedgwick's Assistant General Counsel and Interim General Counsel.

**II.**

A. <u>**Introduction**</u>

8. Sedgwick's roots trace back to 1933, approximately 85 years ago, when enterprising attorneys Gordon Keith and Frank Creede started their own firm, Keith and Creede, in San Francisco. It became Keith, Creede & Sedgwick in approximately 1945, and then Sedgwick Detert, Moran & Arnold in 1959 when the firm then had only 14 attorneys. The firm shortened its name to Sedgwick LLP in 2011.

9.      From that one relatively small office in 1959, Sedgwick grew steadily and strategically until it became an international AmLaw 250 law firm with offices in 13 US cities, plus London and Bermuda. In order to satisfy increasing demand by its clients for representation around the country, Sedgwick opened offices in Los Angeles (1979), London and New York (1985), Orange County (1988), Chicago (1989), Newark and Dallas (2001), Houston, Austin and Bermuda (2006), Fort Lauderdale (2009), Washington, DC and Seattle (2011), and Miami (2013). It provided its clients and attorneys with a national footprint and the ability to provide first class legal services to clients nationwide and for the insurance markets in London and Bermuda. It established a well-deserved reputation for high-end insurance work and as one of the preeminent product liability firms in the country. Sedgwick was known for its excellent trial lawyers who were able to try the toughest and most significant cases for its corporate clients, and its top flight insurance counsel who represented insurance companies in major insurance-related cases.

### B.      Debtor's Prepetition Credit Facility

10.     Citibank, N.A. ("**Citibank**") was the Debtor's only prepetition secured creditor. Under a *Second Amended and Restated Secured Loan Agreement*, dated December 31, 2009 (as amended, the "**Credit Agreement**"), Citibank made a revolving line of credit and term loan available to the Debtor. The parties also entered into and executed various other agreements and documents, which together with the Credit Agreement, are referred to herein as the "**Prepetition Loan Documents**." The Debtor's obligations under the Prepetition Loan Documents were secured by a blanket lien against all assets, including the Debtor's accounts receivable.

11.     Through the Prepetition Loan Documents, the Debtor obtained a $17 million revolving line of credit (the "**Line of Credit**") net of any undrawn of letters of credit commitments (the "**Letters of Credit**").

12.     On or about August 10, 2017, Citibank terminated the Credit Agreement because the Debtor was no longer in compliance with a covenant provision that required minimum number of equity partners. After the termination, the Debtor worked consensually with Citibank to begin repaying the outstanding amounts under the Line of Credit (which was approximately $3 million)

and also cash collateralize seven undrawn Letters of Credit in the approximate aggregate amount of $6,000,000 that secured the Debtor's obligations under certain office leases.

13. During the next five-six months, the Debtor worked with Citibank to repay this secured obligation to the firm. To this end, the Line of Credit was repaid in full in November 2017 and the undrawn Letters of Credit were fully collateralized in February 2018. As of the Petition Date, Citibank is not owed anything on account of the Prepetition Loan Documents, except for certain *de minimis* administrative banking charges that were incurred in the ordinary course.

### C. The Debtor's Assets and Liabilities

14. As of the Petition Date, the Debtor's assets consist principally of $1,565,750 in cash, accounts receivable with a face amount of over $4-5 million, accounts receivable with an estimated recoverable value of approximately $1.5 million, distributions from the Debtor's related UK LLP in an amount of no less than $725,000, and certain potential affirmative claims against former equity partners regarding distributions of capital or compensation draws that were off-set by reasonably equivalent value.

15. As of the Petition Date, there are approximately $32.6 million in claims arising from the termination of office leases, which does not take into account the capping of claims, mitigation, and review and reconciliation),[1] approximately $9.2 million in accounts payable, a *de minimis* amount in taxes, and certain contingent claims of retired partners for anticipated unfunded payments. To the best of my knowledge, there are no liens or security interests on the Debtor's accounts receivable or proceeds thereof.

### D. Events Precipitating the Debtor's Commencement of the Case

16. In January 2017, the Debtor prepared for the new-year like all others. The firm evaluated and revised its business plan to help ensure that its projections for the year were realistic. At this time, Sedgwick had approximately 50 equity partners, 44 non-equity partners, 36 contract partners, and 88 associates practicing in thirteen offices in the United States. In addition, the Debtor

---

[1] It should be noted that prior to the Petition Date Sedgwick consensually terminated or assigned five of its non-residential real property office leases.

also employed approximately 350 individuals in various administrative roles. At the outset of 2017, it was business as usual.

