1  John W. Lucas (CA Bar No. 271038)
   Jason H. Rosell (CA Bar No. 269126)
2  Pachulski Stang Ziehl & Jones LLP
   150 California Street, 15th Floor
3  San Francisco, California 94111-4500
   Telephone:    415.263.7000
4  Facsimile:    415.263.7010
   Email:        jlucas@pszjlaw.com
5                jrosell@pszjlaw.com

6  Attorneys for Debtor

7              UNITED STATES BANKRUPTCY COURT
              NORTHERN DISTRICT OF CALIFORNIA
8                  SAN FRANCISCO DIVISION

9  In re:                          Case No. 18-31087 (HLB)

10    SEDGWICK, LLP,               Chapter 11

11                   Debtor.       MOTION FOR ORDER APPROVING THE
                                   COMPROMISE OF A CONTROVERSY
12                                 AMONG THE DEBTOR AND CERTAIN
                                   FORMER EQUITY PARTNERS OF THE
13                                 DEBTOR

14                                 **Hearing Date:**

15                                 Date:    July 1, 2019
                                   Time:    10:00 a.m.
16                                 Place:   United States Bankruptcy Court
                                            450 Golden Gate Avenue, 16th Floor
17                                          Courtroom 19
                                            San Francisco, California 94102
18                                 Judge:   Honorable Hannah L. Blumenstiel

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

Pages

I. INTRODUCTION ........................................................................................................ 1

II. RELIEF REQUESTED .............................................................................................. 4

III. STATEMENT OF FACTS ........................................................................................ 4

    A.    General Background .................................................................................... 4

    B.    Transfers to the Settling Partners ............................................................... 4

    C.    Events Leading to the Debtor's Wind Down and Insolvency ..................... 4

    D.    The Solvency of the Debtor ........................................................................ 8

        1.    Balance Sheet Solvency ................................................................. 8

        2.    Cash Flow Solvency ...................................................................... 10

        3.    Capital Adequacy .......................................................................... 11

    E.    The Claw-Back Analysis ............................................................................ 13

    F.    The Claw-Back Recovery Models .............................................................. 18

    G.    The Settlement Agreement Was Entered
        Into in Good Faith ...................................................................................... 18

IV. ARGUMENT ............................................................................................................ 19

    A.    Standard for Approval of Compromise
        Under Bankruptcy Rule 9019 .................................................................... 19

    B.    The Probability of Success Factor Favors
        a Compromise ............................................................................................ 20

    C.    The Difficulties of Collection are Not Relevant ....................................... 21

    D.    The Expense, Inconvenience, and Delay of
        Further Litigation ....................................................................................... 21

    E.    The Settlement Agreement Serves the
        Interests of Creditors ................................................................................. 22

    F.    Good Faith Approval Under Section 877.6
        of California Code of Civil Procedure ....................................................... 22

V. CONCLUSION .......................................................................................................... 24

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## CASES

*Annod Corp. v. Hamilton & Samuels*,
100 Cal. App. 4th 1286 (Cal. App. Ct. 2002) ............................................ 13, 14, 16, 21

*Bay Plastics, Inc. v. BT Comm. Corp.* (*In re Bay Plastics, Inc.*),
187 B.R. 315 (Bankr. C.D. Cal. 1995)................................................................ 8, 10

*In re A & C Properties*,
784 F.2d 1377 (9th Cir. 1986) ........................................................................ 20, 21

*In re Carla Leather, Inc.*,
44 B.R. 457 (Bankr. S.D.N.Y. 1984)..................................................................... 20

*In re Schmitt*,
215 B.R. 417 (B.A.P. 9th Cir. 1997) ..................................................................... 20

*In re W.T. Grant & Co.*,
699 F.2d 599 (2d Cir. 1983)................................................................................. 20

*In re Woodson*,
839 F.2d 610 (9th Cir. 1988) ............................................................................... 20

*Neumeyer v. Crown Funding Corp.*,
56 Cal. App. 3d 178 (1976) ................................................................................... 8

*Official Comm. of Former Partners v. Brennan* (*In re LaBrum & Doak, LLP*),
227 B.R. 383 (Bankr. E.D. Pa. 1998) ..................................................................... 9

*Protective Committee v. Anderson*,
390 U.S. 414 (1968)............................................................................................ 20

*Sierra Steel, Inc. v. Totten Tubes, Inc.* (*In re Sierra Steel, Inc.*),
96 B.R. 275 (9th Cir. BAP 1989) ........................................................................... 8

*Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*,
38 Cal. 3d 488 (1985) ........................................................................................ 23

## STATUTES

California Code of Civil Procedure § 877 ..................................................................... 23

## RULES

Fed. R. Bankr. P. 9019..................................................................................... 19

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Sedgwick, LLP, the above-captioned debtor and debtor-in-possession (the "**Debtor**"), submits this motion (the "**Motion**"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Section 877.6 of the California Code of Civil Procedure, for approval of a compromise among the Debtor and certain former equity partners of the Debtor (the "**Settling Partners**") relating to (a) the constructive fraudulent transfer claims arising from the Debtors' ordinary course cash distributions to the Settling Partners as either compensation, draws, or return of capital, (b) any claims arising from the Settling Partners' alleged breach of fiduciary duty to the Debtor, (c) any other claims the Debtor and the Settling Partners have against the other, and (d) the mutual release of any claims among the Settling Partners, as set forth more fully herein and in the *Settlement Agreement and Mutual Release* attached hereto as **Exhibit A** (the "**Settlement Agreement**"). A list of the Settling Partners is annexed to the Settlement Agreement as <u>Exhibit 1</u>.

