John W. Lucas (CA Bar No. 271038)
Jason H. Rosell (CA Bar No. 269126)
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415.263.7000
Facsimile: 415.263.7010
Email: jlucas@pszjlaw.com
jrosell@pszjlaw.com

Attorneys for Sedgwick, LLP

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

In re:

**SEDGWICK, LLP**,

Debtor.

Case No.: 18-31087 (HLB)

Chapter 11

**DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF LIQUIDATION OF SEDGWICK LLP**

**Confirmation Hearing**
Date: ___________, 2019
Time: __:_0 _.m. (Pacific Time)
Place: U.S. Bankruptcy Court
450 Golden Gate Avenue, Courtroom 19
San Francisco, CA
Judge: Hon. Hannah L. Blumenstiel

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ....1
A. Introduction .... 1
B. Information Regarding the Plan .... 2
1. Plan Governing Document ....2
2. Source of Information ....2
3. Warning Regarding Federal and State Income Tax Consequences of the Plan ....3
4. Bankruptcy Court Approval ....3
C. Voting Instructions .... 3
1. How to Vote ....3
2. Who May Vote ....4
D. Confirmation .... 4
E. Disclaimers .... 6
II. PLAN OVERVIEW ....7
A. Introduction .... 7
B. Treatment of Claims .... 8
III. OVERVIEW OF CHAPTER 11 CASE ....10
A. Events Leading Up to the Filing of the Chapter 11 Case .... 10
1. Description of the Debtor ....10
2. The Debtor's Pre-Petition Credit Facility ....11
3. Events Precipitating the Debtor's Filing ....12
B. Summary of Events During the Chapter 11 Case .... 15
1. "First Day" Pleadings ....15
2. Filing of Schedules, Meeting of Creditors and Bar Date ....16
3. The Official Committee of Unsecured Creditors ....16
4. Retention of Professionals ....16
5. Client File Disposition Procedures ....17
6. Procedures for Settlement of Accounts Receivable ....17
7. The GRM Settlement Motion ....18
8. Mediation ....18
9. Partner Settlement Motion ....19
10. Other Postpetition Activities ....20
IV. IDENTIFICATION OF LITIGATION CLAIMS ....21

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 2 of 42

A. The Claw-Back Claims Against Non-Settling Former Equity Partners ..................... 21
B. Non-Settling Former Equity Partner Claims Fiduciary Duty Claims ......................... 22
C. Preservation of Other Causes of Action ...................................................................... 22
V. SUMMARY DESCRIPTION OF THE PLAN ........................................................................23
A. Description Of Classes ................................................................................................ 23
1. Class 1 Claims .........................................................................................................23
2. Class 2 Claims .........................................................................................................23
3. Class 3 Interests. ......................................................................................................23
B. Treatment Of Unclassified Claims ............................................................................... 23
1. Administrative Claims. ............................................................................................23
2. Administrative Claims (Professionals). ...................................................................24
3. Priority Tax Claims. .................................................................................................24
C. Treatment of Classified Claims and Interests ............................................................. 25
1. Unsecured Claims. ...................................................................................................25
2. Class 3 (Interest Holders). .......................................................................................27
D. Implementation of the Plan. ........................................................................................ 27
E. Executory Contracts. ................................................................................................... 27
F. Conditions to Confirmation of the Plan. ...................................................................... 28
G. Effects of Confirmation. .............................................................................................. 28
H. Sources of Funding for the Plan. ................................................................................. 28
I. Post Effective Date Employment and Compensation of Professionals. ..................... 29
J. Section 105 Injunction. ................................................................................................ 29
VI. TAX DISCLOSURE ..............................................................................................................29
A. Tax Consequences To Creditors ................................................................................. 30
B. Tax Consequences to Holders of Interests .................................................................. 31
VII. LIQUIDATION ANALYSIS ..................................................................................................31
VIII. RISK ANALYSIS ..................................................................................................................33
IX. FEASIBILITY ........................................................................................................................33
X. CONFIRMATION OF THE PLAN .........................................................................................33
XI. RECOMMENDATION AND CONCLUSION .......................................................................34

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 3 of 42

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Plan |
| Exhibit B | Liquidation Analysis |
| Exhibit C | Cash Forecast |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:101283.2 77998/002
iii
DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF LIQUIDATION

# I.

# INTRODUCTION

## A. Introduction

On October 2, 2018 (the "Petition Date"), Sedgwick, LLP (the "Debtor"), commenced the above-captioned bankruptcy case by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor's case is being administered in the United States Bankruptcy Court for the Northern District of California, San Francisco Division.

This Disclosure Statement (the "Disclosure Statement") contains information with respect to the plan of liquidation (the "Plan") proposed by the Debtor. A copy of the Plan is attached hereto as **Exhibit A**. Except as otherwise provided herein, capitalized terms used in this Disclosure Statement shall have the meanings set forth in the Plan. (*See* Plan at Article I (Definitions)).

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtor has examined various alternatives and, based on information contained in this Disclosure Statement, and for the reasons set forth below, concluded that the Plan provides the best recovery to creditors and, depending on the ultimate outcome of litigation and the allowance or disallowance of the Claims, it could result in a dividend of as much as [#]% to Class 2 General Unsecured Creditors.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history, business, results of operations, management, properties and liabilities of the Debtor; (2) the proposed wind down of the Debtor and liquidation of its remaining receivables and claims pursuant to the terms of the Plan, and (3) the proposed distribution to Creditors and holders of Claims against the Debtor. The Debtor requests that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Your vote on the Plan is important. For the Plan to be accepted by a Class of Claims or Interests, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims or Interests in such Class who vote on the Plan must vote to accept it.

Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy Code, or to the confirmation of another plan. These alternatives may not provide for a distribution of as much value to holders of Allowed Claims and Interests as the Plan. Accordingly, the Debtor urges you to accept the Plan by completing and returning the enclosed ballot **no later than 4:00 p.m. (Pacific time) on September 5, 2019**.

**B. Information Regarding the Plan**

**1. Plan Governing Document**

Although the Debtor believes that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein which are controlling. You are urged to read the Plan and not just this Disclosure Statement.

**2. Source of Information**

Factual information, including all financial information contained in this Disclosure Statement, has been provided by the Debtor or its professionals, or has been obtained from the Debtor's records, except where otherwise specifically noted. None of the Debtor's attorneys, accountants or other professionals make any representation regarding that information. The Debtor does not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy. The Debtor has, however, attempted to present the information accurately and fairly, and the Debtor believes that the information is substantially accurate. The assumptions underlying the projections contained in this Disclosure Statement concerning the sources and amounts of payments to Creditors and Interest Holders represent the Debtor's best estimate as to what it expects will happen. Because they are only assumptions about or predictions of future events, many of which are beyond the Debtor's control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met. Except as

otherwise provided herein, this Disclosure Statement will not reflect any events that occurred after the hearing before the Bankruptcy Court to determine the adequacy of the Disclosure Statement.

**3. Warning Regarding Federal and State Income Tax Consequences of the Plan**

The tax consequences of the Plan will vary based on the individual circumstances of each holder of a Claim. Accordingly, each Creditor and Interest Holder is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

**4. Bankruptcy Court Approval**

Following a hearing held on August 1, 2019, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Debtor to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, approved the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

**C. Voting Instructions**

**1. How to Vote**

A ballot is enclosed herewith for Creditors and Interest Holders to use in voting on the Plan. To vote on the Plan, indicate on the enclosed ballot that you accept or you reject the Plan and sign your name and mail the ballot in the envelope provided for this purpose.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 4:00 P.M. prevailing Pacific Time on September 5, 2019 at the following address:**

Sedgwick, LLP Plan Balloting
c/o Pachulski Stang Ziehl & Jones LLP
150 California St., 15th Floor
San Francisco, CA 94111

**Do not send your ballot via facsimile or e-mail.**

If your ballot is not properly completed, signed and returned as described herein, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

**2. <u>Who May Vote</u>**

The Plan divides the Claims of Creditors into two (2) Classes. There is one (1) Class of Interests. The Classes are as follows: Class 1 (Insured Malpractice Claims) and Class 2 (General Unsecured Claims), and Class 3 (Interests).