17. On or about January 5, 2017, the equity partners associated with Sedgwick's Newark, New Jersey office announced they were leaving the partnership to start their own firm. Their disassociation with the firm became effective on January 31, 2017 and other than three attorneys resulted in the entire office leaving the firm, which included approximately 45 other attorneys and staff. A few days later, on or about January 7, 2017, the primary partners associated with Sedgwick's Dallas, Texas office announced they were leaving the partnership to join Drinker Biddle & Reath LLP. Their disassociation with the firm also became effective on January 31, 2017 and like the New Jersey office resulted in virtually the entire office leaving the firm, which included approximately 38 attorneys and staff.

18. The departure of these equity partners (and the associated attorneys and staff) was not expected. Sedgwick responded quickly to the departures of the New Jersey office by subletting most of the office space to the new firm and assigned the Dallas office lease to Drinker Biddle. In response to the departures, Sedgwick was able to quickly address these long term liabilities by shifting or eliminating the overhead. At the same time, the equity partners decided to reduce their compensation draws and the firm's chief financial officer analyzed the financial impact caused by these departures and determined the firm continued to be viable. Over time during 2017, while the firm adjusted to the changes, Sedgwick determined that it would be prudent to reduce draws to help ensure the firm continued to be stable.

19. Sedgwick continued to closely monitor its operations, work in progress, accounts receivables, and new originations. In February 2017, Sedgwick held a partner meeting to further analyze, assess and discuss the needs and direction of the firm. Sedgwick again determined that it was best practice to maintain the draws being paid to equity partners. The firm was generally paying its debts as they came due. Unlike many other law firms that have dissolved and wound up their affairs through a formal bankruptcy process, Sedgwick was not operating the firm or paying equity partners by borrowing millions of dollars without regard to account receivables, work in progress, or prospective originations. Sedgwick was compensating its equity partners in accordance with its

projections, and in most cases in amounts substantially less than the partners were entitled given the amount of time and effort they spent for the remainder of the year continuing to bill, originate business, and helping provide the firm with a bridge to a merger, acquisition, or re-sized firm.

20. After the equity partner departures January 31, 2017, Sedgwick was able to operate the firm in the ordinary course and without any substantial changes as a result of the quick actions taken by the firm. While one equity partner from the Los Angeles office left at the end of March 2017, Sedgwick and its CFO believed the firm was stable. In April 2017, Citibank (the firm's lender) sent Sedgwick a reservation of rights letter regarding the covenant requirements the number of equity partners. At this time, Citibank and the Debtor did not adjust the covenant downward because neither party believed that circumstances warranted any change. With over 85% of its equity partnership remaining intact, the firm and its equity partners remained committed to stay while Sedgwick adjusted to the type of changes that comes with the contraction and expansion all law firms face as they react to a changing economy and legal markets.

21. By May 2017, the firm continued to reshape itself. The equity partner who ran Sedgwick's Washington D.C. office left and five equity partners left from the Los Angeles and San Francisco offices. Again, these departures were in step with the development of Sedgwick's evolving business plan. The equity partners who most recently left were on the lower end of the spectrum of revenue generation. Their departure relieved the firm from having to compensate them. The firm looked to wind down the Washington D.C. office because the rent was expensive and subletted a portion of its San Francisco office (2 of its 5 floors) to offset administrative overhead. Thus, as the firm's composition changed, Sedgwick worked to reshape the firm so that it could operate in a new environment.

22. Even though Sedgwick had not been drawing on its Line of Credit, on or about August 10, 2017, Citibank terminated the Debtor's credit facility. While the termination of the Credit Agreement and immediate repayment requirements presented some challenges to the firm, Sedgwick continued to operate with a view that the firm would be able to continue in connection with a merger or acquisition or a scaled down version of the existing firm.

23. For example, after the departure of the New Jersey and Dallas offices and through the fall of 2017, Sedgwick engaged in merger/acquisition discussions with a number of other law firms. Initially, it was Sedgwick's desire to merge its entire firm with another firm. As most know, wholesale mergers not only take time but they prove to be difficult because conflict of interest tend to prevent mergers without severing portions of the firm. Sedgwick considered other options. For example, the firm marketed its litigation and insurance practices separately. The firm marketed portions of its litigation and insurance groups on a regional basis. In the end, Sedgwick was in active and substantive discussions with approximately six major law firms. Sedgwick considered whether there were models to maintain the firm but with a smaller footprint and smaller equity partner and attorney base that would require adjustments to compensation projections while the firm rebuilt. In the end, Sedgwick believed that it was viable because it was exploring and considering all options while at the same time generally paying its debts as they came due.