This Motion is based on the following memorandum of points and authorities, the declaration of Gregory C. Read (the "**Read Declaration**"), annexed hereto as **Exhibit B**, the declaration of Kyle Everett (the "**Everett Declaration**"), annexed hereto as **Exhibit C**, and any other evidence properly before the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

The Debtor stopped providing legal services on December 31, 2017 and immediately commenced the voluntary dissolution of the firm. During 2017, the Debtor made certain distributions in cash to its current and former equity partners as either compensation or draws for their services or a return of capital (as the firm returned capital to former equity partners in the normal course). The Debtor acknowledges that distributions of cash to the firm's then current and former equity partners give rise to potential claw-back claims as a constructive fraudulent transfers (subject to applicable defenses of reasonably equivalent value) but the seminal issue establishing such claims and their amounts depends on the fact intensive determination of when the Debtor became insolvent.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Prior to the commencement of this chapter 11 case, the Debtor and its advisors began to

2   analyze the potential constructive fraudulent transfer claims against its former equity partners. The

3   Debtor engaged with a group of approximately a dozen or more creditors of the Debtor before the

4   petition date to see if there was a way to reach an agreement on the determination of the Debtor's

5   solvency and the methodology of calculating claims against the equity partners. If such an agreement

6   could have been reached, it would have served as the basis for a plan of liquidation at the outset of

7   any bankruptcy case. Without financial advisors or counsel, the informal creditor group was not able

8   to analyze the Debtor's claw-back models and determine whether the proposal was within the range

9   of an acceptable settlement. As a result, the Debtor ultimately commenced this chapter 11 case with

10  a view of engaging with a creditors' committee for the purpose of settling the claw-back claims on a

11  consensual basis thereby avoiding unnecessary discovery, litigation, and delay by guaranteeing the

12  recovery of cash from the equity partners that could be used to pay allowed unsecured claims.

13  In October 2018, the official committee of unsecured creditors (the "**Committee**") was

14  appointed. After its appointment, the Debtor and its advisors immediately commenced discussions

15  regarding a host of issues, which included the claw-back claims. In response to informal discovery

16  requests, the Debtor produced thousands of documents to the Committee. The Debtor, Committee,

17  and their respective advisors met in December 2018 and again in March 2019 but were unable to

18  reach an agreement over terms that would consensually resolve the claw-back claims. While the

19  parties were able to narrow the issues, both sides agreed and believed that a neutral third party might

20  help bridge the gap by mediating the disputed issues. Using Michael Cooper as a mediator, the

21  parties mediated on May 23, 2019, continued to work with the mediator after this date, and

22  substantially narrowed the gap but in the end were not able to reach an agreement that would fully

23  resolve the claw-back claims to everyone's satisfaction.

24  The Debtor believes that further negotiation or active litigation against the Settling Partners

25  will not increase the cash available for distributions to creditors but will only dissipate cash that

26  could otherwise be used to pay the allowed claims of unsecured creditors. The Debtor believes it will

27  be more beneficial to the estate to resolve the claims against the Settling Partners by eliminating

28

litigation, uncertainty, and the expense of delay associated with litigation by guaranteeing a recovery of the Settling Partners.

Subject to Court approval, the Debtor has entered into the Settlement Agreement with 45 Settling Partners who will collectively contribute toward a settlement payment in the aggregate amount of $1,595,000 (the "**Settlement Payment**"). The Settlement Payment represents a recovery against the Settling Partners that is equal to 142.3% of the claims against such partner using an August 31, 2017 an insolvency date proxy. If an earlier insolvency proxy date is used, the Settlement Payment represents a recovery against the Settling Partners that is equal to 86.5% of the claims against such partners using a May 31, 2017 insolvency date. Or to put another way, 100% of the capital distributed to such partners and 60% of the compensation or draws that were not offset by reasonably equivalent value.

It is important to note that the Debtor was not a Dewey, Heller, or Brobeck. The firm's former equity partners were not operating under contractual guarantees that required the firm to pay partners fixed compensation without regard to such partners' actual book of business and receivables generated. Nor was the Debtor inflating income or profits to ensure that partners would not leave or artificially enhance the firm's ratings. Nearly all of the Setting Partners remained at the firm throughout 2017, continued to bring in clients, collect receivables, and were paid a small fraction of what they were paid in prior years or what they could have been paid at other had they left the firm.

In the end, the Debtor acknowledges there is a difference of opinion with the Committee as to when the Debtor became insolvent. The Debtor is not looking to have the firm's insolvency date adjudicated by the Court. Instead, the Debtor believes that the realization of the Settlement Payment far outweighs the risks arising from the uncertainty of establishing an earlier insolvency date and even if an earlier one could be established that the costs associated with litigation and the delay of bringing this case to closure will far exceed any additional recoveries. Plus, and most importantly, approval of the settlement should pave the way for the Debtor to propose a plan of liquidation so that the claims reconciliation process and payments to the holders of allowed claims may begin.

For the reasons set forth herein and at the hearing on the Motion, the Debtor respectfully requests approval of the Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## II.

### RELIEF REQUESTED

The Debtors are seeking approval of the Settlement Agreement, pursuant to Bankruptcy Rule 9019 and Section 877.6 of the California Code of Civil Procedure. Section 877.6 of the California Civil Procedure prohibits any other joint tortfeasor or co-obligor from asserting any further claims against a settling party for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault. A proposed form of order is annexed hereto as **Exhibit D**.

### III.

### STATEMENT OF FACTS

**A.      General Background**

On October 2, 2018 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of California.

On October 14, 2018, the Office of the United States Trustee appointed the following unsecured creditors to be members of the Committee pursuant to section 1102(a) of the Bankruptcy Code: (a) BMO Harris Bank, (b) CPF 801 Tower LLC, and (c) One North Wacker Drive LLC.

**B.      Transfers to the Settling Partners**

On December 31, 2017, the Debtor ceased providing legal services and commenced the formal dissolution process of winding down the firm. During 2017, before the wind down began, the Debtor made various ordinary course distributions of cash to current and former equity partners as compensation, draws, or return of capital. The Debtor is seeking to settle the potential claims arising from such transfers and enter into a general and mutual release of any other claims among the parties pursuant to the terms of the Settlement Agreement.

**C.      Events Leading to the Debtor's Wind Down and Insolvency**

At the conclusion of the Debtor's fiscal year on December 31, 2016, the firm was profitable, it was paying its debts as they came due, and was unquestionably solvent on a balance sheet basis and otherwise. The Debtor believes that this statement is not controversial or disputed by any party.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

On or about January 3, 2017, the former equity partners of the Debtor's Newark, New Jersey office announced they were leaving the firm on January 31, 2017 to start their own firm. On or about January 5, 2017, the former equity partners of the Debtor's Dallas, Texas office announced they were leaving the firm on January 31, 2017 to join another firm.