Classes of Creditors that are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such Class, in which event such Class is conclusively deemed to have rejected the Plan. Each holder of an Allowed Claim in an impaired Class that will receive distributions under the Plan on account of such claims may vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities.

**Classes 1 and 2 are impaired under the Plan and are entitled to vote thereon.**

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim. Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim that has not been objected to or disallowed prior to computation of the votes on the Plan. The Ballot form which you received does <u>not</u> constitute a proof of Claim.

**D. <u>Confirmation</u>**

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Debtor must demonstrate that it has met the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

Voting is tabulated by class. As discussed above, a class of creditors or interest holders has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or interests in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, the plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the Plan by such class, so long as certain statutory requirements are met by the Plan. This procedure is called a "cram down." The Debtor will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code if any Class rejects the Plan.

The Bankruptcy Court has set September 12, 2019 at 10:00 a.m., as the hearing date to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The hearing on confirmation will be held at the United States Bankruptcy Court, 450 Golden Gate Avenue, San Francisco, CA, 16th Floor, Courtroom 19. This hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order. Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below on or before the date set forth in the Notice of Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

Objections must be served upon:

(1) Counsel for the Debtor:
John W. Lucas
Jason Rosell
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone: (415) 263-7000
Facsimile: (415) 263-7010

(2) Counsel for the Committee:
Michael Lauter and Alan Feld
Sheppard Mullin Richter & Hampton, LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 9 of 42

(3) The Office of the United States Trustee
Terri H. Didion
2500 Tulare Street, Ste. 140
Fresno, California 93721
Telephone: (559) 487-5002, ext. 235
Facsimile: (559) 487-5030

-and-

(4) Those parties that have requested notice in this case.

**E. Disclaimers**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. *SEE* 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. ***IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING***.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

# II.

# PLAN OVERVIEW

## A. Introduction

The Plan provides for the liquidation of the Debtor's remaining assets, the winding up of its affairs and the payment of liabilities through distributions under the Plan. Post-confirmation, the Debtor will be managed by a Plan Administrator, subject to the oversight and approval of the Oversight Committee, which may have as few as one member as time passes, who will complete the process of liquidating the Debtor's assets, including overseeing the prosecution of certain causes of action against third parties, the recoveries of which may inure to the benefit of Creditors. The Plan Administrator will also be in charge of making distributions to Creditors.

Payments under the Plan (as well as the operating costs of the Liquidating Debtor) will be funded through a combination of: (1) cash on hand, (2) the collection of accounts receivable, (3) equity distributions from the U.K. LLP, (4) the Former Equity Partner Settlement, and (5) the proceeds of causes of actions against third parties (referred to in the Plan as the Avoidance Actions and Retained Claims and Defenses).

The Plan requires payments totaling $[#] be made to the holders of certain Professional Fee Claims, Administrative Claims and Priority Claims on the Effective Date (the "Effective Date Payments"). The Debtor estimates it will have sufficient cash with which to make the required payments under the Plan. Post-Effective Date distributions to Creditors under the Plan will depend to a great extent on the successful prosecution and/or settlement of claims and actions against third parties; therefore, it is impossible to predict, at this moment, the exact timing or amount of distributions to Class 2 General Unsecured Creditors. Assuming the projected recoveries are realized, at present, the Debtor estimates that an initial distribution to Class 2 General Unsecured Creditors should be made within nine months after Confirmation but such date and timing will be within the determination and discretion of the Plan Administrator and the Oversight Committee.

As distributions to Class 2 General Unsecured Creditors are made on a pro rata basis, the amount of distributions to Unsecured Creditors will also depend on the total dollar amount of Allowed Claims in each Class. The Debtor has not completed its analysis of every Claim. Nor has

it completed the process of objecting to Claims. The Debtor's best estimate, however, at this time, is that if all potential objections to Claims were resolved in its favor, the total amount of Allowed Class 2 General Unsecured Claims would be approximately $20,400,000. The amount of Class 2 Claims in excess of $20,400,000 that remain in dispute is approximately $8,000,000.

**B. Treatment of Claims**

The following chart summarizes the treatment of Creditors and Interest Holders under the Plan. Amounts listed below are estimated.

| TREATMENT OF CLAIMS CHART | | | | |
|---|---|---|---|---|
| **Chart §** | **Class No.** | **Description** | **Estimate of Claims and Recoveries** | **Plan Treatment** |
| A | N/A | Allowed Administrative Claims | Estimated amount of Claims in this category: $60,000<br><br>Estimated Recovery on Allowed Claims in this category: 100% | Each Allowed Administrative Claim, unless the holder of such Claim has agreed to a different treatment, shall be paid in full by the Liquidating Debtor from Available Cash or the Reserved Claims Pool Account (as applicable) on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the fourteenth day after such Claim is Allowed, or as soon thereafter as practicable; and (d) such date as the holder of such Claim and the Liquidating Debtor may agree. |
| B | N/A | Allowed Claims for Professional Fees | Estimated amount of Claims in this category: $745,000<br><br>Estimated Recovery on Allowed Claims in this category: 100% | Each party seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Administrative Claims Bar Date; and (b) if the Bankruptcy Court grants such an award, each such party will be paid in full in Cash by the Liquidating Debtor in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order and the Bankruptcy Court's Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees. |
| C | N/A | Allowed Priority Tax | Estimated amount of Claims in this category: $205,000 | Each Allowed Priority Tax Claim, unless the holder of such Claim has agreed to a |

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 12 of 42

| TREATMENT OF CLAIMS CHART | | | | |
|---|---|---|---|---|
| **Chart §** | **Class No.** | **Description** | **Estimate of Claims and Recoveries** | **Plan Treatment** |
| | | Claims | Estimated Recovery on Allowed Claims in this category: 100% | different treatment, shall receive deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the rate established by applicable nonbankruptcy law as of the calendar month in which the Plan is confirmed, or at such other rate as may be agreed upon between the Liquidating Debtor and the appropriate governmental unit, provided that the Liquidating Debtor may prepay any or all such Claims at any time, without premium or penalty. |
| D | 1 | Insured Malpractice Claims | Estimated Recovery on Allowed Claims in this Class: 100% from insurance<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Class 1 shall consist of Insured Malpractice Claims. Class 1 Claims are impaired. Each Holder of an Insured Malpractice Claim shall receive the treatment provided by the Plan for the holders of Allowed Unsecured Claims under Class 2 of the Plan. In the alternative, at the election (as defined below) of the Holder of a Class 1 Claim, such holder shall instead receive the following treatment: (a) the automatic stay under Section 362 of the Bankruptcy Code shall be deemed modified to permit the Holder of a Class 1 Claim to prosecute its claim to judgment in any applicable court of competent jurisdiction; (b) the Holder shall be deemed to waive its Class 1 Claim against the Debtor and the Estate and shall not be entitled to any distribution under the Plan, (c) the Holder shall limit its recourse on account of its Class 1 Claim solely to the proceeds of any applicable Malpractice Policy; and (d) any recovery obtained by the Holder on account of its Class 1 Claim shall (i) in the event of a judgment, be deemed reduced by the amount of any Insurance Deductible applicable to such Claim under any applicable Malpractice Policy, or (ii) in the event of a settlement, be deemed to satisfy the amount of any Insurance Deductible applicable to such Claim under any applicable Malpractice Policy. For purposes of this Section 4.1 of the Plan, an election shall mean the written acceptance submitted by the Holder of a Class 1 Claim accepting the Plan on the Ballot in connection with solicitation of votes under the Plan. |