24. Even after equity partner departures and other set-backs, approximately thirty-one equity partners stayed committed to the firm. They vowed to stay with the firm continuing to work, originate new business, and carried on while Sedgwick explored options to resize the firm, locate a merger firm, or a firm that could acquire select partners and assets. As the year went on, these partners received far less – in most cases less than 50% – of their anticipated income while working hard for the firm and the firm's clients, and creating value that would have been lost and not available to creditors.

25. The firm was projected to make a profit at the end of 2017, though clearly not in the range of expectations of the equity partners. The equity partners recognized that while the firm was and could remain profitable, it was unrealistic to expect a sufficient number of equity partners, associates, and staff to remain through a long rebuilding process with an uncertain outcome. Under those circumstances, the firm would unlikely be able to recruit replacements to keep it operating. In short, the equity partners recognized that despite their best efforts to keep the firm going, continuing operations was no longer a viable or realistic alternative on a long term basis. Accordingly, the equity partners voted in December 2017 to wind up the firm.

26. While Sedgwick was not able to achieve the goal of merging with or entering into a multi-lateral acquisition with another law firm, the firm believes that the hard work of its former equity partners helped preserve an operation that would have closed much sooner and left employees without an opportunity to transition to new jobs and attorneys without a platform to continue serving their clients at another firm. In fact, it is believed that every lawyer and staff member who wished to remain in the work force was able to find suitable new employment and I do not believe this would have been possible had this devoted group not stayed to the end rather than electing to wind up the firm at a much earlier time.

### E. Debtor's Liquidation and Wind Down

27. After entering its wind down phase in January 2018, the firm discontinued providing legal services. All attorneys had departed the firm and Sedgwick was left with a skeleton staff to assist with the wind down of its operations. The firm and its remaining employees worked to remove property from Sedgwick's former offices, which included removing client files and other property that was regarded as having value to Sedgwick.

28. In May 2018, Sedgwick terminated the last of its employees. It should be noted that all employees were paid in full for their services as well as their accrued but unused PTO at the time they left the firm. While Sedgwick no longer has any employees, the firm does hire a handful of former employees as consultants to assist with wind down matters that includes rollover and termination of 401(k) plan, payment of tax claims, preparation of tax returns, and other tasks associated with the wind down of a law firm. The Debtor expects that it will continue to use certain former employees for wind down tasks to the extent necessary.

### F. Storage of Client Files

29. Like most, if not all law firms, Sedgwick hired a third party vendor to store client files. In this case, Sedgwick hired GRM Document Services ("**GRM**") as its sole provider to store client files. As of the Petition Date, the Debtor estimates that GRM holds approximately 170,000 boxes of client files in various warehouses around the country. The Debtor is incurring charges to store client files that are no longer providing any benefit to the estate. As a result, the Debtor plans to file a motion in the near term where it will request authorization to return or destroy client files in

DOCS_SF:96142.6 77998/001 9
Case: 18-31087 Doc# 2 Filed: 10/02/18 Entered: 10/02/18 12:24:17 Page 9 of 18

accordance with procedures that have been implemented and approved in other law firm dissolutions in this Court.

### G. Settlement Discussions Regarding Clawback of Distributions to Equity Partners

30. In the late spring 2018, Sedgwick retained Development Specialist, Inc. ("**DSI**") as its financial advisor. Sedgwick hired DSI to analyze distributions made to equity partners in 2017 and to determine whether and to what extent former equity partners should be required to return these distributions as improper returns of capital or to what extent, if any, they received compensation draws that were not off-set by reasonably equivalent value.

31. Sedgwick and the members of the Dissolution Committee have held approximately six telephonic meetings with former equity partners. The Debtor used these meetings to begin discussions about the terms and conditions of voluntarily returning and settling the affirmative claims the firm might have against former equity partners. Sedgwick believes that both the firm and former equity partners are committed to reaching a resolution regarding the recovery of these distributions because it will avoid unnecessary litigation and preserve estate assets that can otherwise be used to pay the allowed claims of creditors sooner.