Based on the Debtor's financial information, the former equity partners (eight in total) that departed at the end of January 2017 generated (through business originations) approximately 46% of the firm's net income in 2016. At the time of these departures, the Debtor's management recognized the departures would have a significant impact on the operation of the firm. As a result, management reacted by preparing a revised budget that projected net income in 2017 at approximately 38% of 2016's net income. Plus, management of the firm reduced the draws of the remaining equity partners by approximately 55% of the draws distributed to equity partners in 2016, which is the average reduction and senior partner draws were reduced at greater amounts. The Debtor also took other immediate measures by assigning the lease for the Dallas office to the firm those partners joined and subletted the Newark office to the departing partners, which both had the immediate effect of eliminating significant, long-term real estate liabilities against the firm.

In addition, the Debtor arranged for the vast majority of the non-equity partners, associates, and staff of the two offices to transfer to the former equity partners' new firms or to other positions, thereby eliminating exposure to sizable employee-related costs. Naturally, the very sizable compensation due those departing equity and non-equity partners was also gone. A copy of the revised budget is annexed as Exhibit 1 to the Everett Declaration, which includes actual results through January 2017.

The Debtor's management also realized, after analyzing the circumstances, that the departure created a significant opportunity, from a financial perspective, to rebuild the firm. While a large portion of the revenue generation had left, the departure also created a "cushion" that management recognized could be used to restructure the firm. The "cushion" consisted of the receivables that the departing partners left to be collected, plus the elimination of the costs associated with the partners, other attorneys, and staff that left. The receivables portion of the "cushion" totaled approximately $4,000,000. The Debtor's management intended to utilize these funds along with reductions to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

operating costs to create a path to maintain and increase profitability or a merger, along with immediately restructuring the leases associated with the departed groups and a reduction of overall draws by the remaining partners.

In February 2017, the Debtor held a partner meeting to discuss and analyze the future of the firm. The Debtor's management, with input from the firm's equity partners, determined it was best practice to continue the reduced draws to partners. As a result of the reductions in compensation draws (*on average, 55% reduction over the prior year*), the firm determined that it was not necessary for the partners to contribute additional capital.

In March 2017, one equity partner from the Debtor's Los Angeles office left the firm. However, in the view of management, the firm was still viable as this was only one equity partner among a firm with robust operations that remained in Los Angeles, San Francisco, and the other offices around the country.

During and after this time, the Debtor did not sit idle and wait for the tides to change or an unexpected development to fall into its lap. The firm began actively looking for potential acquisitions of smaller firms or practices to backfill the income generated from the departed partners. In addition, the firm began to explore informal merger/acquisition discussions with a number of other law firms. The Debtor considered all options, including whether the firm should be marketed as a single unit, whether it should market the insurance coverage and litigation practice separately from the commercial and complex tort litigation practice, and whether the firm should be split regionally with a mix of insurance and litigation. The Debtor was inclined to market itself as a single unit to an international firm that did not have a large presence in certain regions of the United States and was looking to expand its footprint in the United States with both insurance and litigation practices. More than one of the law firms that the Debtor was in discussions with signaled that it was interested in certain of the Debtor's office leases. While there was not a successful merger or acquisition, a firm did later take over the Irvine, CA and Kansas City, MO leases.

The Debtor also considered whether it could downsize the firm by reducing headcount, shedding or restructuring real estate leases (which happened as the Firm was able to terminate

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

numerous leases and pay off the associated lease termination charges), and rebuilding based on financial projections with fewer offices, partners, and long-term liabilities.

At the end of May 2017, six equity partners left the firm, two from the Los Angeles office (one of whom was a junior equity partner), three from the San Francisco office (one of whom was a junior equity partner), and one from the Washington, D.C. office. While the partner departures from the Los Angeles and San Francisco office were not welcome news, the equity partner and other partner presence in those offices remained strong. Admittedly, the departure by the Washington, D.C. equity partner was more difficult for the firm to process because that departure effectively commenced the wind down of the Washington, D.C. office. Nevertheless, the Debtor remained current on all of its liabilities and paid them when they came due, including all of its long term real estate obligations for its various office leases around the country.

It was not until August 2017 that things significantly changed for the Debtor. On August 10, 2017, Citibank, N.A. ("**Citibank**"), the firm's lender, terminated the Debtor's secured credit facility and called all outstanding amounts due to be repaid immediately. The termination of the credit agreement challenged the Debtor's ability to pay all of its debts as they came due because: (a) the firm no longer had unfettered use of its cash as it was being restricted by Citibank, (b) the firm was required to start repaying the modest approximate $3 million outstanding on the line of credit, and (c) the firm was required to begin cash collateralizing the $6.9 million in outstanding stand-by letters of credit, which had not yet been called because the Debtor remained current on all of its office lease obligations. Notwithstanding, the firm was able to continue to pay its outstanding debts with Citibank's agreement to allow payoff of the line of credit and funding of the letters of credit over an agreed to time frame.

In addition, and also in August 2017, three equity partners from the New York office left and one equity partner from the Chicago office announced his imminent departure. While the Debtor continued to operate and pay rent for these offices, the firm recognized that it would be difficult to carry the long-term real estate obligations for those offices without the departing partners, the associated attorneys, and staff. These departures effectively caused the termination of the New York and Chicago offices and arguably accelerated the real estate obligations subject to certain discounts.

These events, and the actions by Citibank, were the key events that made it difficult for the Debtor to adjust its business plan and restructure the firm, and likely rendered the firm arguably insolvent on or about August 31, 2017.

After the August events described above, the firm continued its efforts to locate a firm that it could merge with that would provide a new platform for its attorneys and staff but also address its various long-term liabilities. To that end, the Debtor was able to terminate certain of its real estate office leases and also enter other lease termination agreements that it was ultimately not able to fully perform. However, in the end, the Debtor recognized near the end of 2017 that while it was and could remain profitable, it was unrealistic to expect a sufficient number of partners, associates, and staff to remain through a long rebuilding process with an uncertain outcome. Under those circumstances, the firm would unlikely be able to recruit replacements to keep it operating. In this context, the Debtor recognized that despite its best efforts to keep the firm going, continuing operations was no longer a viable or realistic alternative on a long term basis. Accordingly, the firm's equity partners voted in December 2017 to wind up the firm.