| TREATMENT OF CLAIMS CHART | | | | |
|---|---|---|---|---|
| **Chart §** | **Class No.** | **Description** | **Estimate of Claims and Recoveries** | **Plan Treatment** |
| E | 2 | Unsecured Claims | Estimated amount of Claims in this Class: $20.4 million.<br><br>Estimated Recovery on Allowed Claims in this Class: 8.6%<br><br>The estimate does not include all projected litigation recoveries. The actual dividend could be less than 8.6%, or if the litigations are extremely successful, could be higher than 8.6%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Class 2 shall consist of Unsecured Claims. Class 2 Claims are impaired. Each holder of an Allowed Class 2 Claim shall receive, a Pro Rata Share of Net Available Cash after deductions for the payment (or appropriate reserve for) the Allowed Claims of senior classes of Claims and reserves for Disputed Claims, Professional Fees and/or Plan Expenses. To the extent that all Allowed Class 2 Claims have been paid in full, including post-petition interest, any remaining funds in the Claims Reserve Account shall be used by the Liquidating Debtor to fund distributions to the holders of Allowed Interests in Class 3. |
| F | 3 | Interests | 0%<br><br>**IMPAIRED**<br><br>**DEEMED TO REJECT** | On the Effective Date, the Interest Holders shall have no ability to direct or control the affairs of the Liquidating Debtor. Interest Holders shall receive nothing under the Plan until the Allowed Claims of Class 2 is paid in full, including postpetition interest, at which point all Net Available Cash, net of amounts reserved for Disputed Claims, Professional Fees and/or Plan Expenses, shall be paid to the Interests Holders consistent with the extent of their Interests. |

# III.

# OVERVIEW OF CHAPTER 11 CASE

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Case to date, including events leading up to the commencement of this case. Copies of all relevant court papers are on file with the Bankruptcy Court.

## A. Events Leading Up to the Filing of the Chapter 11 Case

### 1. Description of the Debtor

The Debtor's roots trace back to 1933, approximately 85 years ago, when enterprising attorneys Gordon Keith and Frank Creede started their own firm, Keith and Creede, in San Francisco. It became Keith, Creede & Sedgwick in approximately 1945, and then Sedgwick Detert,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Moran & Arnold in 1959 when the firm then had only 14 attorneys. The firm shortened its name to Sedgwick LLP in 2011.

From that one relatively small office in 1959, Sedgwick grew steadily and strategically until it became an international AmLaw 250 law firm with offices in 13 US cities, plus London and Bermuda. In order to satisfy increasing demand by its clients for representation around the country, Sedgwick opened offices in Los Angeles (1979), London and New York (1985), Orange County (1988), Chicago (1989), Newark and Dallas (2001), Houston, Austin and Bermuda (2006), Fort Lauderdale (2009), Washington, DC and Seattle (2011), and Miami (2013). It provided its clients and attorneys with a national footprint and the ability to provide first class legal services to clients nationwide and for the insurance markets in London and Bermuda. It established a well-deserved reputation for high-end insurance work and as one of the preeminent product liability firms in the country. Sedgwick was known for its excellent trial lawyers who were able to try the toughest and most significant cases for its corporate clients, and its top flight insurance counsel who represented insurance companies in major insurance-related cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2. <u>The Debtor's Pre-Petition Credit Facility</u>**

Citibank, N.A. ("**<u>Citibank</u>**") was the Debtor's only prepetition secured creditor. Under a *Second Amended and Restated Secured Loan Agreement*, dated December 31, 2009 (as amended, the "**<u>Credit Agreement</u>**"), Citibank made a revolving line of credit and term loan available to the Debtor. The parties also entered into and executed various other agreements and documents, which together with the Credit Agreement, are referred to herein as the "**<u>Prepetition Loan Documents</u>**." The Debtor's obligations under the Prepetition Loan Documents were secured by a blanket lien against all assets, including the Debtor's accounts receivable.

Through the Prepetition Loan Documents, the Debtor obtained a $17 million revolving line of credit (the "**<u>Line of Credit</u>**") net of any undrawn of letters of credit commitments (the "**<u>Letters of Credit</u>**").

On or about August 10, 2017, Citibank terminated the Credit Agreement because the Debtor was no longer in compliance with a covenant provision that required minimum number of equity partners. After the termination, the Debtor worked consensually with Citibank to begin repaying the

outstanding amounts under the Line of Credit (which was approximately $3 million) and also cash collateralize seven undrawn Letters of Credit in the approximate aggregate amount of $6,000,000 that secured the Debtor's obligations under certain office leases.

During the next five-six months, the Debtor worked with Citibank to repay this secured obligation to the firm. To this end, the Line of Credit was repaid in full in November 2017 and the undrawn Letters of Credit were fully collateralized in February 2018. As of the Petition Date, Citibank is not owed anything on account of the Prepetition Loan Documents, except for certain *de minimis* administrative banking charges that were incurred in the ordinary course.

**3. Events Precipitating the Debtor's Filing**

In January 2017, the Debtor prepared for the new-year like all others. The firm evaluated and revised its business plan to help ensure that its projections for the year were realistic. At this time, Sedgwick had approximately 50 equity partners, 44 non-equity partners, 36 contract partners, and 88 associates practicing in thirteen offices in the United States. In addition, the Debtor also employed approximately 350 individuals in various administrative roles. At the outset of 2017, it was business as usual.

On or about January 5, 2017, the equity partners associated with the Debtor's Newark, New Jersey office announced they were leaving the partnership to start their own firm. Their disassociation with the firm became effective on January 31, 2017 and other than three attorneys resulted in the entire office leaving the firm, which included approximately 45 other attorneys and staff. A few days later, on or about January 7, 2017, the primary partners associated with Sedgwick's Dallas, Texas office announced they were leaving the partnership to join another firm. Their disassociation with the firm also became effective on January 31, 2017 and like the New Jersey office resulted in virtually the entire office leaving the firm, which included approximately 38 attorneys and staff.

The departure of these equity partners (and the associated attorneys and staff) was not expected. However, the Debtor responded quickly to the departures of the New Jersey office by subletting most of the office space to the new firm and assigned the Dallas office lease to another firm. In response to the departures, the Debtor was able to quickly address these long term liabilities

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

by shifting or eliminating the overhead. At the same time, the equity partners decided to reduce their compensation draws and the firm's chief financial officer analyzed the financial impact caused by these departures and determined the firm continued to be viable. Over time during 2017, while the firm adjusted to the changes, the Debtor determined that it would be prudent to reduce draws to help ensure the firm continued to be stable.

The Debtor continued to closely monitor its operations, work in progress, accounts receivables, and new originations. In February 2017, the Debtor held a partner meeting to further analyze, assess and discuss the needs and direction of the firm. The Debtor again determined that it was best practice to maintain the draws being paid to equity partners. The firm was generally paying its debts as they came due. Unlike many other law firms that have dissolved and wound up their affairs through a formal bankruptcy process, the Debtor was not operating the firm or paying equity partners by borrowing millions of dollars without regard to account receivables, work in progress, or prospective originations. The Debtor was compensating its equity partners in accordance with its projections, and in most cases in amounts substantially less than the partners were entitled given the amount of time and effort they spent for the remainder of the year continuing to bill, originate business, and helping provide the firm with a bridge to a merger, acquisition, or re-sized firm.

After the equity partner departures January 31, 2017, the Debtor was able to operate the firm in the ordinary course and without any substantial changes as a result of the quick actions taken by the firm. While one equity partner from the Los Angeles office left at the end of March 2017, the Debtor and its CFO believed the firm was stable. With over 85% of its equity partnership remaining intact, the firm and its equity partners remained committed to stay while the Debtor adjusted to the type of changes that comes with the contraction and expansion that all law firms face as they react to a changing economy and legal markets.

By May 2017, the equity partner who ran the Debtor's Washington, D.C. office left and five equity partners left from the Los Angeles and San Francisco offices. The equity partners who most recently left were on the lower end of the spectrum of revenue generation and they were all from the Los Angeles and San Francisco office, which both continued to have robust practices. The firm

looked to wind down the Washington, D.C. office because the rent was expensive. Plus, the Debtor subletted a portion of its San Francisco office (2 of its 5 floors) to offset administrative overhead. Thus, as the firm's composition changed, the Debtor worked to reshape the firm so that it could operate in a new environment.