32. At the same time, Sedgwick commenced discussions with approximately twelve of its larger creditors. Most if not all of these creditors voiced an interest in serving as an ad hoc committee of creditors until an official committee was appointed after the commencement of a chapter 11 case. As a result, the firm believed it would be productive to engage with this group of creditors to determine whether the parameters of an agreement could be reached regarding the claw-back of distributions to equity partners. It was Sedgwick's intention use any agreement reached with this ad-hoc creditor group as the framework of a plan of liquidation. Sedgwick hosted three telephonic meetings during which the firm provided information regarding Sedgwick's financial circumstances in 2017, the distributions made to equity partners, and a range of recoveries the Debtor believed was supported the firm's financials and other pertinent information.

33. While Sedgwick believed the meetings were productive, the ad hoc group of creditors was not willing to continue negotiations outside the context of a formal bankruptcy filing. Upon its appointment, the firm intends to engage with an official committee of unsecured creditors and the

former equity partners to reach a resolution regarding the return of capital and compensation draws. The Debtor believes consensually resolving the claw-back claims is most beneficial because it will avoid unnecessary expense of litigation, help preserve assets, and provide for a quicker distribution to the holders of allowed claims after the approval of a plan of liquidation.

**III.**

**A.     First Day Motions**

34.     To minimize adverse effects of the commencement of the bankruptcy case, the Debtor has requested various types of relief in the motions filed concurrently with my Declaration (each, a "**First Day Motion**" and collectively, the "**First Day Motions**").  Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the relevant First Day Motions listed below.

35.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto), and I incorporate by reference the factual statements set forth in the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions is: (a) necessary to enable the Debtor to operate under chapter 11 with minimal disruption to its current operations; and (b) essential to maximizing the value of the Debtor's assets for the benefit of its estate and creditors.

36.     I believe that the relief requested in the First Day Motions if not granted could have an immediate and irreparably harmful impact on the Debtor's wind down to the detriment of all of the creditor constituencies in this case. I believe that payment of the prepetition claims identified in the First Day Motions will forestall such irreparable harm and that all the Debtor's creditors will ultimately benefit from the relief requested therein.

**B.     Responsible Individual Application**

37.     By this application, the Debtor seeks to approve the appointment of Curtis D. Parvin ("**Mr. Parvin**") (Dissolution Committee chair), Bruce D. Celebrezze ("**Mr. Celebrezze**"), and myself (collectively, the "**Responsible Individuals**"), each members of the Debtor's Dissolution Committee, as the designated individuals with primary responsibility to administer this case on behalf the Debtor.

38. I believe that it will be most efficient if each of the Dissolution Committee members is designated as responsible individuals. While the members of the Dissolution Committee will collectively make decisions regarding the administration of this case, they have attempted to divide the responsibilities and tasks to wind down the firm since their appointment. Now that the case has been filed, they intend to continue dividing labor among them during the pendency of the Debtor's chapter 11 case. The Responsible Individuals will endeavor to each attend the necessary hearing but in the event a conflict arises one or more of the others will be able to attend and make the necessary decisions to the extent necessary.

39. The contact information of the Dissolution Committee Members is:

- Gregory C. Read
  2646 Dupont Drive,
  Suite 60 #503
  Irvine, CA 92612
  gregory.read@sedgwickdissolution.com

- Curtis D. Parvin
  2646 Dupont Drive
  Suite 60 #503
  Irvine, CA 92612
  curtis.parvin@sedgwickdissolution.com

- Bruce Celebrezze
  2646 Dupont Drive,
  Suite 60 #503
  Irvine, CA 92612
  Bruce.celebrezze@sedgwickdissolution.com

## C. Motion to Maintain Existing Bank Accounts and Continue Use of Cash Management System

40. In the ordinary course of business, the Debtor maintains a cash management system that provides well-established processes for the collection, concentration, management, and disbursement of funds generated and used in its operations (the **"Cash Management System"**). The Cash Management System is a centralized process that was specifically designed to accommodate the Debtor's business operations and continues to be used in its wind down.

41. The Cash Management System consists of: twenty-three (23) bank accounts, which consist of disbursement, operating, pass-through, and trust accounts (collectively, the "**Bank Accounts**"). A complete list of the Bank Accounts is annexed hereto as **Exhibit A**. The Bank

DOCS_SF:96142.6 77998/001 12
Case: 18-31087  Doc# 2  Filed: 10/02/18  Entered: 10/02/18 12:24:17  Page 12 of 18

Accounts are held at Citibank, N.A. ("**Citibank**"), which is an approved depository on the United States Trustee Region 17 List of Authorized Depositories.