**D.     The Solvency of the Debtor**

    **1.     Balance Sheet Solvency**

The analysis of a company's balance sheet is a well-established method used to determine whether the company is solvent or insolvent at a specific time. A company is solvent if, using fair valuations, the sum of assets is greater than liabilities. The valuation of assets and liabilities for solvency purposes is based on "a fair valuation." This differs from a company's general balance sheet, where most assets apart from publicly traded stocks and bonds are carried at historic cost, rather than current market value. *Bay Plastics, Inc. v. BT Comm. Corp.* (*In re Bay Plastics, Inc.*), 187 B.R. 315, 328 n.22 (Bankr. C.D. Cal. 1995). As a result, the asset values must be updated in light of subsequent use and market conditions. However, with contingent liabilities, they must be discounted by the probability of the liability actually accruing. *Sierra Steel, Inc. v. Totten Tubes, Inc.* (*In re Sierra Steel, Inc.*), 96 B.R. 275, 279 (9th Cir. BAP 1989). As a general rule, solvency and **<u>not</u>** insolvency is presumed. *Neumeyer v. Crown Funding Corp.*, 56 Cal. App. 3d 178, 186 (1976).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

On a balance sheet basis, the Debtor was solvent at the end of January 2017 and every month through at least August 2017. For example, at the conclusion of January 2017, the Debtor's GAAP basis equity was approximately $44 million, fair market value equity of $28 million because there was little or no likelihood that any of the firm's long-term real property lease obligations would be accelerated. *Official Comm. of Former Partners v. Brennan* (*In re LaBrum & Doak, LLP*), 227 B.R. 383, 389 (Bankr. E.D. Pa. 1998) (refusing to recognize contingent real property lease liabilities when determining solvency because the threat to the debtor's continuation did not arise after other key events). A copy of the Firm's balance sheet as of January 2017 is annexed to the Everett Declaration as Exhibit 2.

The Debtor disputes that its long-term real estate obligations (*i.e.*, office leases) should be recognized as actual or matured liabilities on its balance sheet. If this were true, then presumably all projectable costs of doing business in the future could be counted as liabilities. *Id.* In the context of a law firm, future compensation of partners might be counted as liabilities as easily as future rents. In the case of a manufacturer, one could consider projected purchases of raw materials as liabilities. *No business that has projectable costs going forward could ever be determined to be solvent, which is the critical and fatal assumption of any party that attempts to base the Debtor's purported balance sheet insolvency in January 2017 on the acceleration of long-term real estate obligations.*

It is also clear that long term lease liabilities should not be valued at their face amount simply because they can be easily forecasted and projected with specificity. If they are counted at all, they must be discounted to account whether or not they will actually mature. In January 2017, it was highly unlikely that these long-term lease obligations would accrue as all amounts due under the leases had been paid currently and there were not any lease defaults.

In March 2017, the Debtor continued to operate in the ordinary course and remained solvent. At this time, the Firm's GAAP basis equity was approximately $39 million, fair market value equity was approximately $24 million, which does not include any real estate liabilities because the Firm was current on its obligations and there was little to no likelihood that those liabilities would be accelerated. A copy of Sedgwick's March 2017 balance sheet is annexed to the Everett Declaration as Exhibit 3.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

In May 2017, the Debtor continued to operate in the ordinary course and remained solvent. At this time, the Debtor's GAAP basis equity was approximately $36 million, fair market value equity was approximately $21.6 million. Again, this does not include any real estate liabilities (other than Washington, D.C.) because the firm was current on its obligations and there was little to no likelihood that those liabilities would be accelerated. A copy of Debtor's May 2017 balance sheet is annexed to the Everett Declaration as <u>Exhibit 4</u>.

In August 2017, the Debtor continued to operate in the ordinary course. The Debtor's GAAP basis equity was approximately $33 million, fair market value equity was approximately $12.8 million excluding real property lease liabilities (except for $1 million for the Washington, D.C. lease) but it is unclear how much those liabilities should be discounted at this time. A copy of the Debtor's August 2017 balance sheet is annexed to the Everett Declaration as <u>Exhibit 5</u>.

However, at the conclusion of August 2017, the Debtor was arguably insolvent on a balance sheet basis on account of the termination of the secured line of credit and acceleration of approximately $10 million of debt, the lease obligations for the New York, Chicago, and Washington DC offices, and the departures associated with those offices, which would cause their closure.

## 2.    Cash Flow Solvency

A company is presumed to be solvent if it is generally paying its debts as they become due. *In re Bay Plastics*, 187 B.R. at 328 n.22. There is no dispute that the Debtor was paying its debts as they came due in January 2017 through at least August 2017. It was not until Citibank terminated the secured credit facility and required the immediate repayment of the nearly $10 million in debt that the firm began to struggle to pay its debts as they came due. After the termination, the Debtor's bank accounts were restricted. After August 31, 2017, the Debtor was required to make installment payments to reduce the $3 million line of credit and also segregate cash in a restricted account for the purpose of cash collateralizing the $6.9 million exposure for the outstanding letters of credit. Prior to August 31, 2017, the Debtor operated and paid its debts as they came due. In summary, the Debtor was not insolvent prior to August 31, 2017 based on the cash flow test.

**3.     Capital Adequacy**

Section 548(a)(1)(B)(ii)(II) of the Bankruptcy Code provides that a transfer may be avoided if the debtor received less than reasonably equivalent value in exchange for such transfer and "was engaged in business or a transaction, or was about to engage in a business or transaction, for which any property remaining with the debtor was an unreasonably small capital." The Bankruptcy Code does not provide further guidance as to what constitutes "unreasonably small capital." Generally, inadequate capitalization applies where, post-transfer, a debtor is left technically solvent, but doomed to fail. Determining capital adequacy is a question of fact, and the burden of proof is on the party seeking to establish the debtor had unreasonably small capital during the period in which the transfer(s) occurred.