On or about August 10, 2017, Citibank terminated the Debtor's credit facility. While the termination of the Credit Agreement and immediate repayment requirements presented some challenges to the firm, Sedgwick continued to operate with a view that the firm would be able to continue in connection with a merger or acquisition or a scaled down version of the existing firm.

For example, after the departure of the New Jersey and Dallas offices and through the fall of 2017, the Debtor engaged in merger/acquisition discussions with a number of other law firms. Initially, it was the Debtor's desire to merge its entire firm with another firm. As most know, wholesale mergers not only take time but they prove to be difficult because conflict of interest tend to prevent mergers without severing portions of the firm. The Debtor considered other options. For example, the firm marketed its litigation and insurance practices separately. The firm marketed portions of its litigation and insurance groups on a regional basis. In the end, the Debtor was in active and substantive discussions with approximately six major law firms. The Debtor considered whether there were models to maintain the firm but with a smaller footprint and smaller equity partner and attorney base that would require adjustments to compensation projections while the firm rebuilt. In the end, the Debtor believed that it was viable because it was exploring and considering all options while at the same time generally paying its debts as they came due.

Even after other equity partner departures and other set-backs, approximately thirty-one equity partners stayed committed to the firm. They vowed to stay with the firm continuing to work, originate new business, and carried on while the Debtor explored options to resize the firm, locate a merger firm, or a firm that could acquire select partners and assets. As the year went on, these partners received far less – in most cases less than 50% – of their anticipated income while working hard for the firm and the firm's clients, and creating value that would have been lost and not available to creditors.

The firm was projected to make a profit at the end of 2017, though clearly not in the range of expectations of the equity partners. The equity partners recognized that while the firm was and could remain profitable, it was unrealistic to expect a sufficient number of equity partners, associates, and staff to remain through a long rebuilding process with an uncertain outcome. Under those circumstances, the firm would unlikely be able to recruit replacements to keep it operating. In short, the equity partners recognized that despite their best efforts to keep the firm going, continuing operations was no longer a viable or realistic alternative on a long term basis. Accordingly, the equity partners voted in December 2017 to wind up the firm.

**B. Summary of Events During the Chapter 11 Case**

The following is a summary of important events that have taken place since the Petition Date.

**1. "First Day" Pleadings**

Contemporaneously with the filing of the Debtor's chapter 11 petition, the Debtor filed certain standard "first day" pleadings (the "First Day Pleadings") requesting relief from the Bankruptcy Court that would minimize the disruption caused by the bankruptcy filing to its ordinary business operations, including the following:

- *Application for Order Approving Designation of Curtis D. Parvin, Gregory C. Read, and Bruce D. Celebrezze as Responsible Individuals Pursuant to Bankruptcy Local Rule 4002-1* [Docket No. 3]
- *Motion for Order Authorizing Debtor to (A) Maintain Existing Bank Accounts and (B) Continue Use of Cash Management System* [Docket No. 4]
- *Motion Pursuant to Section 365(a) of the Bankruptcy Code for an Order (I) Authorizing the Debtor (A) to Reject Unexpired Non-Residential Real Property Leases and (B) to Abandon Any Personal Property Located at Such Premises, and (II) Fixing a Bar Date for Claims of Counterparties* [Docket No. 5]
- *Ex Parte Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 6]

The Bankruptcy Court held an expedited hearing on the First Day Pleadings on December 29, 2008. Following the December 29, 2008 hearing on the First Day Pleadings, the Bankruptcy Court entered several orders related to the First Day Pleadings on December 30, 2008, which orders, as well as certain subsequent orders, are discussed in the following paragraphs.

**2. Filing of Schedules, Meeting of Creditors and Bar Date**

On November 27, 2018, the Debtor filed its Schedules [Docket Nos. 107 and 119] and Statement of Financial Affairs [Docket No. 108] with the Bankruptcy Court. The Schedules provide detailed information on the Debtor's assets and liabilities, as well as other information about its business. In addition, on October 23, 2018 and December 11, 2018, the United States Trustee conducted the Section 341 meeting of creditors in the Debtor's chapter 11 case. Pursuant to rules 2002(1) and 9008 of the Federal Rules of Bankruptcy Procedure, the deadline for filing proofs of Claim in the Bankruptcy Case for non-Governmental Units was January 22, 2019 and the deadline for governmental units was March 31, 2019. The Debtor has filed monthly operating reports commencing with the month ending October, 2018, and continues to file such reports.

**3. The Official Committee of Unsecured Creditors**

On October 14, 2018, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in this case [Docket No. 37]. The current members of the Committee are as follows: (1) BMO Harris Bank; (2) CPF 801 Tower LLC; and (3) One North Wacker Drive LLC.

**4. Retention of Professionals**

The Bankruptcy Court has authorized the Debtor to retain the following professionals:

- Pachulski Stang Ziehl & Jones LLP, as general bankruptcy counsel, which employment was approved on October 30, 2018;
- Development Specialists, Inc. as Financial Advisor, which employment was approved on October 23, 2018.
- On-Site Associates, LLC as Collections Agent, which employment was approved on November 8, 2018.
- Armanino LLP as Accountant, which employment was approved on October 30, 2018.

- CandC Fees Limited as London Collections Agent, which employment was approved on October 30, 2018.

- Baker Tilly LLP, as Tax Advisor, who employment was approved on February 7, 2019.

The Bankruptcy Court authorized the Committee to retain Pillsbury Winthrop Shaw & Pittman LLP as its legal counsel by order entered on December 17, 2018 and authorized the Debtor and the Committee to employ Commenda Asset Resolution Partners, LLC as financial advisors to the Committee by order entered on March 5, 2019. Subsequently, the Committee retained Baker & Hostetler LLP as its legal counsel, which was approved on March 1, 2019 and then most recently the Committee retained Sheppard Mullin Richter & Hampton LLP as its legal counsel, which was approved on May 29, 2019.

**5. Client File Disposition Procedures**

As a result of the wind-down and prior thereto, substantially all of the Debtor's attorneys became affiliated with other law firms. In certain but not all cases, each attorney transferred to other firms, that attorney's open client files were transferred as well. However, during the Debtor's 85-plus year history, approximately 170,000 closed client files were retained and stored by the Debtor, in some manner, for various reasons, including compliance with applicable rules of professional responsibility.

On November 13, 2018, the Debtor filed the *Motion and Memorandum of Points and Authorities in Support of Motion for Approval of Client File Disposition Procedures* [Docket No. 98], which provided notice and an opportunity for the Debtor's former clients to retrieve their files in accordance with applicable rules of professional responsibility and to minimize cost of file storage, retrieval and destruction costs to the estate. The Court entered an order authorizing the Debtor to dispose of client files pursuant to the foregoing motion by *Order Approving Debtor's Motion for Approval of Client File Disposition Procedures* [Docket No. 112].

**6. Procedures for Settlement of Accounts Receivable**

On October 31, 2018, the Debtor filed the *Motion for Approval of Settlement Procedures for Compromising Accounts Receivable* [Docket No. 81], which sought approval of settlement

parameters for the Debtor's outstanding accounts receivable. On November 8, 2018, the Bankruptcy Court approved the foregoing motion by entry of the *Order Approving Motion for Approval of Settlement Procedures for Compromising Accounts Receivable* [Docket No. 90]. Since this time, the Debtor's Professional, On-Site Associates, LLC and CandC have been engaged in the collection of the Debtor's accounts receivable for the benefit of the Estate.

**7. <u>The GRM Settlement Motion</u>**

On November 13, 2018, the Debtor filed the *Motion and Memorandum of Points and Authorities in Support of Motion for Approval of Client File Disposition Procedures* [Docket No. 98], which sought authorization to implement notification procedures regarding the disposition of former client files. As set forth in the motion, the Debtor stored over 170,000 boxes of client files with a third-party storage provider, GRM Document Management ("GRM"). The Debtor was required to pay a monthly storage fee to GRM but also reimburse GRM for the loan it provided to the Debtor when the Debtor transferred its other client files to GRM. In the end, the Bankruptcy Court approved the motion by entry of the *Order Approving Debtor's Motion for Approval of Client File Disposition Procedures* [Docket No. 112], which provided that the Debtor would pay $775,000 to GRM for all storage and destructions fees for the files that are not retrieved by former clients.