42. The Bank Accounts are necessary because the Debtor and its advisor continue to collect accounts receivable. Plus, the Debtor will need the Bank Accounts to administer its chapter 11 case. However, as the Debtor continues to wind-down its affairs, the Debtor expects to close Bank Accounts that are no longer necessary. For example, the Debtor does not expect to need all of the Local Operating Accounts, unless and only to the extent former clients might wire accounts receivable to these accounts. Further, the Debtor holds cash in the trust accounts that belongs to former clients. The Debtor is in the process of transferring such funds to former clients or using the funds to pay accounts receivable upon the necessary authorization from former clients. Once the funds from the Trust Accounts are full disbursed, the Debtor will close the trust accounts.

43. In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor incurs routine bank charges and fees relating to the administration of the Cash Management System. While it is difficult to readily determine the aggregate amount of unpaid prepetition banking fees as of the Petition Date (given, for example, the bank's varying timing of charging/deducting such fees from a given account), on average, the Debtor pays approximately $1,000 in monthly banking fees and charges associated with the Bank Accounts. The Debtor seeks authority, in its sole discretion, to pay any such routine prepetition banking fees and charges owed to Citibank.

44. The United States Trustee has established certain operating guidelines for debtors-in-possession. One such provision requires a chapter 11 debtor-in-possession to close all existing bank accounts and open new bank accounts. This requirement, designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, helps protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

45. The Debtor seeks a waiver of the United States Trustee's requirement to close the Bank Accounts and open new postpetition bank accounts. If strictly enforced in this chapter 11 case, I believe the requirement to close and open new accounts would cause a disruption in the Debtor's

ability to collect and receive outstanding accounts receivable, which are the primary assets of the Debtor and would impair the Debtor's ability to maximize the collection of cash for the benefit of all parties in interest. Maintenance of the Bank Accounts and the Cash Management Systems will greatly facilitate the Debtor's wind down during the pendency of this chapter 11 case.

46. If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments out of the Debtors' accounts, which would disrupt the flow of postpetition accounts receivable. In addition, closing the Bank Accounts would require the Debtor to cancel and reinstitute wire transfer instructions. These disruptions would severely impact and could irreparably harm the Debtor's ability to efficiently wind down the firm. To avoid these disruptions and delays in the wind down of the Debtor's business, the Debtor should be permitted to maintain its existing Bank Accounts and, if necessary, to open new accounts as debtor-in-possession accounts or to close any unneeded existing accounts. The Debtor requests that banks be authorized to honor the Debtor's request to open or close any bank accounts; *provided*, *however*, that any new account is established at a bank insured with the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation and that is organized under the law of the United States or any State therein.

47. To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Debtor will promptly notify Citibank not to honor checks drawn on the Debtor's accounts before the Petition Date, except upon limited Court-approved exceptions. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtor requests that it be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

48. If the relief requested herein is granted, the Debtor will not pay, and Citibank will be required not to pay, any debts incurred before the Petition Date, other than as specifically authorized through this Motion or otherwise ordered by the Court.

In addition to the above, to require the Debtor to close the Bank Accounts and establish new accounts would require considerable time and expense with no real benefit to the Debtor's estates.

The Debtor maintains a limited work-force and it would be a waste of resources to require the Debtor to close and open accounts when the Debtor's accounting system can account for and track pre and postpetition transactions. Permitting the Debtor to continue using its existing Bank Accounts is essential to a smooth and orderly transition of the Debtor into chapter 11 and to avoid the delay of the collection of accounts receivable.

As part of the relief requested, the Debtor also seeks a waiver of the requirement by the United States Trustee for Region 17 to establish specific bank accounts for tax payments. *See* Region 17 United States Trustee Guidelines, § 4.4.6. The Debtor believes that tax obligations can be paid most efficiently out of the existing Bank Accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among, and out of the Bank Accounts through the Debtor's required monthly operating reports, and that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessary and inefficient. Plus, the Debtor believes that most if not all of its tax obligations have been satisfied.

49. The Debtor hereby requests authority to maintain the Bank Accounts and utilize them pursuant to the existing Cash Management System described above. I do not believe that allowing the Debtor to do so will prejudice their estates or any party-in-interest. If the relief requested herein is granted, the Debtor will not pay any debts incurred before the Petition Date unless specifically authorized by this Court pursuant to a separate motion.