A debtor's debt to equity ratio, historical capital cushion, and the need for working capital in the specific industry at issue are considered in the company's projected cash inflows (also referred to as working capital or operating funds) with the company's capital needs through a reasonable period of time after the transfer. When determining capital adequacy, one must evaluate the reasonableness of a company's cash flow projections objectively so as to balance what might be considered management's optimism with the company's actual performance. Only those cash inflows that are reasonable for a company to have expected to receive—whether through new equity, cash from operations, or available credit (whether secured or unsecured)—are considered in this analysis. Although a company does not need resources sufficient to withstand any and all setbacks, projections are not reasonable unless they include a sufficient working capital cushion. *See* Everett Declaration, Exhibit 6.

While cash was declining, the Settling Partners (and all other partners as well, many of which were billing on matters generated by the Settling Partners) were generating billings to replenish cash at a faster rate than the cash distributions made to the Settling Partners. In fact, the billings of the Settling Partners alone (and those that are not settling) covered the draws **AND** 2016 profit distributions made in 2017. *See* Everett Declaration, Exhibit 7.

Importantly, it was not unexpected that the cash levels decline in the early part of the year as the Debtor (like all law firms) typically pays distributions to partners at the end of the year and the

11

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

first of the year based on its profits for the prior year. Cash is built up in the third and fourth quarters. For example, average cash balances by quarter in 2015 were:

- Q1- $9.6MM
- Q2 - $12.9MM
- Q3 - $15.8MM
- Q4 - $19.6MM.  A $10MM swing from Q1 to Q4.

Average cash balances by quarter in 2016 were:

- Q1- $10.1MM
- Q2 - $8.8MM
- Q3 - $10.7MM
- Q4 - $13.7MM.

Cash and income are tied together as the Debtor was on a cash basis and so similarly, the first few months of the year are typically losses and lower profits as the receivables are generated and collected in the normal cycle and a return to cumulative profitability normally in the third and fourth quarters. This can be seen in the monthly financial statements for prior years. *See* Everett Declaration, Exhibit 8.

Cumulative profit or (loss) by quarter in 2015 were:

- Q1- $1.4MM
- Q2 - $12.0MM
- Q3 - $9.1MM
- Q4 - $15.7MM
- Two-thirds of the profit is generated in the second half of the year.

Cumulative profit or (loss) by quarter in 2016 were:

- Q1- $(1.2MM)
- Q2 - $5.6MM
- Q3 - $8.9MM
- Q4 - $18.3MM

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

- More than 85% of the profit was generated in the second half of the year.

In 2017, a year that was planned to be modestly leaner than prior years, it is no surprise that cash levels and profits are down. The Debtor missed its budget as a result of additional partner departures that occurred after the January 2017 departures. The Debtor scheduled the revenue generations by those partners by month using the 2016 revenues. *See* Everett Declaration, Exhibit 9.

While the departure of partners in January was unexpected, and created some level of concern, it did not prospectively determine the Debtor's future. Management righted the ship with revised budgets and reduced draws and approval from the firm's equity partners.

Based on its revised budget, created after the Dallas and New Jersey partners announced their departures, the Debtor was projected to make a profit at the end of 2017 of approximately $12 million; this was not in the range of expectations of prior years, but of course there were fewer equity partners left who would share in the profits. With a revised budget, the partners recognized that they could shed some expenses to increase the profits above the $12 million initially budgeted and embarked upon a plan to do so. In March 2017, they revised the budget by reducing expenses (and increasing budgeted revenues very slightly) to increase the 2017 budgeted profitability from $12 million to just under $22 million. But for the unfortunate developments in August 2017, the Debtor had positioned itself to recover from a difficult transition period and continue successfully in business either as re-engineered firm or as part of another, larger firm. In summary, the Debtor was not insolvent under a capital adequacy test until at least August 31, 2017.

## E.    The Claw-Back Analysis

The leading and primary case analyzing constructive fraudulent transfer claims against equity partners of an insolvent law firm is *Annod Corp. v. Hamilton & Samuels*, 100 Cal. App. 4th 1286 (Cal. App. Ct. 2002). In *Annod*, the debtor's former landlord sought to avoid distributions of cash made to the debtor's Partners after it became insolvent. *Id*. at 1291 and 1292. The court found that the distributions to Partners were not avoidable because: (a) they were made in good faith because had they not been made the partners would have left the firm and not continued working and generating revenue for the firm; (b) the draws paid to the partners were substantially less than paid to partners in prior years; (c) the draws represented under market values for the services provided by

the partners; (d) the partners were not personally liable for the firm's financial obligations; and (e) the distributions were offset by revenue generated by the partners thereby providing reasonably equivalent value. *Id.* at 1295.

The first concept is that of "capital distributions," which are primarily payments made to Settling Partners on account of their capital account balances after the date of insolvency. It should be noted that within the recoverable capital amounts there is a small group of Settling Partners who were required and requested to contribute additional capital for a prior year but did not. As a result, a receivable from those Settling Partners as opposed to a payment is included in the Debtor's Capital Distributions model.

Additionally, within the "capital distribution" concept are amounts that are "deemed" capital distributions (*i.e.*, the return of capital). These amounts are essentially payments made to Settling Partners initially as draws (subject to the second concept of "clawbacks" to be discussed below) but once the actual profit for the year was finally calculated, the distributions were in excess of the individual Settling Partner's allocation of profits for 2017 (calculated in accordance with the allocation sections of the Partnership Agreement in effect at the time). For example, if at the end of 2017 a Settling Partner's share of profit was $150,000 and he/she received $200,000, the $50,000 in excess of the profit distribution is deemed a return of capital as the Settling Partner was not entitled to receive more than his/her share of profit. As a result, those distributions are recognized as capital and were reported as such on the Settling Partners' individual K-1 tax forms. However, had the Debtor discontinued paying these Settling Partners their monthly draws (and the others not included in the settlement), they would certainly have left the firm and thereby ruined ongoing efforts to re-engineer or arrange a merger/acquisition.