**8. <u>Mediation</u>**

Prior to the Petition Date, the Debtor, through its counsel, engaged with a group of creditors regarding the potential settlement of claims against the Debtor's Former Equity Partners arising from the payment of compensation, draws, and the return of capital as constructive fraudulent transfers claims. The Debtor and group of creditors were not able to reach an agreement and as a result, the Debtor commenced this Chapter 11 Case, which intended to use to resolve the foregoing claims, in addition to the wind down of the Estates other open matters as discussed herein.

After the commencement of the Chapter 11 Case, of the creditors that the Debtor was negotiating with, three were appointed to the Committee. In an effort to continue the negotiation of these claims, the Debtor exchanged thousands of documents in response to informal requests from the Committee and met with the Committee to negotiate an agreement. The parties met in December 2018 and again in March 2019 but the parties were not able to reach a resolution.

As result, the parties agreed to mediate the disputed issues using a neutral third party, Michael Cooper. On May 23, 2019, the parties and their respective Professionals met for a full day of discussions. The discussions continued after the conclusion of the formal mediation but in the end the parties were not able to reach an agreement that was acceptable to all parties.

**9. Partner Settlement Motion**

As described in the section above, during 2017, the Debtor made certain distributions in cash to its current and former equity partners as either compensation or draws for their services or a return of capital (as the firm returned capital to former equity partners in the normal course). The Debtor acknowledges that distributions of cash to the firm's then current and former equity partners gave rise to potential claw-back claims as a constructive fraudulent transfers (subject to applicable defenses of reasonably equivalent value) but the seminal issue establishing such claims and their amounts depends on the fact intensive determination of when the Debtor became insolvent.

The Debtor believes that further negotiation or active litigation against the Settling Former Equity Partners will not increase the cash available for distributions to creditors but will only dissipate cash that could otherwise be used to pay the allowed claims of unsecured creditors. The Debtor believes it will be more beneficial to the estate to resolve the claims against the Settling Former Equity Partners by eliminating litigation, uncertainty, and the expense of delay associated with litigation by guaranteeing a recovery of the Settling Partners.

To that end, the Debtor filed the *Motion for Order Approving the Compromise of a Controversy Among the Debtor and Certain Former Equity Partners of the Debtor* [Docket No. 234] (the "**Partner Settlement Motion**"), the Former Equity Partner Settlement Motion. By such motion, and subject to Court approval, the Debtor has entered into the settlement agreement with 45 Settling Partners who will collectively contribute toward a settlement payment in the aggregate amount of $1,595,000, the Former Equity Partner Settlement Payments. The Former Equity Partner Settlement Payments represents a recovery against the Settling Former Equity Partners that is equal to 142.3% of the claims against such partner using an August 31, 2017 an insolvency date proxy. If an earlier insolvency proxy date is used, the Former Equity Partner Settlement Payments represent a recovery against the Settling Former Equity Partners that is equal to 86.5% of the claims against such partners

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 23 of 42

using a May 31, 2017 insolvency date. Or to put another way, 100% of the capital distributed to such partners and 60% of the compensation or draws that were not offset by reasonably equivalent value.

It is important to note that the Debtor was not a Dewey, Heller, or Brobeck. The firm's former equity partners were not operating under contractual guarantees that required the firm to pay partners fixed compensation without regard to such partners' actual book of business and receivables generated. Nor was the Debtor inflating income or profits to ensure that partners would not leave or artificially enhance the firm's ratings. Nearly all of the Setting Former Equity Partners remained at the firm throughout 2017, continued to bring in clients, collect receivables, and were paid a small fraction of what they were paid in prior years or what they could have been paid at other had they left the firm.

In the end, the Debtor acknowledges there is a difference of opinion with the Committee as to when the Debtor became insolvent. The Debtor is not looking to have the firm's insolvency date adjudicated by the Court. Instead, the Debtor believes that the realization of the Former Equity Partner Settlement Payments far outweigh the risks arising from the uncertainty of establishing an earlier insolvency date and even if an earlier one could be established that the costs associated with litigation and the delay of bringing this case to closure will far exceed any additional recoveries. Plus, and most importantly, approval of the settlement should pave the way for the Debtor to propose a plan of liquidation so that the claims reconciliation process and payments to the holders of allowed claims may begin. On the date hereof, the Bankruptcy Court will consider approval of this settlement on July 18, 2019.

**10. <u>Other Postpetition Activities</u>**

In addition to the activities enumerated above, the Debtor has continued its liquidation of the Estate's Assets and the resolution of Claims. Specifically, prior to the Petition Date, the landlord at the Debtor's former Miami office attempted to levy against one of the Debtor's bank accounts. Citibank segregated approximately $278,500[1] from the Debtor's bank account in response to the landlord's action. The Debtor believed that the landlord's action and the segregation of cash

[1] This amount represents twice the amount of the judgment as applicable law required Citibank to segregate twice the amount of the judgment.

was a plain vanilla preference. Since that time, the Debtor and landlord reached a settlement where the landlord retained $15,000 of the segregated/levied cash and the balance ($263,500) was returned to the Debtor's estate. The settlement was approved by the Bankruptcy Court by entry of the *Order Granting Motion for Order Approving the Compromise of a Controversy Among the Debtor and One Biscayne Tower, LLC* [Docket No. 162].

## IV.

## IDENTIFICATION OF LITIGATION CLAIMS

The Debtor's Estate includes claims and/or causes of action that the Debtor has or may have against various third parties. These are known in the Plan as the Retained Claims and Defenses. As set forth in the Plan and herein, the Debtor intends to vest the Retained Claims and Defenses with the Liquidating Debtor and have the Plan Administrator and the Oversight Committee investigate and pursue such Retained Claim in their discretion for the benefit of the holders of Allowed Claims. This Article IV provides a description of the Retained Claims and Defenses.

### A. The Claw-Back Claims Against Non-Settling Former Equity Partners

As described in Article III.9 and 10, the Debtor believes there are constructive fraudulent transfer claims against certain Former Equity Partners on account of cash distributions as compensation, draws, or the return of capital. The Debtor believes there are sixty-six (66) potential targets and currently believes that twenty-one (21) Former Equity Partners will have potential claims against them after confirmation in the event the Bankruptcy Court approves the Partner Settlement Motion. A list of those Non-Settling Former Equity Partners is annexed to the Plan Exhibit E. The claw-back claims are driven, in large part, by the date the Debtor became insolvent but also offset by the reasonable equivalent value provided by such Non-Settling Former Equity Partners to the extent such defense is applicable.

The Debtor has conducted an analysis of these claims and shared all of the Debtor's information in support of such claims with the Committee. It is the Debtors understanding that the Committee and its professionals also have conducted an analysis of these claims, which will be among the Retained Claims and Defenses that may be pursued by the Liquidating Debtor and Plan Administrator.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
San Francisco, California

**B. Non-Settling Former Equity Partner Claims Fiduciary Duty Claims**

At the time the certain of the Debtor's Former Equity Partners announced their departure on or about January 5, 2017 and January 7, 2017, there was no indication from these group of Former Equity Partners would leave or were contemplating leaving the firm. One of the Former Equity Partners was the chairman of the Debtor for several years and another was on the Debtor's executive committee approximately five days before the departure announcement was made. The Debtor believes that these departures arguable caused harm to the Debtor and that the Former Equity Partners might have breached their fiduciary duty to the Debtor.

Any and all such claims are being preserved under the Plan as Retained Claims and the Plan Administrator, at the direction of the Oversight Committee, will investigate such claims and prosecute such claims for the benefit of creditors.