### D. Motion to Reject Real Property Leases

50. In conjunction with its discontinuation of legal services and its formal winddown, the Debtor determined that it has no further use for the Leased Premises. In the fall of 2017, the Debtor, through counsel, embarked on a process to terminate the Leases on terms that were mutually agreeable with each of the landlords. In certain instances, the Debtor entered into termination agreements that were fully performed prior to the commencement of this case. In other instances, the Debtor entered into lease termination agreements that were not fully performed before the commencement of this case. And in others no termination agreement was ever executed. However, in all instances, the Debtor turned over and removed any personal property of value from the Leased Premises well before the Petition Date. As of the Petition Date, the Debtor is no longer occupying

any of the Leased Premises. It should be noted that subtenants might be using certain of the Leased Premises. For the avoidance of doubt, the Leases subject to this Motion include all of the subleases that the Debtor was party to as of the Petition Date. In the end, the Debtor is seeking to reject the Leases to ensure that it no longer has any postpetition obligation to pay rent or any other charges that might have accrued under the Leases.

The Debtor seeks to reject the Leases, in accordance with principles of sound business judgment, based on the belief that the Leases no provide any benefit to the Debtor or its estate as the Debtor no longer provides legal services and is in dissolution. Thus, I believe the Leases will be a burden to the Debtor's estate if they are not rejected. As set forth in the Motion, the Debtor has no further use for the Leased Premises and the Leases no longer provides any economic benefit to the Debtor in connection with wind down of the firm, and the Debtor turned over possession of the Leased Premises well before the Petition Date.

Additionally, I believe that there is no net benefit that can be realized from an attempt to market and assign the Leases for several reasons, including because the Debtor would have to pay rent while they marketed the sale and assignment of the Leases, and the Debtor is no longer in possession of any the Leased Premises so it would be impossible to assume and assign the Leases in exchange for any benefit. There is no guarantee they would find an acceptable assignee and the Debtor believes it is more prudent to reject the Leases immediately so that cash is not needlessly used for what could otherwise be used to fund this administration of this case and distributions to general unsecured creditors. As a result, the Debtor has determined that the cost of performing their obligations under the Rejected Lease and incurring unnecessary administrative expenses will exceed any realistic sales price. Thus, the Debtor submits that rejection of the Leases is in the best interests of the Debtor's estate and creditors, and other parties in interest.

In addition, the Debtor seeks authority to abandon any owned personal property located at the Leased Premises on the Rejection Effective Date, as is, where is. Prior to the Debtor's prepetition abandonment of the Leased Premises, the Debtor removed any personal property that had value (including all client files) and returned any leased equipment or property owned by third parties. I believe the costs associated with liquidating any personal property assets remaining at the Leased

Premises on the Rejection Effective Date will likely approach or exceed the value of such assets. Accordingly, I believe that the personal property at the Leased Premises, if any, has inconsequential value to the estate and should be abandoned as of the Rejection Effective Date.

### E. Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs

I believe that cause exists for an extension. As of the Petition Date, the Debtor does not have any employees. In January 2018, the Debtor terminated substantially its entire administrative staff in connection with the commencement of the Firm's dissolution. While a handful of employees remained through May 2018, they are no longer employed by the Debtor as of the Petition Date. As a result, I believe that it will take additional time to prepare the Schedules. The members of the Debtor's Dissolution Committee do not have all of the information readily available and they anticipate that they will need to hire certain former employees of the Debtor to assemble the information needed to complete the Schedules. The Debtor believes that there is a considerable amount of information necessary to provide a complete perspective of the Debtor's financial situation as of the Petition Date and that it will require significant effort and more time than is provided by Bankruptcy Rule 1007(c).

Accordingly, the Debtor requests that the Court extend the deadline for filing the Schedules to November 27, 2018. Given that the requested extension of time is relatively short (42 days) and will allow the Debtor to file complete and accurate Schedules, I believe that the requested extension will not prejudice any party in interest. In addition, counsel for the Debtor will inform the Office of the United States Trustee of its intent to seek a forty-two (42) day extension. Based on the foregoing, the Debtor submits that "cause" exists for the Court to grant the requested extension.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed this 2nd day of October, 2018 at San Francisco, California.

_____
Gregory C. Read
Dissolution Committee Member