The second and more complex calculation of "clawbacks" relates to distributions made to Settling Partners on account of profits. Simply, this is meant to be a calculation of the recoverable amounts of non-capital payments made to Settling Partners after the date of insolvency based on the premise of *Annod* above wherein the recoverable amounts are determined to be the amounts distributed, reduced by the reasonably equivalent value ("**REV**") or the benefit provided by the Settling Partner(s).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Before describing the calculation of the REV, there are some additional adjustments, unique

2    to the Debtor that need to be discussed to arrive at the amount recoverable before the application of

3    REV. The analysis starts with the **gross** monthly draws to Settling Partners (*i.e.*, the amount before

4    reduction for any amounts withheld by the Debtor for any purpose). That amount is then increased

5    for distributions made in 2017 based on the firm's profits earned, but not yet distributed, in 2016.

6    Next, the Debtor includes a reduction by the calculation of the "deemed" capital distributions as

7    described above. The "deemed" (or excess) capital distributions are already included in the monthly

8    draws and so need to be transferred from the draws on this schedule and added to the "capital

9    distribution" schedule so as not to be double counted and to be included in the correct recoverable

10   category.

11       Next, there is either a reduction or addition to the draw amounts for the individual composite

12   tax effect of each applicable Settling Partner. The Debtor calculates and pays the state composite

13   taxes in various states for each Settling Partner and withholds amounts from their draws in an

14   estimate of those expected taxes. In the event the Settling Partner has had more amounts withheld

15   from their draws than composite taxes paid by the Debtor, they essentially have a receivable from

16   the firm that is uncollectible, but also not an amount that they received a benefit for, so the Debtor

17   reduced the draws by the net receivable  Conversely, if the Debtor has paid more composite taxes

18   than have been withheld from the Settling Partner, he/she has received an additional benefit and

19   therefore the Debtor has calculated this excess as an additional draw and added it to the amounts

20   accumulated.

21       A similar situation occurred with respect to certain Settling Partners' 2017 401(k)

22   contributions. At some point in the year, the Debtor's third party administrator ("**TPA**") determined

23   that certain Settling Partners had contributed too much to their 401(k) accounts and the excess

24   amounts could not be returned to the Settling Partners. These amounts were also withheld from the

25   gross draws as the composite taxes were. In some instances, certain Settling Partners were able to

26   roll all of their amounts over to new accounts and therefore received the full benefit of the

27   contributions withheld and no adjustment was made to our analysis for them. In other instances,

28   certain Settling Partners were unable to roll their contributions over and the TPA locked those

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

15

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   amounts inside the plan but not in the Settling Partners individual accounts, but for use generally in

2   the plan for the payment of the administrative expenses of the plan which benefitted all the

3   participants. In these instances, those Settling Partners did not receive a benefit for the contributions

4   withheld from their draws, and therefore, we have reduced their draws accordingly.

5        This brings the calculation to the amount to which the Debtor calculates and applies the

6   REV. The REV calculated is both appropriate and conservative. Acting extremely conservatively,

7   rather than considering the partners' "book of business" brought to the firm, or his/her efforts at

8   management, administration, or business development for the benefit of the firm, the Debtor

9   determined the actual collections for each Settling Partner of **their** personal time incurred

10  subsequent to the date of insolvency and stopped the calculation as of December 31, 2017 (there

11  were collections of receivables in 2018, and continue to date, that arguably could be included in each

12  Settling Partner's REV) and then reduced the collections amount by a calculated cost per attorney

13  based on the concept that while the Settling Partners were generating business, billing and collecting,

14  there was a cost associated with that process. The Debtor calculated this based on the number of

15  attorneys and the costs in 2017 and applied this as a daily cost to each Settling Partner for the

16  number of days he/she was at the firm between the insolvency date and December 31, 2017. This

17  calculation directly reduced the amount of collections which could be used as REV to offset the

18  draws. This is the *Annod* or net REV benefit provided by each Settling Partner and the Debtor

19  applied it to the Settling Partners' individual accumulation of draws as described above.

20       The Debtor determined the recoverable amount individually for each Settling Partner to be

21  the accumulated draws, less the net REV collections determined above. In the event that the net

22  collections for an individual Settling Partner is greater than the amounts distributed to that Settling

23  Partner, the Debtor has not drawn the recoverable amount below zero so that any REV greater than

24  the amounts drawn by that individual Settling Partner are lost to them and all other Settling Partners

25  (even though as a partnership all receivables could be used collectively to reduce the overall

26  exposure of the partners as a group).

27       Importantly, the Debtor did not apply any REV to "capital distributions" because the Settling

28  Partners who received a return of capital did not have an entitlement to such until all creditors are

DOCS_SF:101321.6 77998/002

paid in full. Because the Settling Partners did not have a "claim" or entitlement to the capital, they may not offset the amounts with REV under basic set off principles as only mutual debts that are due and owing may be setoff. Plus, the Debtor conservatively stopped the REV calculation as of December 31, 2017, when the firm officially terminated operating as a law firm but continued to collect receivables and those too should be applied toward Settling Partners' REV.

The Debtor raises these last issues because there are many theoretical interpretations of "benefit" that could be calculated that would significantly reduce the calculation of the overall recoverable amounts from the Settling Partners at any given point in time. For example, the Debtor could easily have argued that the benefit provided by the Settling Partners continued long past December 31, 2017 and calculated a much greater collection offset amount, even on an individual basis. The Debtor could have made the analysis a collective recovery amount as opposed to individual Settling Partners (more in line with the concept that this was a law firm, not just a group of individuals or defendants), in which case, the REV that was greater than the draws for any individual Settling Partner would not be lost and could be shared by all Settling Partners as part of the collective benefit provided by all of the Partners. Instead, the Debtor used the amounts collected for the individual Settling Partners' time billed subsequent to the insolvency date, but in reality, as long as that Settling Partner was at the firm and generating revenues, he/she was not the only person billing on those matters. In that regard, a Settling Partner could easily argue that the real benefit was to use the concept of "responsible attorney" ("**Responsible Collections**"), which captures all of the collections related to a Settling Partner (*i.e.*, all of his or her originations even if he/she did not bill on the matter) and again, applied them on a firm-wide basis and the recoverable amounts would have been less. In addition, certain partners were charged with administrative or managerial duties that were critical to the ongoing operations of the firm and its efforts to merge with or acquire other firms, and it would be unfair to penalize them for their very important efforts simply because they could not bill for that time. And many Settling Partners engaged in business development efforts which resulted in even more business coming to the firm in 2017; business development takes time away from billing on files.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Accordingly, the Debtor believes that it has selected the most conservative methodology for