**C. Preservation of Other Causes of Action**

As of the Effective Date, each and every claim, right, cause of action, claim for relief, right to set-off and other entitlement held by the Debtor whether arising under §§ 502, 506, 510, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552 or 553 of the Bankruptcy Code, or otherwise, other than those waived or released by express terms of the Plan or the Confirmation Order, shall be deemed fully preserved and vested in the Liquidating Debtor. Without limiting the generality of the foregoing, any and all claims and causes of action held by the Debtor, the debtor in possession, and its Estate prior to the Effective Date against any person or entity, shall be retained by the Liquidating Debtor. Such claims shall include but not be limited to any claims based on the facts and circumstances related in any way to the dissolution of the Debtor, and all avoidance actions for transfers made by the Debtors or any affiliates, including all claims, rights to recovery, or transfers disclosed in the statement financial affairs filed with the Court by the Debtor. Confirmation of the Plan effects no settlement, compromise, waiver, or release of any cause of action unless the Plan or Confirmation Order specifically and unambiguously so provides. The nondisclosure or nondiscussion of any particular cause of action is not and shall not be construed as a settlement, compromise, waiver, or release of such cause of action.

The Debtor and Liquidating Debtor also reserve the right to object to any of the Claims (regardless of whether the Claim was actually filed and classified as a priority or secured claim) improperly asserted against the Debtor and its estate. As stated above, however, under the Plan all Retained Claims and Defenses (among other things) shall revest in the Liquidating Debtor on the Effective Date, including Avoidance Actions.

## V.

## SUMMARY DESCRIPTION OF THE PLAN

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan which follows constitutes a summary only and should not be relied upon for voting purposes. You are urged to read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Proponents. If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

### A. Description Of Classes

The Plan divides Creditors and Interest Holders into Classes. Creditors with similar Claims are placed in the same Class. There are two (2) Classes of Claims and one (1) Class of Interests under the Plan as follows:

1. **Class 1 Claims.** Class 1 shall consist of Insured Malpractice Claims.

2. **Class 2 Claims.** Class 2 shall consist of general Unsecured Claims.

3. **Class 3 Interests.** Class 3 shall consist of the Interests held by the Interest Holders.

### B. Treatment of Unclassified Claims

Article III of the Plan provides for the treatment of unclassified claims. The Plan sets forth the treatment of Administrative Claims (including Claims for Professional Fees) and Priority Tax Claims, which are not classified under the Plan.

1. **Administrative Claims.** The Plan contemplates that Allowed Administrative Claims will be paid in full by the Liquidating Debtor. Allowed Administrative Claims will be accorded the treatment specified in Article 3.1 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § A. The Plan also provides for an Administrative

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 27 of 42

Claims Bar Date, which requires that all requests for payment of Administrative Claims, other than Claims for Professional Fees, must be filed by thirty-five (35) days after the Effective Date for claims arising between October 2, 2018 and the Effective Date. If an Administrative Claim is not filed by the Administrative Bar Date, the holder thereof shall be forever barred from asserting such Administrative Claim against the Debtor or the Liquidating Debtor or from sharing in any distribution under the Plan. Holders of Administrative Claims based on liabilities incurred in the ordinary course of the Debtor's business following the Petition Date shall not be required to comply with the Administrative Claim Bar Date, provided that, (i) such holders have otherwise submitted an invoice, billing statement or other evidence of indebtedness to the Debtor in the ordinary course of business, and (ii) such Claims are not past due according to their terms. The Debtor estimates that Allowed Claims in this category will total approximately $60,000.

**2. Administrative Claims (Professionals).** The Plan contemplates that Allowed Claims for Professional Fees shall be paid in full by the Liquidating Debtor. Allowed Claims of Professionals will be accorded the treatment specified in Article 3.3 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § B. Each party seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Administrative Claims Bar Date; and (b) if the Bankruptcy Court grants such an award, each such party will be paid in full in Cash by the Liquidating Debtor in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order, and the Bankruptcy Court's Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees. The Debtor estimates that Allowed Claims in this category will total approximately $745,000.

**3. Priority Tax Claims.** The Debtor anticipates that the estate will be obligated to satisfy certain tax claims entitled to priority under section 507(a)(8) of the Bankruptcy Code. Allowed Priority Tax Claims will be accorded the treatment specified in Article 3.4 of the Plan,

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 28 of 42

which terms are reprinted in the Treatment of Claims Chart, *supra*, at § C. The Debtor estimates that Allowed Claims in this category will total approximately $205,000.

**C. Treatment of Classified Claims and Interests**

Article IV of the Plan sets forth the treatment of classified Claims and Interests. A summary of the treatment of classified Claims and Interests is also provided in the chart set forth in Section I of this Disclosure Statement. As set forth in the Plan and previously herein, Classes 1 and 2 are impaired and are entitled to vote on the Plan.

**1. Unsecured Claims.**

The Plan creates two Classes of non-priority unsecured claims: Class 1 (Insured Malpractice Claims) and Class 2 (General Unsecured Claims). The Plan treats these Claims as follows:

(a) Class 1 (Insured Malpractice Claims)

Insured Malpractice Claims are classified as Class 1 Claims under the Plan. The Debtor has malpractice insurance policies as set forth in Exhibit D to the Plan. It had primary coverage with an independent insurer, such as Certain Underwriters at Lloyd's, London and Aspen Specialty Insurance Company. Within each primary policy, the applicable insurer required the Debtor to reimburse it the amount of the Insurance Deductible on any claim. The obligation of the applicable insurer remains unchanged except that to the extent that Class 1 accepts or is crammed down, the applicable insurer will only be required to pay the amount of the Malpractice Claim that is in excess of the amount of the Insurance Deductible. Nothing herein or in the Plan provides any obligation or intent to incur or pay amounts that fall within the amount of the Insurance Deductible. Through the Plan, the Plan Administrator and the applicable insurer will determine whether or not to incur Malpractice Claim Expenses, and act accordingly, without any obligation to pay any of the Insurance Deductible or to comply with any other obligations under the insurance policies.

The Debtor is treating the Insured Malpractice Claims as follows. Such claims are impaired. Each Holder of an Insured Malpractice Claim shall receive the treatment provided by the Plan for the holders of Allowed Unsecured Claims under Class 2 of the Plan. In the alternative, at the clection (as defined below) of the Holder of a Class 1 Claim, such holder shall instead receive the following treatment: (a) the automatic stay under Section 362 of the Bankruptcy Code shall be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

deemed modified to permit the Holder of a Class 1 Claim to prosecute its claim to judgment in any applicable court of competent jurisdiction; (b) the Holder shall be deemed to waive its Class 1 Claim against the Debtor and the Estate and shall not be entitled to any distribution under the Plan, (c) the Holder shall limit its recourse on account of its Class 1 Claim solely to the proceeds of any applicable Malpractice Policy; and (d) any recovery obtained by the Holder on account of its Class 1 Claim shall (i) in the event of a judgment, be deemed reduced by the amount of any Insurance Deductible applicable to such Claim under any applicable Malpractice Policy, or (ii) in the event of a settlement, be deemed to satisfy the amount of any Insurance Deductible applicable to such Claim under any applicable Malpractice Policy. For purposes of this Section 4.1 of the Plan, an election shall mean the written acceptance submitted by the Holder of a Class 1 Claim accepting the Plan on the Ballot in connection with solicitation of votes under the Plan.

There is no guarantee that the applicable insurer(s) will provide the insurance coverage necessary to create a recovery on an Allowed Class 1 Claim. It is possible that the applicable insurer(s) will deny coverage or that the insurer will otherwise be unable or unwilling to satisfy an Allowed Class 1 Claim. Nevertheless, Creditors with Class 1 Claims shall have no recourse to Class 2 for amounts unpaid on account of an Allowed Class 1 Claim.

(b) Class 2 (General Unsecured Claims)

Class 2 shall consist of Unsecured Claims. Class 2 Claims are impaired. Each holder of an Allowed Class 2 Claim shall receive, a Pro Rata Share of Net Available Cash after deductions for the payment (or appropriate reserve for) the Allowed Claims of senior classes of Claims and reserves for Disputed Claims, Professional Fees and/or Plan Expenses. To the extent that all Allowed Class 2 Claims have been paid in full, including post-petition interest, any remaining funds in the Claims Reserve Account shall be used by the Liquidating Debtor to fund distributions to the holders of Allowed Interests in Class 3.