2   the determination of the REV and believes the recoverable amounts determined under this

3   methodology should not be any greater than as calculated. Notably, this is the same methodology

4   that was used in the law firm bankruptcies of Heller Ehrman, Howrey, and others and what the

5   Debtor's financial expert expects to use in Archer Norris.

6   **F.      The Claw-Back Recovery Models**

7   Annexed to the Everett Declaration as <u>Exhibit 10</u> is a spreadsheet that shows the net

8   recoverable distributions and capital paid to the Settling Partners after August 31, 2017. This

9   "clawback" analysis was prepared in accordance with the analysis discussed above in Section III.E

10  and shows that the total claims against the Settling Partners using August 31, 2017 as an insolvency

11  proxy equals $1,121.033.

12  Annexed to the Everett Declaration as <u>Exhibit 11</u> is a spreadsheet that shows the net

13  recoverable distributions and capital paid to the Settling Partners after May 31, 2017. This claw-back

14  analysis was prepared in the same manner as the August 2017 analysis but used May 31, 2017 as the

15  insolvency proxy date. Under this scenario, the claims against the Settling Partners equals

16  $1,844,670.

17  **G.      The Settlement Agreement Was Entered Into in Good Faith**

18  As set forth in the Settlement Agreement, the Debtors are seeking approval to settle the claw-

19  back claims (and any other claims) against the Settling Partners in exchange for a lump sum

20  Settlement Payment of $1,595,000. The Debtor believes that the Settlement Payment represents a

21  more than reasonable recovery on account of such claims because it is equal to 142.3% of the claims

22  against such partner using August 31, 2017 as a proxy for when the firm became insolvent. Even if

23  May 31, 2017 were used as an insolvency proxy, the Settlement Payment still represents a more than

24  reasonable recovery against the Settling Partners because it is equal to 86.5% of the claims against

25  such partners using that date. Or to put it another way, the Settlement payment represents 100% of

26  the capital distributed to such partners and 60% of the compensation that was not offset by

27  reasonably equivalent value even if May 31, 2017 is used as an insolvency proxy.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  As set forth in the Read Declaration, Mr. Read believes that the Settlement Agreement was

2  entered into in good faith and represents a fair bargain for the Debtor's estate as well as its general

3  unsecured creditors.

4  The Settlement Agreement will avoid unnecessary and protracted litigation involving

5  bankruptcy law, various state law issues, and the difficulty of determining when the Debtor became

6  insolvent. The Debtor's solvency can be established in at least three ways (as noted above) and each

7  of them are dependent upon a host of various facts that are not always applied in the same manner.

8  Any contested matter or trial over the Debtor's solvency will not only be time consuming but the

9  outcome will be uncertain. In addition, a settlement avoids any issue of collectability, however

10  minor of a concern this may be.

11  Second, the Settlement Agreement guarantees that the Debtor's estate will receive

12  $1,595,000 by the Settling Partners voluntarily contributing their share towards the Settlement

13  Payment. The Settlement Agreement not only avoids the uncertainty of prevailing against the

14  Settling Partners but also avoids the costs of contingency counsel and the incurrence of other

15  expenses that could very well exceed the net benefits of the Settlement Agreement.

16  Third, the Settlement Agreement brings closure to the last major part of this chapter 11 case.

17  As the Court is aware, the Debtor has been collecting accounts receivable subject to certain pre-

18  approved settlement procedures and the oversight of the Committee. Also, the Debtor is nearing the

19  end of the long and tedious process of notifying former clients about their files and arranging for

20  their return. Assuming the Settlement Agreement is approved, it will provide the basis for the Debtor

21  to formulate and propose a liquidating chapter 11 plan.

22  For all the foregoing reasons, the Debtor supports the Settlement Agreement and asks that the

23  Court approve the compromise embodied therein.

24  **IV.**

25  <u>**ARGUMENT**</u>

26  A.  <u>**Standard for Approval of Compromise Under Bankruptcy Rule 9019**</u>

27  Bankruptcy Rule 9019(a) provides in relevant part that "[o]n motion by the trustee and after

28  notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

In reviewing proposed settlements, the standard that courts applied under the former Bankruptcy Act also applies under the Bankruptcy Code. *See In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985). The U.S. Supreme Court stated in *Protective Committee v. Anderson*, 390 U.S. 414 (1968), that in order to approve a proposed settlement under the Bankruptcy Act, a court must have found that the settlement was "fair and equitable" based on an "educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Carla Leather*, 44 B.R. at 466.

A court, however, should not substitute its own judgment for the judgment of a trustee or a debtor. *Id*. at 465. In reviewing a proposed settlement, a court is not "to decide the numerous questions of law and fact . . . but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983). "When assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required." *In re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997) (citations omitted).

The Ninth Circuit has held that in considering a proposed compromise, the Court must evaluate the following factors: (i) the probability of success; (ii) the difficulties, if any, of collection; (iii) the complexity of litigation involved, and the expense, inconvenience and delay in necessarily attending to it; and (iv) the paramount interests of creditors. *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988) (quoting *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), *cert. denied sub nom*).

Many issues arise in evaluating whether a settlement is appropriate, including bankruptcy issues, collectability issues, and whether better alternatives exist. Those issues are discussed below.

**B.**    **The Probability of Success Factor Favors a Compromise**

The determination of the Debtor's solvency, or insolvency, as of a specific date will be a long, expensive, and uncertain process with no guarantee that the Court will determine that the Debtor became insolvent prior to May 31, 2017. As noted above and in the Read Declaration and Everett Declaration, the Debtor was balance sheet solvent at least through August 2017 and there is

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   no question that the Debtor continued to pay its debts as they came due through the same period in

2   time. The only other solvency test involves analyzing the Debtor's capitalization, which again is

3   subject to more facts, interpretation, and assessing whether, when, and to what extent certain long-

4   term liabilities should be accelerated and discounted.