2. **Class 3 (Interest Holders)**

Class 3 consists of all holders of Interests in the Debtor. No distribution is expected to be made to Interest Holders. Allowed Class 3 Interests will be accorded the treatment specified in Article 4.3 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § F.

D. **Implementation of the Plan.**

Article V of the Plan provides the principal means for the implementation of the Plan. The Plan shall be implemented on the Effective Date as set forth in the Plan. The Plan provides for, among other things, the revesting of Estate Assets in the Liquidating Debtor (Plan at Articles 5.2, 8.2), the management of the Liquidating Debtor by a Plan Administrator (subject to oversight restrictions by the Oversight Committee) (Plan at Articles 5.3, 5.4), and the rights of the Liquidating Debtor and the Plan Administrator to prosecute, investigate, liquidate and/or settle for Retained Claims and Defenses and Avoidance Actions for the benefit of the Estate (Plan at Articles 5.7, 5.12). Article V of the Plan also contains provisions governing the allowance, distribution and payment of Claims (Plan at Articles 5.8, 5.9, 5.14, 5.15, 5.16, 5.17), the establishment of reserves for Disputed Claims (Plan at Article 5.21), the Reserved Claims Pool Account and the Claims Reserve Account (Plan at Article 5.8) and procedures governing the payment of Plan Expenses (Plan at Article 5.14). Article V of the Plan also provides for the terms and conditions of the power and authority of the Oversight Committee as of the Effective Date (Plan at Article 5.12), fixes procedures for the post-Effective Date employment and compensation of Professionals (Plan at Article 5.29) and provides for the entry of a final decree closing the Debtor's chapter 11 case following the payment (or reserve for the payment) of Claims to be paid on or after the Effective Date (Plan at Article 5.30).

E. **Executory Contracts.**

Article VI of the Plan sets forth procedures governing the assumption and rejection of the Debtor's executory contracts and unexpired leases. The Plan provides that, on the Effective Date, the Debtor will reject each of the Rejected Contracts except for any Assumed Contracts identified on Exhibit A to the Plan. The Debtor reserves the right to make additions to Exhibit A to the Plan up to 14 days prior to the date on which objections must be filed to the Plan with respect to the

Confirmation Hearing. The Debtor does not anticipate there will be any Assumed Contracts. In the event there is, the Liquidating Debtor shall satisfy any Cure Obligations for the Assumed Contracts by making a Cash payment equal to the lesser of the amount: (a) set forth on Exhibit A to the Plan, (b) set forth in any other notice, motion or supplement to the Plan filed and served in connection with the Confirmation Hearing or as may be determined in an Assumption and Cure Order, or (c) agreed to in writing between the Liquidating Debtor and the non-debtor parties to such contracts or leases. The Liquidating Debtor shall satisfy the Cure Obligations within (14) days from the date from which an Assumed Contract is assumed pursuant to section 365(b) of the Bankruptcy Code. The Plan also addresses the treatment of the Debtor's postpetition executory contracts and agreements.

**F. Conditions to Confirmation of the Plan.**

Article VII of the Plan provides a list of conditions that must occur in order for the Plan to be confirmed. In addition, the Plan identifies conditions to the effectiveness of the Plan.

**G. Effects of Confirmation.**

Article VIII of the Plan sets forth certain effects of Confirmation of the Plan and the parties that will be bound by the Plan, once confirmed. As noted above, the Plan provides for the revesting of Estate Assets in the Liquidating Debtor. The Plan further provides that all Unsecured Claims against the Debtor or the Estate shall be of no further force or effect except with respect to the rights of holders of Allowed Claims to receive payments or distributions as set forth in the Plan. The Plan also sets forth certain injunctive provisions that will go into effect on the Effective Date (Plan at Article 8.3) and provides for the limitation of certain liabilities for certain parties (Plan at Article 8.4).

**H. Sources of Funding for the Plan.**

The Liquidating Debtor will be capitalized with Available Cash, the Former Equity Partner Settlement Payments, the proceeds from the U.K. LLP Equity, Accounts Receivable, and the proceeds from any Retained Claims and Avoidance Actions. In addition, Class 1 Insured Malpractice Claims shall be fully satisfied from the proceeds of any applicable Malpractice Policy.

**I. Post Effective Date Employment and Compensation of Professionals.**

After the Effective Date, the Plan Administrator may retain any existing Professionals of the Committee or the Debtor without further employment agreements or orders. Additionally, after the Effective Date, the Plan Administrator may hire other professionals without the requirement that such professionals file employment applications for Bankruptcy Court approval of their employment, whether on an hourly, contingency fee or other basis, and without requirement that such professionals file applications for payment of post-Effective Date fees and expenses on an interim basis.

**J. Section 105 Injunction.**

If the Plan is confirmed without modification, on the Effective Date, and except as otherwise provided by the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtor or the Debtor's estate that arose prior to the Effective Date will be permanently enjoined from taking legal action against the Debtor or the Liquidating Debtor for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any Claim or demand against the Debtor or the Liquidating Debtor.

## VI.

## TAX DISCLOSURE

Implementation of the Plan may have federal, state, local and foreign tax consequences to the Debtor, Creditors and Interest Holders. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure (the “Tax Disclosure”) does not constitute and is not intended to constitute either a tax opinion or tax advice to any person. Rather, the Tax Disclosure is provided for informational purposes only.

Moreover, the Tax Disclosure summarizes only certain of the federal income tax consequences under the Internal Revenue Code of 1986, as amended (“IRC”) associated with the Plan’s implementation, and does not attempt to comment on all such aspects of the Plan’s implementation. In addition, certain of the federal income tax consequences described in the Tax Disclosure are dependent on factual determinations that are subject to uncertainties. Similarly, the Tax Disclosure does not attempt to consider any facts or limitations applicable to any particular

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 33 of 42

creditor or interest holder which may modify or alter the consequences described below. The Tax Disclosure also does not address state, local, or foreign tax consequences or the consequences of any federal tax other than the federal income tax. No assurance can be given that legislative, judicial, or administrative changes will not be forthcoming that would affect the accuracy of the discussion below. Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof. Finally, the tax consequences of certain aspects of the Plan are uncertain due to a lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below. The discussion contained in this Tax Disclosure is not binding on the IRS or any other governmental tax authority.

Creditors, therefore, are advised to consult with their own tax advisors regarding the tax consequences to them of the transactions contemplated by the Plan, including federal, state, local, and foreign tax consequences.

**A. Tax Consequences to Creditors**

Pursuant to the Plan, holders of allowed claims will receive distributions of cash in exchange for their allowed claims. Whether and the extent to which such a payment to a creditor holding an allowed claim is includible in the holder's gross income will be determined by reference to the claim in respect of which the distribution is made. The holder may recognize ordinary income in respect of such payment if the claim is in respect of an item generating ordinary income, such as wages, to such holder. Similarly, if a claim is held as part of a trade or business, the holder of such claim may recognize ordinary loss to the extent that such holder's adjusted basis in the claim exceeds the amount received by such holder with respect to such claim. If a claim is held in respect of a capital asset, the holder may recognize a capital gain or loss. However, any distribution attributable to accrued but unpaid interest may be treated as ordinary income, regardless of whether the origin of the claim is capital in nature or whether gain or loss is otherwise recognized on the Claim.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE CONSEQUENCES FOR SUCH CREDITOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

**B. Tax Consequences to Holders of Interests**

Pursuant to the Plan, Interests will be retained on the Effective Date. However, it is anticipated that each holder of Interests shall receive no distribution or any other consideration on account of such Interests. In general, assuming that a holder has not previously treated the Interests as worthless for tax purposes, the holder should recognize loss equal to the difference between the amount of consideration received by such holder (in this case, none) and the adjusted tax basis in the Interests of such holder.