5   In addition, and as noted above in Section III.E, the Settling Partners could argue that the

6   Debtor should have counted the collection of accounts receivable in 2018 towards REV (which was

7   not done but should be done); that the excess REV of one partner should be used towards the firm as

8   a whole rather than applied on an individualized basis; or, that all of a Settling Partner's originations

9   should be included in the REV even if he/she did not bill any time to such matters. If REV was

10  calculated in either of these ways it would further reduce the potential recovery against the Settling

11  Partners.

12  Accordingly, the Debtor believes that the benefits under the Settlement Agreement far

13  outweigh the risk of litigation of trying to establish an earlier insolvency date or being challenged by

14  an alternative recovery analysis that reasonably fit within the analysis of *Annod*. The Debtor submits

15  that the first factor of the traditional test under *A & C Properties* supports approval of the

16  compromise reflected in the Settlement Agreement.

17  **C.      The Difficulties of Collection are Not Relevant**

18  The Debtor does not believe this factor supports or is against the approval of the Settlement

19  Agreement. If the Debtor or its estate obtained judgments against any of the Settling Partners the

20  Debtor does not have any reason to believe that it would have difficulties collecting from most of the

21  Settling Partners. In the end, the irrelevance of this factor is not determinative.

22  **D.      The Expense, Inconvenience, and Delay of Further Litigation**

23  The third prong of the test under *A & C Properties* is the complexity of litigation involved,

24  and the expense, inconvenience, and delay in attending to it. This factor unquestionably supports

25  approval of the Settlement Agreement. As discussed above regarding the probability of success, the

26  adjudication of the Debtor's solvency, or insolvency, will be a long and expensive process that will

27  involve competing financial advisors preparing valuation reports, who will each be deposed about

28  their evaluation of the Debtor's financial wherewithal during 2017. The process will not only be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

expensive but will also consume a substantial amount of time and further delay confirmation of a liquidating plan, the claim reconciliation process, and distributions to the holders of allowed unsecured claims. Thus, approval of the Settlement Agreement will avoid the expense and uncertainty of litigation, which has been kept at a minimum to date, and also guarantee a reasonable and immediate recovery on account of these claims thereby paving the way for the Debtor to propose a plan of liquidation. For the foregoing reasons, the Debtor submits that the third factor under *A & C Properties* favors approval of the Settlement Agreement.

**E.    The Settlement Agreement Serves the Interests of Creditors**

It is important to note that the Debtor was not a Dewey, Heller, or Brobeck. Partners were not operating under contractual guarantees that required the Firm to pay partners fixed compensation without regard to such partners' actual book of business and receivables generated.  Nor was the Debtor inflating income or profits to ensure that partners would not leave or to enhance the firm's rating. The Setting Partners remained at the firm throughout 2017, continued to bring in clients, collect receivables, and were paid a small fraction of what they were paid in prior years or what they could have been paid at other had they left the firm.

Finally, as outlined in the Read Declaration and explained above, the Debtor believes that the deal embodied in the Settlement Agreement serves the interests of creditors. The Settlement Agreement will avoid unnecessary and potentially protracted litigation, immediately increase the pool of cash that can be used to administer the case and pay creditors, and bring an end to the last remaining piece of the wind down of the firm. Accordingly, the Settlement Agreement is in the best interests of the Debtor's estate and its creditors.

**F.    Good Faith Approval Under Section 877.6 of California Code of Civil Procedure**

The claims being resolved against the Settling Partners not only include the claw-back claims but also any other claim that the Debtor might have against the Settling Partner, which could include breach of fiduciary duty claims. The Debtor does not believe that the firm has claims arising from breach of fiduciary duty or other claims against the Settling Partners. Absent a global settlement, the Settling Partners would not agree to participate in this settlement if it were not for the global, mutual releases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The pertinent portion of Section 877.6 of the California Code of Civil Procedure provides:

> (a) Any party to an action wherein it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors . . . . [para. ] (c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault. [para. ] (d) The party asserting the lack of good faith shall have the burden of proof on that issue.

California Code of Civil Procedure § 877.6.

As the California Supreme Court has determined,

> [T]he intent and policies underlying section 877.6 require that a number of factors be taken into account including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants.

*Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*, 38 Cal. 3d 488, 499 (1985).

The Debtor believes that standard of good faith set under *Tech-Bilt* has been satisfied here. First, the Settling Partners (at those that were still equity partners and had not previously left the firm prior to the events in January 2017) remained that the firm after the January 2017 departures. The management of the firm along with the remaining equity partners reacted to the changes caused by the departures and attempted adjust the firm's business model and look for merger or acquisition opportunities. It is the Debtor's view that while saving or reorganizing the firm was not successful, management's and the efforts of other equity partners that remained at the firm does not breach their duty to the firm. If the firm has claims for breach of fiduciary duty against any of the Settling Partners that have little or no value that justifies the release the Debtor is willing provide in the context of settling the primary and central claims in this case, which relate to the constructive fraudulent transfer claims. As noted above, the Settling Partners would never agree to pay their share

of the Settlement Payment without also receiving a full general and mutual release from the Debtor that will give them finality, as any reasonable settling party would and should expect.

The Debtor believes there might be viable breach of fiduciary duty claims against certain former equity partners who are not parties to the Settlement Agreement. Pursuant to Section 877.6 of the California Code of Civil Procedure, the Settling Partners contribution toward the Settlement Payment under the Settlement Agreement is contingent upon the Court determining that the Settlement Agreement was entered into in good faith and that any non-settling partner is therefore barred from seeking comparative or partial contribution or any other type of indemnity from the Settling Partners in the event the Debtor, the Committee, or any other estate representative established under a plan of liquidation seeks to prosecute breach of fiduciary duty or other claims against any non-settling partners and obtains a judgment.

# V.

## CONCLUSION

For the foregoing reasons, the Debtor requests that the Court approve the Settlement Agreement.  A proposed form of order is attached hereto as **Exhibit D**.

Dated: June 6, 2019                        PACHULSKI STANG ZIEHL & JONES LLP


By: */s/ John W. Lucas*
     John W. Lucas

Attorneys for the Debtor

DOCS_SF:101321.6 77998/002

24