EACH HOLDER OF AN INTEREST IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## VII.

## LIQUIDATION ANALYSIS

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtor must demonstrate, and the Bankruptcy Court must determine, with respect to such Class, each holder of a Claim or Interest will receive property of a value, as of the Effective Date of the Plan that is not less than the amount that such holder would

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This requirement is commonly referred to as the "Best Interests Test." For the reasons set forth below, the Debtor submits that it easily satisfy the "Best Interests Test" and therefore should be approved.

As the Liquidation Analysis attached hereto as **Exhibit B** demonstrates, the Debtor estimates that in chapter 11, General Unsecured Creditors will receive a dividend of 8.6% on Allowed Claims where as a Chapter 7 dividend would be only 7.4%. The Debtor believes there are a number of reasons why the recovery to Creditors would be reduced in a chapter 7 liquidation.

The trustee in a chapter 7 case will likely employ legal counsel and accountants, which would add additional administrative expenses that would be paid ahead of Class 2 General Unsecured Creditors. The Debtor and the Committee already have legal counsel with extensive knowledge of the complexities of this case. The learning curve for the trustee, new counsel, and the new staff that would likely need to be hired due to the attrition caused by the appointment of a trustee, would simply increase expense and reduce the recoveries to Creditors. The Debtors estimate to get a new chapter 7 staff up to speed would be approximately $350,000 more than projected, post-Confirmation staffing costs in Chapter 11.[2] Finally, the Debtor, its staff and its advisors have been working diligently to settle a number of matters that may result in substantial recoveries to the Estate, and believe that a chapter 7 trustee might not be able to realize on these assets. For example, if the Partner Settlement Motion is not approved, the Debtor does not believe that a chapter 7 trustee will realize the same recovery without incurring expenses far excess of the recovery contemplated by such motion.

Because the Plan implements the priorities set forth in the Bankruptcy Code, each Creditor will receive under the Plan proposed by the Debtor property of a value that is not less than the amount such Creditor would receive in a chapter 7 case. The Plan proposed by the Debtor presents a better alternative to Creditors than a chapter 7 liquidation because the Plan provides a substantial recovery of Unsecured Claims.

[2] These adjustments are reflected in the Liquidation Analysis on the line items for "Trustees Professionals Under Chapter 11" and "Staffing Costs" respectively.

## VIII.

## RISK ANALYSIS

The Plan is conditioned on the Liquidating Debtor's fulfillment of its responsibilities under the Plan and the Bankruptcy Court's confirmation of the Plan. Although the Debtor currently expects that all of the transactions required under the Plan shall be consummated, there is always a risk that an unforeseen development could affect either the confirmation or the implementation of the Plan or affect the transactions contemplated under the Plan after confirmation. In addition, the Plan contains several conditions precedent to the confirmation of the Plan and it is possible that one or more of these conditions may not be satisfied. Finally, while the Debtor believes that the Plan satisfies all of the confirmation requirements under section 1129 of the Bankruptcy Code, there is no guarantee that the Bankruptcy Court will concur with this analysis and necessarily confirm the Plan. In addition, recovery by Creditors is tied, in part, to the Debtor's recovery from the Partner Settlement Motion, as well as to the proceeds of Retained Claims and Defenses and Avoidance Actions, which amounts are presently unknown. Thus, the recovery by Creditors may vary based upon the collections to be used to fund payments to Creditors under the Plan.

## IX.

## FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation is proposed in the Plan. As is set forth on the cash forecast attached hereto as **Exhibit C**, the Debtor will have sufficient cash on hand to meet all of the Debtor's Effective Date obligations under the Plan. Accordingly, the Plan proposed by the Proponents satisfies the requirements of Section 1129(a)(11)and is "feasible."

## X.

## CONFIRMATION OF THE PLAN

The Proponents will seek confirmation of the Plan at the Confirmation Hearing, pursuant to applicable provisions of the Bankruptcy Code. If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives include (i) liquidation of the Debtor under chapter 7 or

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 37 of 42

chapter 11 of the Bankruptcy Code; or (ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code. If the Plan is not confirmed, the Debtor will decide which alternative to pursue by weighing each of the available options and choosing the alternative or alternatives that are in the best interests of the Debtor, its Creditors and other parties in interest. However, the Debtor believes that the Plan, as proposed, provides the greatest possible return currently available for the holders of Claims in this chapter 11 case.

**XI.**

**RECOMMENDATION AND CONCLUSION**

Based on the foregoing, the Debtor believes that the Plan is in the best interests of Creditors and urge Creditors to vote to accept the Plan.

Dated: June 17, 2019

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ John W. Lucas*
John W. Lucas

Attorneys for Sedgwick, LLP

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 38 of 42

**<u>Exhibit A</u>**

**Plan**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 39 of 42

**Exhibit B**

**Liquidation Analysis**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:101283.2 77998/002
DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF LIQUIDATION

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 40 of 42

***In re* Sedgwick, LLP, Debtor**
**Case No. 18-31087 (HLB)**
**Liquidation Analysis as of 9.15.2019**

| | Chapter 11 | Chapter 7 |
|---|---|---|
| **Assets** | | |
| **Total Estimated Cash on Effective Date** | **$ 1,433,000** | **$ 1,433,000** |
| | | |
| **Post Effective Income And (Expenses)** | | |
| Partner Settlements (9019 Motion) | $ 1,600,000 | $ 1,600,000 |
| Partner Clawback Recoveries - Litigation | 687,000 | 687,000 |
| Contingent Counsel Fees | (240,000) | (240,000) |
| Accounts Receivable Collections | 200,000 | 200,000 |
| Partner Clawback Litigation Costs | (100,000) | (100,000) |
| Expert Costs | (150,000) | (350,000) |
| Staffing Costs | (60,000) | - |
| Tax Preparation | (75,000) | (150,000) |
| Taxes And Tax Refunds | 100,000 | 100,000 |
| Operating Costs and Services | (100,000) | (100,000) |
| US Trustee Fees | (60,000) | - |
| **Total Post Effective Income and (Expenses)** | **$ 1,802,000** | **$ 1,647,000** |
| | | |
| **Net Proceeds Available for Distribution** | **$ 3,235,000** | **$ 3,080,000** |
| | | |
| **Estimated Allowed Secured Creditors** | | |
| **Distribution to Secured Creditors** | **-** | **-** |
| | | |
| **Net Available for Administrative Creditors** | **$ 3,235,000** | **$ 3,080,000** |
| | | |
| **Administrative Creditors** | | |
| Plan Agent Costs Under Plan | $ (170,000) | $ - |
| Plan Agent Counsel | (250,000) | - |
| Professional Fees Due At Confirmation | (745,000) | (745,000) |
| Document Retention And Destruction | (100,000) | (100,000) |
| Trustee Compensation | - | (170,000) |
| Trustee Professionals - Chapter 7 | - | (350,000) |
| UST Trustee Fees Due At Confirmation | (20,000) | - |
| **Total Administrative Claims** | **$ (1,285,000)** | **$ (1,365,000)** |
| | | |
| **Net Proceeds Available for Priority Creditors** | **$ 1,950,000** | **$ 1,715,000** |
| | | |
| **Estimated Allowed Priority Claims** | | |
| **Distribution to Priority Creditors** | **(205,000)** | **(205,000)** |
| | | |
| **Net Proceeds Available for Unsecured Creditors** | **$ 1,745,000** | **$ 1,510,000** |
| | | |
| Estimated Allowed Unsecured Creditors | $ 20,400,000 | $ 20,400,000 |
| | | |
| Distribution to Unsecured Creditors | **$ 1,745,000** | **$ 1,510,000** |
| | | |
| **Return to Unsecured Creditors** | **8.6%** | **7.4%** |

# EXHIBIT C

**Cash Forecast**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:101283.2 77998/002
DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF LIQUIDATION

Case: 18-31087 Doc# 246 Filed: 06/17/19 Entered: 06/17/19 13:56:58 Page 42 of 42