1   John W. Lucas (CA Bar No. 271038)
    Pachulski Stang Ziehl & Jones LLP
2   150 California Street, 15th Floor
    San Francisco, California 94111-4500
3   Telephone:    415.263.7000
    Facsimile:    415.263.7010
4   Email:        jlucas@pszjlaw.com

5   Attorneys for Sedgwick, LLP

6   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        A Limited Liability Partnership
7       Including Professional Corporations
    Alan M. Feld, Cal. Bar No. 155345
8   Michael M. Lauter, Cal. Bar No. 246048
    Shadi Farzan, Cal. Bar No. 301610
9   Four Embarcadero Center, 17th Floor
    San Francisco, California 94111-4109
10  Telephone:    415.434.9100
    Facsimile:    415.434.3947
11  E mail        afeld@sheppardmullin.com
                  mlauter@sheppardmullin.com
12                sfarzan@sheppardmullin.com

13  Attorneys for the Official Committee
    of Unsecured Creditors

14

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No.: 18-31087 (HLB) |
| **SEDGWICK, LLP**, | Chapter 11 |
| Debtor. | **DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION OF SEDGWICK LLP** |
| | **<u>Confirmation Hearing</u>** |
| | Date:   January 30, 2019 |
| | Time:   10:00 a.m. (Pacific Time) |
| | Place:  U.S. Bankruptcy Court |
| |          450 Golden Gate Avenue, |
| |          Courtroom 19 |
| |          San Francisco, CA |
| | Judge:  Hon. Hannah L. Blumenstiel |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**TABLE OF CONTENTS**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. Introduction | 1 |
| | B. Information Regarding the Plan | 2 |
| | 1. Plan Governing Document | 2 |
| | 2. Source of Information | 2 |
| | 3. Warning Regarding Federal and State Income Tax Consequences of the Plan | 3 |
| | 4. Bankruptcy Court Approval | 3 |
| | C. Voting Instructions | 3 |
| | 1. How to Vote | 3 |
| | 2. Who May Vote | 4 |
| | D. Confirmation | 4 |
| | E. Disclaimers | 6 |
| II. | PLAN OVERVIEW | 7 |
| | A. Introduction | 7 |
| | B. Treatment of Claims | 9 |
| III. | OVERVIEW OF CHAPTER 11 CASE | 12 |
| | A. Events Leading Up to the Filing of the Chapter 11 Case | 12 |
| | 1. Description of the Debtor | 12 |
| | 2. The Debtor's Pre-Petition Credit Facility | 13 |
| | 3. Events Precipitating the Debtor's Filing | 14 |
| | B. Summary of Events During the Chapter 11 Case | 16 |
| | 1. "First Day" Pleadings | 16 |
| | 2. Filing of Schedules, Meeting of Creditors and Bar Date | 17 |
| | 3. The Official Committee of Unsecured Creditors | 17 |
| | 4. Retention of Professionals | 18 |
| | 5. Client File Disposition Procedures | 18 |
| | 6. Procedures for Settlement of Accounts Receivable | 19 |
| | 7. The GRM Settlement Motion | 19 |
| | 8. Mediation | 20 |
| | 9. Other Postpetition Activities | 20 |
| IV. | IDENTIFICATION OF LITIGATION CLAIMS | 21 |
| | A. The Claw-Back Claims Against Non-Settling Former Partners | 21 |
| | B. Non-Settling Former Equity Partner Fiduciary Duty Claims | 22 |
| | C. Preservation of Other Causes of Action | 22 |

| | | | |
|---|---|---|---|
| V. | | SETTLING FORMER PARTNER SETTLEMENT | 23 |
| | A. | Transfers to the Settling Partners | 24 |
| | B. | Events Leading to the Debtor's Wind Down and Insolvency | 24 |
| | C. | The Solvency of the Debtor | 28 |
| | | 1. Balance Sheet Solvency | 29 |
| | | 2. Cash Flow Solvency | 29 |
| | | 3. Capital Adequacy | 30 |
| | D. | The Claw-Back Analysis | 31 |
| | E. | The Settlement Agreement Was Entered Into in Good Faith | 32 |
| | F. | Standard for Approval of Compromise Under Bankruptcy Rule 9019 | 33 |
| | G. | The Probability of Success Factor Favors a Compromise | 34 |
| | H. | The Difficulties of Collection are Not Relevant | 36 |
| | I. | The Expense, Inconvenience, and Delay of Further Litigation | 36 |
| | J. | The Settlement Agreement Serves the Interests of Creditors | 36 |
| | K. | Good Faith Approval Under Section 877.6 of California Code of Civil Procedure | 37 |
| VI. | | SUMMARY DESCRIPTION OF THE PLAN | 38 |
| | A. | Description of Classes | 39 |
| | | 1. Class 1 Claims | 39 |
| | | 2. Class 2 Claims | 39 |
| | | 3. Class 3 Interests. | 39 |
| | B. | Treatment of Unclassified Claims | 39 |
| | | 1. Administrative Claims. | 39 |
| | | 2. Administrative Claims (Professionals). | 40 |
| | | 3. Priority Tax Claims. | 40 |
| | C. | Treatment of Classified Claims and Interests | 40 |
| | | 1. Unsecured Claims. | 41 |
| | | 2. Class 3 (Interest Holders) | 42 |
| | D. | Implementation of the Plan. | 43 |
| | E. | Executory Contracts. | 43 |
| | F. | Conditions to Confirmation of the Plan. | 44 |
| | G. | Effects of Confirmation. | 44 |
| | H. | Sources of Funding for the Plan. | 44 |
| | I. | Post Effective Date Employment and Compensation of Professionals. | 44 |
| VII. | | TAX DISCLOSURE | 45 |
| | A. | Tax Consequences to Creditors | 46 |
| | B. | Tax Consequences to Holders of Interests | 46 |
| VIII. | | LIQUIDATION ANALYSIS | 47 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IX.     RISK ANALYSIS..................................................................................48

X.      FEASIBILITY ....................................................................................49

XI.     CONFIRMATION OF THE PLAN.......................................................49

XII.    RECOMMENDATION AND CONCLUSION.........................................50

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:101283.7 77998/002

iii

DISCLOSURE STATEMENT IN SUPPORT OF
PLAN OF LIQUIDATION

**EXHIBITS**

Exhibit A        Plan

Exhibit B        Revised 2017 Budget

Exhibit C        Liquidation Analysis

Exhibit D        Cash Forecast

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# I.

# INTRODUCTION

## A.  Introduction

On October 2, 2018, Sedgwick, LLP commenced the above-captioned bankruptcy case by filing a voluntary petition under chapter 11 of title 11 of the United States Code.  The Debtor's case is being administered in the United States Bankruptcy Court for the Northern District of California, San Francisco Division.

This Disclosure Statement (the "**Disclosure Statement**") contains information with respect to the plan of liquidation (the "**Plan**") proposed jointly by the Debtor and Committee, the Proponents.  A copy of the Plan is attached hereto as **Exhibit A**.  Except as otherwise provided herein, capitalized terms used in this Disclosure Statement shall have the meanings set forth in the Plan.  (*See* Plan at Article I (Definitions)).

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtor has examined various alternatives and, based on information contained in this Disclosure Statement, and for the reasons set forth below, concluded that the Plan provides the best recovery to creditors and, depending on the ultimate outcome of litigation and the allowance or disallowance of the Claims, it could result in a dividend of as much as 12.8% to Class 2 General Unsecured Creditors.

The Disclosure Statement describes the Plan and contains information concerning, among other matters:  (1) the history, business, results of operations, management, properties and liabilities of the Debtor; (2) the proposed wind down of the Debtor and liquidation of its remaining receivables and claims pursuant to the terms of the Plan, and (3) the proposed distribution to Creditors and holders of Claims against the Debtor.  The Proponents request that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan.  Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Your vote on the Plan is important. For the Plan to be accepted by a Class of Claims or

2   Interests, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of

3   Allowed Claims or Interests in such Class who vote on the Plan must vote to accept it.

4   Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy

5   Code, or to the confirmation of another plan. These alternatives may not provide for a distribution

6   of as much value to holders of Allowed Claims and Interests as the Plan. Accordingly, the Debtor

7   and Committee urge you to accept the Plan by completing and returning the enclosed ballot **no**

8   **later than 4:00 p.m. (Pacific time) on January 16, 2019**.

9   **B.      Information Regarding the Plan**

10  **1.      Plan Governing Document**

11  Although the Debtor believes that this Disclosure Statement accurately describes the Plan,

12  all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and

13  the documents described therein which are controlling. You are urged to read the Plan and not just

14  this Disclosure Statement.

15  **2.      Source of Information**

16  Factual information, including all financial information contained in this Disclosure

17  Statement, has been provided by the Debtor or its professionals, or has been obtained from the

18  Debtor's records, except where otherwise specifically noted. None of the Debtor's attorneys,

19  accountants or other professionals make any representation regarding that information. The Debtor

20  does not represent or warrant that the information contained in this Disclosure Statement is free

21  from any inaccuracy. The information herein is given solely for the purpose of providing parties

22  entitled to vote on the Plan with adequate information about the Plan; it is not intended to be used

23  or relied upon in future litigation by or against the Debtor's estate. The Debtor has, however,

24  attempted to present the information accurately and fairly, and the Debtor believes that the

25  information is substantially accurate. The assumptions underlying the projections contained in this

26  Disclosure Statement concerning the sources and amounts of payments to Creditors and Interest

27  Holders represent the Debtor's best estimate as to what it expects will happen. Because they are

28  only assumptions about or predictions of future events, many of which are beyond the Debtor's

control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met. Except as otherwise provided herein, this Disclosure Statement will not reflect any events that occurred after the hearing before the Bankruptcy Court to determine the adequacy of the Disclosure Statement.

### 3. Warning Regarding Federal and State Income Tax Consequences of the Plan

The tax consequences of the Plan will vary based on the individual circumstances of each holder of a Claim. Accordingly, each Creditor and Interest Holder is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

### 4. Bankruptcy Court Approval

Following a hearing held on December 12, 2019, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Debtor to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, approved the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

## C. Voting Instructions

### 1. How to Vote

A ballot is enclosed herewith for Creditors and Interest Holders to use in voting on the Plan. To vote on the Plan, indicate on the enclosed ballot that you accept or you reject the Plan and sign your name and mail the ballot in the envelope provided for this purpose.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 4:00 P.M. prevailing Pacific Time on January 16, 2019 at the following address:**

Sedgwick, LLP Plan Balloting
c/o Pachulski Stang Ziehl & Jones LLP
150 California St., 15th Floor
San Francisco, CA 94111

**Do not send your ballot via facsimile or e-mail.**

If your ballot is not properly completed, signed and returned as described herein, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

## 2. Who May Vote

The Plan divides the Claims of Creditors into two (2) Classes. There is one (1) Class of Interests. The Classes are as follows: Class 1 (Insured Malpractice Claims) and Class 2 (General Unsecured Claims), and Class 3 (Interests).

Classes of Creditors that are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such Class, in which event such Class is conclusively deemed to have rejected the Plan. Each holder of an Allowed Claim in an impaired Class that will receive distributions under the Plan on account of such claims may vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities.

**Classes 1 and 2 are impaired under the Plan and are entitled to vote thereon.**

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim. Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim that has not been objected to or disallowed prior to computation of the votes on the Plan. The Ballot form which you received does <u>not</u> constitute a proof of Claim.

## D. Confirmation

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Debtor must demonstrate that it has met the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Voting is tabulated by class.  As discussed above, a class of creditors or interest holders has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or interests in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, the plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the Plan by such class, so long as certain statutory requirements are met by the Plan.  This procedure is called a "cram down."  The Debtor will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code if any Class rejects the Plan.

The Bankruptcy Court has set **January 30, 2020 at 10:00 a.m.**, as the hearing date to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied.  The hearing on confirmation will be held at the United States Bankruptcy Court, 450 Golden Gate Avenue, San Francisco, CA, 16th Floor, Courtroom 19.  This hearing may be continued from time to time and day to day without further notice.  If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.  Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below on or before the date set forth in the Notice of Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

Objections must be served upon:

> (1) Counsel for the Debtor:
> John W. Lucas
> Pachulski Stang Ziehl & Jones LLP
> 150 California Street, 15th Floor
> San Francisco, CA  94111
> Telephone:  (415) 263-7000
> Facsimile:   (415) 263-7010
>
> (2) Counsel for the Committee:
> Michael Lauter and Alan Feld
> Sheppard Mullin Richter & Hampton, LLP
> Four Embarcadero Center, 17th Floor
> San Francisco, CA 94111
> Telephone:  (415) 434-9100
> Facsimile:   (415) 434-3947

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  (3) The Office of the United States Trustee

2  Terri H. Didion
   2500 Tulare Street, Ste. 140
   Fresno, California 93721

3  Telephone: (559) 487-5002, ext. 235
   Facsimile: (559) 487-5030

4

5  -and-

6  (4) Those parties that have requested notice in this case.

7  **E.**     **Disclaimers**

8     THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR

9  UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN.

10  PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THIS DISCLOSURE

11  STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN

12  SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE

13  NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S

14  BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE

15  INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT

16  CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. *SEE* 11 U.S.C.

17  § 1125(a).

18     FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT

19  SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY

20  SUMMARY. ***IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS***

21  ***DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING***.

22     THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE

23  CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST

24  HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT

25  AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

26

27

28

A.    **Introduction**

The Plan sets forth a proposal for the resolution of all Claims against and Interests in the Debtor.  In sum, the Plan provides for the Debtor to continue its wind-down efforts after confirmation with its administration to be handled by the Liquidating Trustee replacing the Dissolution Committee as the responsible party.  Confirmation of the Plan shall constitute and confirm the appointment of the Liquidating Trustee, including responsibility and authority to (a) exercise the rights, power, and authority of the Liquidating Trust, under the applicable provisions of the Plan and bankruptcy and non-bankruptcy law, and (b) retain post-confirmation professionals to represent the Liquidating Trust and assist the Liquidating Trustee in performing and implementing the Plan, including without limitation retaining professionals originally engaged by the Debtor and/or the Committee, and (c) otherwise implement the Plan, wind up the affairs of the Estate and close the Chapter 11 Case.

The Plan also embodies and seeks approval of the Former Partner Settlement, which is a settlement between the Debtor and its Estate and forty-seven  Former Partners of the Debtor pursuant to which: (i) the Settling Former Partners will pay the Estate $1,921,000 on or before fourteen (14) days after Effective Date; (ii) Debtor's counsel will reduce its allowed fees on its final fee application by $10,500; (iii) the Debtor and its Estate will release all claims against the Settling Former Partners; (iv) the Settling Former Partners will release all claims against the other Settling Former Partners; and (v) the consideration paid by the Settling Former Partners is conditioned on the implementation of Section 9.4 of the Plan and a good faith finding pursuant to Section 877.6 of the California Code of Civil Procedure.  In addition to the forty-seven Settling Former Partners who are parties to the existing Former Partner Settlement, additional Former Partners may reach settlements with the Proponents; however, any new settlement with a Former Partner is conditioned upon an agreement with the Committee and Debtor. Any Former Partner who becomes a Settling Former Partner will be entitled to the benefit of Section 9.4 of the Plan and Section 877.6 of the California

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:101877.7 77795/001

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

7

Case: 18-81037    Doc# 309    Filed: 12/12/19    Entered: 12/12/19 16:04:55    Page 12 of 62

1  Code of Civil Procedure and such partner will be required to release the other Settling Former

2  Parties.

3      The Plan contemplates the liquidation of all of the Debtor's assets—which shall be

4  transferred to the Liquidating Trust as Liquidating Trust Assets—for the benefit of the holders of

5  Allowed Claims and Allowed Interests, if any. The resulting funds, after payment of Plan Expenses,

6  will be made available for distribution to holders of Allowed Claims and Allowed Interests, if any, in

7  accordance with the terms of the Plan. The Liquidating Trustee's operation of the Liquidating Trust

8  will be for the purpose of liquidating and monetizing Liquidating Trust Assets, which consist

9  primarily of the Accounts Receivables, Retained Claims, and Defenses.

10      From and after the Effective Date, the Liquidating Trust, acting through the Liquidating

11  Trustee, shall expeditiously seek to collect, liquidate, sell and/or reduce to Cash all Liquidating Trust

12  Assets, including, without limitation, through pursuit of the Accounts Receivables, Retained Claims,

13  and Defenses, and use the proceeds thereof and the existing cash on hand to fund the Plan.

14      As set forth in this Disclosure Statement, the Proponents believe that the Plan will allow the

15  holders of Unsecured Claims to receive a meaningful return on account of their Allowed Claims

16  against the Debtor, which in part will depend upon the collection of outstanding Accounts

17  Receivables, the outcome of litigation of Retained Claims, and the ultimate allowance of Claims.

18      With the Plan, Creditors entitled to vote will receive a Ballot for voting on the Plan, and a

19  Disclosure Statement that provides information concerning the Debtor and the Plan. This Disclosure

20  Statement includes a summary of the assets and liabilities of the Debtor, a summary of what

21  Creditors and Interest Holders will receive under the Plan, a discussion of certain alternatives to the

22  Plan, and a summary of the procedures and voting requirements necessary for confirmation of the

23  Plan. You should thoroughly review both the Plan and Disclosure Statement before deciding

24  whether you will accept or reject the Plan.

25      Payments under the Plan (as well as the operating costs of the Liquidating Trust) will be

26  funded through a combination of: (1) cash on hand, (2) the collection of accounts receivable,

27  (3) equity distributions from the U.K. LLP, (4) the Former Partner Settlement, and (5) the proceeds

28

of causes of actions against third parties (referred to in the Plan as the Avoidance Actions and Retained Claims and Defenses).

The Plan requires payments totaling $785,000 be made to the holders of certain Professional Fee Claims, Administrative Claims and Priority Claims on the Effective Date (the "Effective Date Payments"). The Debtor estimates it will have sufficient cash with which to make the required payments under the Plan. Post-Effective Date distributions to Creditors under the Plan will depend to a great extent on the successful prosecution and/or settlement of claims and actions against third parties; therefore, it is impossible to predict, at this moment, the exact timing or amount of distributions to Class 2 General Unsecured Creditors. Assuming the projected recoveries are realized, at present, the Debtor estimates that an initial distribution to Class 2 General Unsecured Creditors should be made within nine months after Confirmation but such date and timing will be within the determination and discretion of the Liquidating Trustee and the Oversight Committee.

As distributions to Class 2 General Unsecured Creditors are made on a pro rata basis, the amount of distributions to Unsecured Creditors will also depend on the total dollar amount of Allowed Claims in each Class. The Debtor has not completed its analysis of every Claim. Nor has it completed the process of objecting to Claims. The Debtor's best estimate, however, at this time, is that if all potential objections to Claims were resolved in its favor, the total amount of Allowed Class 2 General Unsecured Claims would be approximately $20,400,000. The amount of Class 2 Claims in excess of $20,400,000 that remain in dispute is approximately $8,000,000.

For the reasons set forth in this Disclosure Statement, the Debtor and the Committee believe the Plan provides the best mechanism available for maximizing returns to Creditors and they urge Creditors to vote to accept the Plan.

**B.** **Treatment of Claims**

The following chart summarizes the treatment of Creditors and Interest Holders under the Plan. Amounts listed below are estimated.

| TREATMENT OF CLAIMS CHART | | | | |
|---|---|---|---|---|
| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
| A | N/A | Allowed Administrative Claims | Estimated amount of Claims in this category: $60,000 | Each Allowed Administrative Claim, unless the holder of such Claim has agreed to a different treatment, shall be paid in |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| TREATMENT OF CLAIMS CHART | | | | |
|---|---|---|---|---|
| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
| | | | Estimated Recovery on Allowed Claims in this category: 100% | full by the Liquidating Trustee from Available Cash or the Reserved Claims Pool Account (as applicable) on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the fourteenth day after such Claim is Allowed, or as soon thereafter as practicable; and (d) such date as the holder of such Claim and the Liquidating Trustee may agree. |
| B | N/A | Allowed Claims for Professional Fees | Estimated amount of Claims in this category: $785,000<br><br>Estimated Recovery on Allowed Claims in this category: 100% | Each party seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Administrative Claims Bar Date; and (b) if the Bankruptcy Court grants such an award, each such party will be paid in full in Cash by the Liquidating Trustee in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order and the Bankruptcy Court's Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees. |
| C | N/A | Allowed Priority Tax Claims | Estimated amount of Claims in this category: $0.00<br><br>Estimated Recovery on Allowed Claims in this category: 100% | Each Allowed Priority Tax Claim, unless the holder of such Claim has agreed to a different treatment, shall receive deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the rate established by applicable nonbankruptcy law as of the calendar month in which the Plan is confirmed, or at such other rate as may be agreed upon between the Liquidating Trustee and the appropriate governmental unit, provided that the Liquidating Trustee may prepay any or all such Claims at any time, without premium or penalty. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| TREATMENT OF CLAIMS CHART | | | | |
|---|---|---|---|---|
| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
| D | 1 | Insured Malpractice Claims | Estimated Recovery on Allowed Claims in this Class: 100% from insurance<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Class 1 shall consist of Insured Malpractice Claims. Class 1 Claims are impaired and holders of Class 1 claims are entitled to vote. Each holder of an Insured Malpractice Claim shall receive the following treatment: (a) the automatic stay under Section 362 of the Bankruptcy Code shall be deemed modified to permit the holder of a Class 1 Claim to prosecute its claim to judgment in any applicable court of competent jurisdiction; (b) the holder shall be deemed to waive its Class 1 Claim against the Debtor and the Estate and shall not be entitled to any distribution under the Plan, (c) the holder shall limit its recourse on account of its Class 1 Claim solely to the proceeds payable by any insurer under any applicable Malpractice Policy; and (d) any recovery obtained by the holder on account of its Class 1 Claim shall (i) in the event of a judgment, be deemed reduced by the amount of the unsatisfied portion of any Insurance Deductible applicable to such Claim under any applicable Malpractice Policy, or (ii) in the event of a settlement, be deemed to satisfy the amount of any Insurance Deductible applicable to such Claim under any applicable Malpractice Policy. In the alternative, at the election (as defined below) of the holder of a Class 1 Claim, such holder shall instead receive the treatment provided by the Plan for the holders of Allowed Unsecured Claims under Class 2 of the Plan. For purposes of this Section 4.1 of the Plan, an election shall mean the written acceptance submitted by the holder of a Class 1 Claim accepting the Plan on the Ballot in connection with solicitation of votes under the Plan. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| TREATMENT OF CLAIMS CHART | | | | |
|---|---|---|---|---|
| Chart § | Class No. | Description | Estimate of Claims and Recoveries | Plan Treatment |
| E | 2 | Unsecured Claims | Estimated amount of Claims in this Class: $20.4 million**.**<br><br>Estimated Recovery on Allowed Claims in this Class: 12.8%<br><br>The estimate does not include all projected litigation recoveries. The actual dividend could be less than 12.8%, or if the litigations are extremely successful, could be higher than 12.8%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Class 2 shall consist of Unsecured Claims. Class 2 Claims are impaired. Each holder of an Allowed Class 2 Claim shall receive, a Pro Rata Share of Net Available Cash after deductions for the payment (or appropriate reserve for) the Allowed Claims of senior classes of Claims and reserves for Disputed Claims, Professional Fees and/or Plan Expenses. To the extent that all Allowed Class 2 Claims have been paid in full, including post-petition interest, any remaining funds in the Claims Reserve Account shall be used by the Liquidating Trust to fund distributions to the holders of Allowed Interests in Class 3. |
| F | 3 | Interests | 0%<br><br>**IMPAIRED**<br><br>**DEEMED TO REJECT** | On the Effective Date, the Interest Holders shall have no ability to direct or control the affairs of the Liquidating Trust. Interest Holders shall receive nothing under the Plan until the Allowed Claims of Class 2 is paid in full, including postpetition interest, at which point all Net Available Cash, net of amounts reserved for Disputed Claims, Professional Fees and/or Plan Expenses, shall be paid to the Interests Holders consistent with the extent of their Interests. |

## III.

## OVERVIEW OF CHAPTER 11 CASE

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Case to date, including events leading up to the commencement of this case. Copies of all relevant court papers are on file with the Bankruptcy Court.

### A. Events Leading Up to the Filing of the Chapter 11 Case

#### 1. Description of the Debtor

The Debtor's roots trace back to 1933, approximately 85 years ago, when enterprising attorneys Gordon Keith and Frank Creede started their own firm, Keith and Creede, in San Francisco. It became Keith, Creede & Sedgwick in approximately 1945, and then Sedgwick Detert,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Moran & Arnold in 1959 when the firm then had only 14 attorneys. The firm shortened its name to Sedgwick LLP in 2011.

From that one relatively small office in 1959, Sedgwick grew steadily and strategically until it became an international AmLaw 250 law firm with offices in 13 US cities, plus London and Bermuda. In order to satisfy increasing demand by its clients for representation around the country, Sedgwick opened offices in Los Angeles (1979), London and New York (1985), Orange County (1988), Chicago (1989), Newark and Dallas (2001), Houston, Austin and Bermuda (2006), Fort Lauderdale (2009), Washington, DC and Seattle (2011), and Miami (2013). It provided its clients and attorneys with a national footprint and the ability to provide first class legal services to clients nationwide and for the insurance markets in London and Bermuda. It established a well-deserved reputation for high-end insurance work and as one of the preeminent product liability firms in the country. Sedgwick was known for its excellent trial lawyers who were able to try the toughest and most significant cases for its corporate clients, and its top flight insurance counsel who represented insurance companies in major insurance-related cases.

## 2. The Debtor's Pre-Petition Credit Facility

Citibank, N.A. ("**Citibank**") was the Debtor's only prepetition secured creditor. Under a *Second Amended and Restated Secured Loan Agreement*, dated December 31, 2009 (as amended, the "**Credit Agreement**"), Citibank made a revolving line of credit and term loan available to the Debtor. The parties also entered into and executed various other agreements and documents, which together with the Credit Agreement, are referred to herein as the "**Prepetition Loan Documents**." The Debtor's obligations under the Prepetition Loan Documents were secured by a blanket lien against all assets, including the Debtor's accounts receivable.

Through the Prepetition Loan Documents, the Debtor obtained a $17 million revolving line of credit (the "**Line of Credit**") net of any undrawn of letters of credit commitments (the "**Letters of Credit**").

On or about August 10, 2017, Citibank terminated the Credit Agreement because the Debtor was no longer in compliance with a covenant provision that required minimum number of equity partners. After the termination, the Debtor worked consensually with Citibank to begin repaying

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the outstanding amounts under the Line of Credit (which was approximately $3 million) and also cash collateralize seven undrawn Letters of Credit in the approximate aggregate amount of $6,000,000 that secured the Debtor's obligations under certain office leases.

During the next five-six months, the Debtor worked with Citibank to repay this secured obligation to the firm.  To this end, the Line of Credit was repaid in full in November 2017 and the undrawn Letters of Credit were fully collateralized in February 2018.  As of the Petition Date, Citibank is not owed anything on account of the Prepetition Loan Documents, except for certain *de minimis* administrative banking charges that were incurred in the ordinary course.

### 3.    Events Precipitating the Debtor's Filing

In January 2017, Sedgwick had approximately 50 equity partners, 44 non-equity partners, 36 contract partners, and 88 associates practicing in thirteen offices in the United States.  In addition, the Debtor also employed approximately 350 individuals in various administrative roles. At the outset of 2017, the Debtor's day-to-day operations continued as they had in 2016 and prior years.

On or about January 5, 2017, the equity partners associated with the Debtor's Newark, New Jersey office announced they were leaving the partnership to start their own firm.  Their disassociation with the firm became effective on January 31, 2017 and other than three attorneys resulted in the entire office leaving the firm, which included approximately 45 other attorneys and staff.  A few days later, on or about January 7, 2017, the primary partners associated with Sedgwick's Dallas, Texas office announced they were leaving the partnership to join another firm. Their disassociation with the firm also became effective on January 31, 2017 and like the New Jersey office resulted in virtually the entire office leaving the firm, which included approximately 38 attorneys and staff.

The departure of these equity partners (and the associated attorneys and staff) was not expected.  The Debtor responded to the departures of the New Jersey office by subletting most of the office space to the new firm and assigned the Dallas office lease to another firm. Further, the Debtor's remaining equity partners decided to reduce their compensation draws.

The Debtor continued to closely monitor its operations, work in progress, accounts receivables, and new originations. In February 2017, the Debtor held a partner meeting to further analyze, assess and discuss the needs and direction of the firm. The Debtor again determined that it was best practice to maintain the draws being paid to equity partners. The firm was generally paying its debts as they came due. The Debtor was not operating the firm or paying equity partners by borrowing millions of dollars without regard to account receivables, work in progress, or prospective originations. The Debtor was compensating its equity partners in accordance with its projections, which were revised after the Newark and Dallas departures.

After the equity partner departures became final on January 31, 2017, the Debtor continued operating on a reduced footprint. While one equity partner from the Los Angeles office left at the end of March 2017, over 85% of its equity partnership remained intact.

By May 2017, the equity partner who ran the Debtor's Washington, D.C. office left and five equity partners left from the Los Angeles and San Francisco offices. The equity partners who most recently left were on the lower end of the spectrum of revenue generation and they were all from the Los Angeles and San Francisco office, which both continued to have robust practices. The firm looked to wind down the Washington, D.C. office because the rent was expensive. Plus, the Debtor subletted a portion of its San Francisco office (2 of its 5 floors) to offset administrative overhead. Thus, as the firm's composition changed, the Debtor worked to reshape the firm so that it could operate in a new environment.

On or about August 10, 2017, Citibank terminated the Debtor's credit facility. While the termination of the Credit Agreement and immediate repayment requirements presented some challenges to the firm, Sedgwick continued to operate with a view that the firm would be able to continue in connection with a merger or acquisition or a scaled down version of the existing firm.

For example, after the departure of the New Jersey and Dallas offices and through the fall of 2017, the Debtor engaged in merger/acquisition discussions with a number of other law firms. Initially, it was the Debtor's desire to merge its entire firm with another firm. As most know, wholesale mergers not only take time but they prove to be difficult because conflict of interest tend to prevent mergers without severing portions of the firm. The Debtor considered other options. For

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

example, the firm marketed its litigation and insurance practices separately. The firm marketed portions of its litigation and insurance groups on a regional basis. In the end, the Debtor was in active and substantive discussions with approximately six major law firms. The Debtor considered whether there were models to maintain the firm but with a smaller footprint and smaller equity partner and attorney base that would require adjustments to compensation projections while the firm rebuilt. In the end, the Debtor believed that it was viable because it was exploring and considering all options while at the same time generally paying its debts as they came due.

Even after other equity partner departures and other set-backs, approximately thirty-one equity partners stayed committed to the firm. They vowed to stay with the firm continuing to work, originate new business, and carried on while the Debtor explored options to resize the firm, locate a merger firm, or a firm that could acquire select partners and assets. As the year went on, these partners received far less – in most cases less than 50% – of their anticipated income.

The firm was projected to make a profit at the end of 2017, though clearly not in the range of expectations of the equity partners. The equity partners recognized that while the firm was and could remain profitable, it was unrealistic to expect a sufficient number of equity partners, associates, and staff to remain through a long rebuilding process with an uncertain outcome. Under those circumstances, the firm would unlikely be able to recruit replacements to keep it operating. In short, the equity partners recognized that despite their best efforts to keep the firm going, continuing operations was no longer a viable or realistic alternative on a long term basis. Accordingly, the equity partners voted in December 2017 to wind up the firm.

**B.** **Summary of Events During the Chapter 11 Case**

The following is a summary of important events that have taken place since the Petition Date.

**1.** **"First Day" Pleadings**

Contemporaneously with the filing of the Debtor's chapter 11 petition, the Debtor filed certain standard "first day" pleadings (the "First Day Pleadings") requesting relief from the Bankruptcy Court that would minimize the disruption caused by the bankruptcy filing to its ordinary business operations, including the following:

DOCS_SF:101877.7 77709/004                                16                    DISCLOSURE STATEMENT IN SUPPORT OF
                                                                                                        JOINT PLAN OF LIQUIDATION

• *Application for Order Approving Designation of Curtis D. Parvin, Gregory C. Read, and Bruce D. Celebrezze as Responsible Individuals Pursuant to Bankruptcy Local Rule 4002-1* [Docket No. 3]

• *Motion for Order Authorizing Debtor to (A) Maintain Existing Bank Accounts and (B) Continue Use of Cash Management System* [Docket No. 4]

• *Motion Pursuant to Section 365(a) of the Bankruptcy Code for an Order (I) Authorizing the Debtor (A) to Reject Unexpired Non-Residential Real Property Leases and (B) to Abandon Any Personal Property Located at Such Premises, and (II) Fixing a Bar Date for Claims of Counterparties* [Docket No. 5]

• *Ex Parte Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 6]

The Bankruptcy Court held an expedited hearing on the First Day Pleadings on December 29, 2008. Following the December 29, 2008 hearing on the First Day Pleadings, the Bankruptcy Court entered several orders related to the First Day Pleadings on December 30, 2008, which orders, as well as certain subsequent orders, are discussed in the following paragraphs.

**2.      Filing of Schedules, Meeting of Creditors and Bar Date**

On November 27, 2018, the Debtor filed its Schedules [Docket Nos. 107 and 119] and Statement of Financial Affairs [Docket No. 108] with the Bankruptcy Court. The Schedules provide detailed information on the Debtor's assets and liabilities, as well as other information about its business. In addition, on October 23, 2018 and December 11, 2018, the United States Trustee conducted the Section 341 meeting of creditors in the Debtor's chapter 11 case. Pursuant to rules 2002(1) and 9008 of the Federal Rules of Bankruptcy Procedure, the deadline for filing proofs of Claim in the Bankruptcy Case for non-Governmental Units was January 22, 2019 and the deadline for governmental units was March 31, 2019. The Debtor has filed monthly operating reports commencing with the month ending October, 2018, and continues to file such reports.

**3.      The Official Committee of Unsecured Creditors**

On October 14, 2018, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in this case [Docket No. 37]. The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

current members of the Committee are as follows: (1) BMO Harris Bank; (2) CPF 801 Tower LLC; and (3) One North Wacker Drive LLC.

### 4. Retention of Professionals

The Bankruptcy Court has authorized the Debtor to retain the following professionals:

- Pachulski Stang Ziehl & Jones LLP, as general bankruptcy counsel, which employment was approved on October 30, 2018;

- Development Specialists, Inc. as Financial Advisor, which employment was approved on October 23, 2018.

- On-Site Associates, LLC as Collections Agent, which employment was approved on November 8, 2018.

- Armanino LLP as Accountant, which employment was approved on October 30, 2018.

- CandC Fees Limited as London Collections Agent, which employment was approved on October 30, 2018.

- Baker Tilly LLP, as Tax Advisor, who employment was approved on February 7, 2019.

The Bankruptcy Court authorized the Committee to retain Pillsbury Winthrop Shaw & Pittman LLP as its legal counsel by order entered on December 17, 2018 and authorized the Debtor and the Committee to employ Commenda Asset Resolution Partners, LLC as financial advisors to the Committee by order entered on March 5, 2019. After the primary partner on the matter left Pillsbury for Baker & Hostetler LLP, the Committee retained Baker & Hostetler LLP as its legal counsel, which was approved on March 1, 2019. Later, the Committee decided to change counsel and retained Sheppard Mullin Richter & Hampton LLP as its legal counsel, which was approved on May 29, 2019.

### 5. Client File Disposition Procedures

As a result of the wind-down and prior thereto, substantially all of the Debtor's attorneys became affiliated with other law firms. In certain but not all cases, each attorney transferred to other firms, that attorney's open client files were transferred as well. However, during the Debtor's 85-plus year history, approximately 170,000 closed client files were retained and stored by the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Debtor, in some manner, for various reasons, including compliance with applicable rules of

2   professional responsibility.

3          On November 13, 2018, the Debtor filed the *Motion and Memorandum of Points and*

4   *Authorities in Support of Motion for Approval of Client File Disposition Procedures* [Docket No.

5   98], which provided notice and an opportunity for the Debtor's former clients to retrieve their files

6   in accordance with applicable rules of professional responsibility and to minimize cost of file

7   storage, retrieval and destruction costs to the estate.  The Court entered an order authorizing the

8   Debtor to dispose of client files pursuant to the foregoing motion by *Order Approving Debtor's*

9   *Motion for Approval of Client File Disposition Procedures* [Docket No. 112].

10                **6.      Procedures for Settlement of Accounts Receivable**

11         On October 31, 2018, the Debtor filed the *Motion for Approval of Settlement Procedures for*

12  *Compromising Accounts Receivable* [Docket No. 81], which sought approval of settlement

13  parameters for the Debtor's outstanding accounts receivable.  On November 8, 2018, the

14  Bankruptcy Court approved the foregoing motion by entry of the *Order Approving Motion for*

15  *Approval of Settlement Procedures for Compromising Accounts Receivable* [Docket No. 90].  Since

16  this time, the Debtor's Professional, On-Site Associates, LLC and CandC have been engaged in the

17  collection of the Debtor's accounts receivable for the benefit of the Estate.

18                **7.      The GRM Settlement Motion**

19         On November 13, 2018, the Debtor filed the *Motion and Memorandum of Points and*

20  *Authorities in Support of Motion for Approval of Client File Disposition Procedures* [Docket No.

21  98], which sought authorization to implement notification procedures regarding the disposition of

22  former client files.  As set forth in the motion, the Debtor stored over 170,000 boxes of client files

23  with a third-party storage provider, GRM Document Management ("GRM").  The Debtor was

24  required to pay a monthly storage fee to GRM but also reimburse GRM for the loan it provided to

25  the Debtor when the Debtor transferred its other client files to GRM.  In the end, the Bankruptcy

26  Court approved the motion by entry of the *Order Approving Debtor's Motion for Approval of Client*

27  *File Disposition Procedures* [Docket No. 112], which provided that the Debtor would pay $775,000

28  to GRM for all storage and destructions fees for the files that are not retrieved by former clients.

### 8. Mediation

Prior to the Petition Date, the Debtor, through its counsel, engaged with a group of creditors regarding the potential settlement of claims against the Debtor's Former Equity Partners arising from the payment of compensation, draws, and the return of capital as constructive fraudulent transfers claims. The Debtor and group of creditors were not able to reach an agreement and as a result, the Debtor commenced this Chapter 11 Case, which intended to use to resolve the foregoing claims, in addition to the wind down of the Estate's other open matters as discussed herein.

After the commencement of the Chapter 11 Case, of the creditors that the Debtor was negotiating with, three were appointed to the Committee. In an effort to continue the negotiation of these claims, the Debtor exchanged thousands of pages of documents in response to informal requests from the Committee and met with the Committee to negotiate an agreement. The parties met in December 2018 and again in March 2019 but the parties were not able to reach a resolution.

As result, the parties agreed to mediate the disputed issues using a neutral third party, Michael Cooper. On May 23, 2019, the parties and their respective Professionals met for a full day of discussions. The discussions continued after the conclusion of the formal mediation but in the end the parties were not able to reach an agreement that was acceptable to all parties. However the mediation provided a framework for discussion that ended up leading to the proposed settlement embodied in this Plan and described below.

### 9. Other Postpetition Activities

In addition to the activities enumerated above, the Debtor has continued its liquidation of the Estate's Assets and the resolution of Claims. Specifically, prior to the Petition Date, the landlord at the Debtor's former Miami office attempted to levy against one of the Debtor's bank accounts. Citibank segregated approximately $278,500[1] from the Debtor's bank account in response to the landlord's action. The Debtor believed that the landlord's action and the segregation of cash was a plain vanilla preference. Since that time, the Debtor and landlord reached a settlement where the landlord retained $15,000 of the segregated/levied cash and the balance ($263,500) was returned

---

[1] This amount represents twice the amount of the judgment as applicable law required Citibank to segregate twice the amount of the judgment.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

to the Debtor's estate. The settlement was approved by the Bankruptcy Court by entry of the *Order Granting Motion for Order Approving the Compromise of a Controversy Among the Debtor and One Biscayne Tower, LLC* [Docket No. 162].

**IV.**

**IDENTIFICATION OF LITIGATION CLAIMS**

The Debtor's Estate includes claims and/or causes of action that the Debtor has or may have against various third parties. These are known in the Plan as the Retained Claims and Defenses. As set forth in the Plan and herein, the Debtor intends to transfer the Retained Claims and Defenses to the Liquidating Trust and have the Liquidating Trustee and the Oversight Committee investigate and pursue such Retained Claims and Defenses in their discretion for the benefit of the holders of Allowed Claims. This Article IV provides a description of the Retained Claims and Defenses.

**A.**     **The Claw-Back Claims Against Non-Settling Former Partners**

As described in Article III.9 and 10, the Debtor believes there are constructive fraudulent transfer claims against certain Former Equity Partners on account of cash distributions as compensation, draws, or the return of capital. The Debtor believes there are sixty-six (66) potential targets and currently believes that nineteen (19) Former Equity Partners will have potential claims against them after confirmation in the event the Bankruptcy Court approves the Former Partner Settlement. A list of those Non-Settling Former Partners is annexed to the Plan as Exhibit E. The claw-back claims are driven, in large part, by the date the Debtor became insolvent but also offset by the reasonable equivalent value provided by such Non-Settling Former Equity Partners to the extent such defense is applicable.

The Debtor has conducted an analysis of these claims and shared all of the Debtor's information in support of such claims with the Committee. The Committee and its professionals also have conducted an analysis of these claims, which will be among the Retained Claims and Defenses that may be pursued by the Liquidating Trustee. The Committee also believes that former non-equity partners and retirees potentially face fraudulent transfer liability as well, and for the sake of preserving all assets of the Estate for the benefit of its Creditors, it reserves all causes of action against non-equity partners and retirees as well.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

At the time certain of the Debtor's Former Equity Partners announced their departure on or about January 5, 2017 and January 7, 2017, there was no indication from this group of Former Partners would leave or were contemplating leaving the firm. One of the Former Partners was the chairman of the Debtor for several years and another was on the Debtor's executive committee approximately five days before the departure announcement was made. The Debtor believes that these departures arguable caused harm to the Debtor and that the Former Partners might have breached their fiduciary duty to the Debtor.

Any and all such claims are being preserved under the Plan as Retained Claims and Defenses and the Liquidating Trustee, at the direction of the Oversight Committee, will investigate such claims and prosecute such claims for the benefit of creditors.

**C.** **Preservation of Other Causes of Action**

As of the Effective Date, each and every claim, right, cause of action, claim for relief, right to set-off and other entitlement held by the Debtor whether arising under §§ 502, 506, 510, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552 or 553 of the Bankruptcy Code, or otherwise, other than those waived or released by express terms of the Plan or the Confirmation Order, shall be deemed fully preserved and vested in the Liquidating Trust. Without limiting the generality of the foregoing, any and all claims and causes of action held by the Debtor, the debtor in possession, and its Estate prior to the Effective Date against any person or entity, shall be transferred to and retained by the Liquidating Trust. Such claims shall include but not be limited to any claims based on the facts and circumstances related in any way to the dissolution of the Debtor, and all avoidance actions for transfers made by the Debtors or any affiliates, including all claims, rights to recovery, or transfers disclosed in the statement financial affairs filed with the Court by the Debtor. Confirmation of the Plan effects no settlement, compromise, waiver, or release of any cause of action unless the Plan or Confirmation Order specifically and unambiguously so provides. The nondisclosure or nondiscussion of any particular cause of action is not and shall not be construed as a settlement, compromise, waiver, or release of such cause of action.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 18-81037    Doc# 309    Filed: 12/12/19    Entered: 12/12/19 16:04:53    Page 27 of 62    DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION

22

DOCS_SF:101877.7 77769/001

The Debtor (prior to the Effective Date) and Liquidating Trust (after the Effective Date) also reserve the right to object to any of the Claims (regardless of whether the Claim was actually filed and classified as a priority or secured claim) improperly asserted against the Debtor and its estate. As stated above, however, under the Plan all Retained Claims and Defenses (among other things) shall be transferred to the Liquidating Trust on the Effective Date, including Avoidance Actions.

## V.

## SETTLING FORMER PARTNER SETTLEMENT

Pursuant to Bankruptcy Rule 9019 and Section 877.6 of the California Code of Civil Procedure, the Debtor and the Estate, the Committee, and the Settling Former Partners have agreed to the Former Partner Settlement as set forth herein and Exhibit G of the Plan relating to (a) the constructive fraudulent transfer claims arising from the Debtor's ordinary course cash distributions to the Settling Former Partners as either compensation, draws, or return of capital, (b) any claims arising from the Settling Former Partners' alleged breach of fiduciary duty to the Debtor, (c) any other claims the Debtor and the Estate and the Settling Former Partners have against the other, and (d) the mutual release of any claims among the Settling Former Partners.

The complete terms of the Former Partner Settlement are set forth in the Former Partner Settlement Agreement attached as Exhibit G to the Plan. The terms of such Settlement include:

(1)    The Settling Former Partners, identified on Exhibit C to the Plan and in the Former Partner Settlement Agreement, will pay a total of $1,921,000.00 to the Estate, which is conditioned upon the implementation of Section 9.4 of the Plan and Section 877.6 of the California Code of Civil Procedure, and counsel to the Debtor will reduce its allowed fees on its final fee application by $10,500, so that the net economic benefit to the Estate from the settlement is $1,931,500.00. The Settling Former Partners shall each pay their respective share of the settlement amount on or before 14 days after the Effective Date.

(2)    Pursuant to Section 877.6 of the California Code of Civil Procedure, the Settling Former Partners are entering into this settlement with the Debtor in good-faith.

(3)     The Committee will be in charge of all claims against Non-Settling Former Partners and there will not be any other settlements with Non-Settling Former Partners without the Committee's consent.

(4)     As the Former Partner Settlement Agreement is a settlement, nothing in the settlement is construed as making a determination on the date the Debtor became insolvent or any other issue *vis a vis* any other claim or action against any Non-Settling Former Partner.

(5)     On or before fourteen (14) days after the Effective Date of the Plan, U.K. LLP will pay the sums separately owed to the Debtor from the liquidation of the U.K. LLP.

(6)     Each Settling Former Partner, and any Non-Settling Former Partner who enters into a settlement before or after the Effective Date, will receive the benefit of Section 9.4 of the Plan and exchange general releases with the existing Settling Former Partners that are consistent with the releases set forth in the Former Partner Settlement Agreement provided that such Settling Former Partner has paid his or her allocable share under the Former Partner Settlement Agreement or the agreement reached with the Plan Proponents or the Liquidating Trustee, as applicable.

## A.      Transfers to the Settling Partners

As noted above, on December 31, 2017, the Debtor ceased providing legal services and commenced the formal dissolution process of winding down the firm. During 2017, before the wind down began, the Debtor made various ordinary course distributions of cash to current and former equity partners as compensation, draws, or return of capital.  The Debtor is seeking to settle the potential claims arising from such transfers (and any other claims among and between the parties, including any potential breach of fiduciary duty claims the Debtor might have against the Settling Former Partners) and enter into a general and mutual release of any other claims among the parties pursuant to the terms of the Settlement Agreement.

## B.      Events Leading to the Debtor's Wind Down and Insolvency

At the conclusion of the Debtor's fiscal year on December 31, 2016, the firm was profitable, it was paying its debts as they came due, and according to the Debtor was solvent on a balance sheet basis and otherwise, which the Committee disputes.  On or about January 3, 2017, the former equity partners of the Debtor's Newark, New Jersey office announced they were leaving the firm

DOCS_SF:102377.7 77700/001                                                      DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION
24

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

effective January 31, 2017 to start their own firm. On or about January 5, 2017, the former equity partners of the Debtor's Dallas, Texas office announced they were leaving the firm effective January 31, 2017 to join another firm.

Based on the Debtor's financial information, the former equity partners (eight in total) that departed at the end of January 2017 generated (through business originations) approximately 46% of the firm's net income in 2016. At the time of these departures, the Debtor's management recognized the departures would have a significant impact on the operation of the firm. As a result, management reacted by preparing a revised budget that projected net income in 2017 at approximately 38% of 2016's net income. Plus, management of the firm reduced the draws of the remaining equity partners by approximately 55% of the draws distributed to equity partners in 2016, which is the average reduction and senior partner draws were reduced at greater amounts. The Debtor also took other immediate measures by assigning the lease for the Dallas office to the firm those partners joined and sublet the Newark office to the departing partners, which both had the immediate effect of eliminating significant, long-term real estate liabilities against the firm.

In addition, the Debtor arranged for the vast majority of the non-equity partners, associates, and staff of the two offices to transfer to the former equity partners' new firms or to other positions, thereby eliminating exposure to sizable employee-related costs. Naturally, the very sizable compensation due those departing equity and non-equity partners was also gone. A copy of the revised budget is annexed hereto **Exhibit B**, which includes actual results through January 2017.

While a large portion of the revenue generation had left, the departure also created a "cushion" that management recognized could be used to restructure the firm. The "cushion" consisted of the receivables that the departing partners left to be collected, plus the elimination of the costs associated with the partners, other attorneys, and staff that left. The receivables portion of the "cushion" totaled approximately $4,000,000. The Debtor's management intended to utilize these funds along with reductions to operating costs to create a path to maintain and increase profitability or a merger, along with immediately restructuring the leases associated with the departed groups and a reduction of overall draws by the remaining partners.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

In February 2017, the Debtor held a partner meeting to discuss and analyze the future of the firm. The Debtor's management, with input from the firm's equity partners, determined it was best practice to continue the reduced draws to partners. As a result of the reductions in compensation draws (*on average, 55% reduction over the prior year*), the firm determined that it was not necessary for the partners to contribute additional capital.

The Debtor also made significant distributions to partners of the 2016 partnership net income in January and March of 2017, and began to draw on its secured line of credit with Citibank with a $2 million draw on the line in April and a further $1 million draw in June.

In March 2017, one equity partner from the Debtor's Los Angeles office left the firm. However, in the view of Debtor's management, the firm was still viable as this was only one equity partner among a firm with robust operations that remained in Los Angeles, San Francisco, and the other offices around the country.

During and after this time, the Debtor began actively looking for potential acquisitions of smaller firms or practices to backfill the income generated from the departed partners. In addition, the firm began to explore informal merger/acquisition discussions with a number of other law firms. The Debtor considered all options, including whether the firm should be marketed as a single unit, whether it should market the insurance coverage and litigation practice separately from the commercial and complex tort litigation practice, and whether the firm should be split regionally with a mix of insurance and litigation. The Debtor was inclined to market itself as a single unit to an international firm that did not have a large presence in certain regions of the United States and was looking to expand its footprint in the United States with both insurance and litigation practices. More than one of the law firms that the Debtor was in discussions with signaled that it was interested in certain of the Debtor's office leases. While there was not a successful merger or acquisition, a firm did later take over the Irvine, CA and Kansas City, MO leases.

The Debtor also considered whether it could downsize the firm by reducing headcount, shedding or restructuring real estate leases (which happened as the Firm was able to terminate numerous leases and pay off the associated lease termination charges), and rebuilding based on financial projections with fewer offices, partners, and long-term liabilities.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

At the end of May 2017, six equity partners left the firm, two from the Los Angeles office (one of whom was a junior equity partner), three from the San Francisco office (one of whom was a junior equity partner), and one from the Washington, D.C. office. Despite the partner departures from the Los Angeles and San Francisco offices, the equity partner and other partner presence in those offices remained strong. The departure by the Washington, D.C. equity partner was more difficult for the firm to process because that departure effectively commenced the wind down of the Washington, D.C. office. Nevertheless, the Debtor remained current on all of its liabilities and paid them when they came due, including all of its long term real estate obligations for its various office leases around the country.

On August 10, 2017, Citibank, N.A. ("**Citibank**"), the firm's lender, terminated the Debtor's secured credit facility and called all outstanding amounts due to be repaid immediately. The termination of the credit agreement challenged the Debtor's ability to pay all of its debts as they came due because: (a) the firm no longer had unfettered use of its cash as it was being restricted by Citibank, (b) the firm was required to start repaying the approximately $3 million outstanding on the line of credit, and (c) the firm was required to begin cash collateralizing the $6.9 million in outstanding stand-by letters of credit, which had not yet been called because the Debtor remained current on all of its office lease obligations. Notwithstanding, the firm was able to continue to pay its outstanding debts with Citibank's agreement to allow payoff of the line of credit and funding of the letters of credit over an agreed to time frame.

In addition, and also in August 2017, three equity partners from the New York office left and one equity partner from the Chicago office announced his imminent departure. While the Debtor continued to operate and pay rent for these offices, the firm recognized that it would be difficult to carry the long-term real estate obligations for those offices without the departing partners, the associated attorneys, and staff. These departures effectively caused the termination of the New York and Chicago offices and arguably accelerated the real estate obligations subject to certain discounts. These events, and the actions by Citibank, were the key events that made it difficult for the Debtor to adjust its business plan and restructure the firm, and likely rendered the firm arguably insolvent on or about August 31, 2017, in the view of the Debtor. The Committee

believes that the Debtor became insolvent at an earlier date, likely in January 2017 when the Newark and Dallas departures dealt what ultimately proved to be a death blow to the firm by the departure and the firm also distributed much of the 2016 partnership net income to its partners.

After the August events described above, the firm continued its efforts to locate a firm that it could merge with that would provide a new platform for its attorneys and staff but also address its various long-term liabilities. To that end, the Debtor was able to terminate certain of its real estate office leases and also enter other lease termination agreements that it was ultimately not able to fully perform. However, in the end, the Debtor recognized near the end of 2017 that while it was and could remain profitable, it was unrealistic to expect a sufficient number of partners, associates, and staff to remain through a long rebuilding process with an uncertain outcome. Under those circumstances, the firm would unlikely be able to recruit replacements to keep it operating. In this context, the Debtor recognized that despite its best efforts to keep the firm going, continuing operations was no longer a viable or realistic alternative on a long term basis. Accordingly, the firm's equity partners voted in December 2017 to wind up the firm.

### C. The Solvency of the Debtor

The claims against former Partners were largely constructively fraudulent transfer claims. One element of such a claim involves the movant establishing one of three alternatives for insolvency or fragile financial condition set forth in Section 548(a)(1)(B)(ii). As with any company, the solvency of the Debtor is a fact intensive and difficult analysis to undertake. The Debtor and its advisors have analyzed the Debtor's operations and its performance from the time of the partner departures in January 2017 through the commencement of the wind-down of the firm in December 2017. The facts and the application of those facts under the various ways to measure solvency do not definitely show that the Debtor was or was not solvent at a particular time. More importantly, the Committee disagrees with the Debtor's viewpoint that the firm did not become solvent until the second half of 2017. It is the Committee's view that the Debtor became insolvent in January 2017 at the same time the initial partner departures were announced. In the end, the Proponents use the information discussed herein to show and support the reasonableness of the settlement but do not make a determination as to when the Debtor actually became solvent nor do they ask the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Bankruptcy Court to make that determination because it would be time consuming, expensive, and the costs would likely exceed the benefits that flow from any such findings.

### 1. Balance Sheet Solvency

One of the three alternatives a movant asserting a constructively fraudulent transfer claim is set forth in Section 548(a)(1)(B)(ii)(I), which requires the debtor to be "insolvent" as that term is defined in the Bankruptcy Code. The term "insolvent" is defined in Section 101(32) of the Code on a balance sheet basis, which is why it is referred to as balance sheet insolvency. Under this analysis, a company is solvent if, using fair valuations, the sum of assets is greater than liabilities. The valuation of assets and liabilities for solvency purposes is based on "a fair valuation." *Bay Plastics, Inc. v. BT Comm. Corp. (In re Bay Plastics, Inc.)*, 187 B.R. 315, 328 n.22 (Bankr. C.D. Cal. 1995).

On a balance sheet basis, it is the Debtor's view that it was solvent at the end of January 2017. For example, at the conclusion of January 2017, the Debtor asserts that is GAAP basis equity was approximately $44 million, and the fair market value equity of $28 million because the Debtor believes there was little or no likelihood that any of the firm's long-term real property lease obligations would be accelerated. *Official Comm. of Former Partners v. Brennan (In re LaBrum & Doak, LLP)*, 227 B.R. 383, 389 (Bankr. E.D. Pa. 1998) (refusing to recognize contingent real property lease liabilities when determining solvency because the threat to the debtor's continuation did not arise after other key events).

The Committee disputes this view and believes that the Debtor was balance sheet insolvent in at least January 2017. For purposes of this settlement, the Debtor and Committee do not fully set forth their views or the views of the Settling Partners on this issue in this pleading as they do not believe it to be necessary for the provision of adequate information under section 1125(a)(1) of the Bankruptcy Code, and they want to preserve all arguments for the Estate in any future with litigation with Non-Settling Former Partners.

### 2. Cash Flow Solvency

A movant asserting a constructively fraudulent transfer claim can also meet the "insolvency element" of such a claim by demonstrating what is known as cash flow insolvency. 11 U.S.C. § 548(a)(1)(B)(ii)(III). A company is presumed to be solvent if it is generally paying its debts as

they become due. *In re Bay Plastics*, 187 B.R. at 328 n.22. The Debtor believes that it was paying its debts as they came due in January 2017 through at least August 2017. According to the Debtor, it was not until Citibank terminated the secured credit facility and required the immediate repayment of the nearly $10 million in debt that the firm began to struggle to pay its debts as they came due. The Committee, however, disagrees. Again, the Debtor and the Committee do not set forth their views or the views of the Settling Partners on the matter here fully in the interest of preserving all arguments for the benefit of the Estate post-confirmation.

### 3.    Capital Adequacy

The third option for meeting the insolvency element of a fraudulent transfer claim is found in section 548(a)(1)(B)(ii)(II) of the Bankruptcy Code, which provides that said element is satisfied if the movant demonstrates that the debtor "was engaged in business or a transaction, or was about to engage in a business or transaction, for which any property remaining with the debtor was an unreasonably small capital." The Bankruptcy Code does not provide further guidance as to what constitutes "unreasonably small capital." Generally, inadequate capitalization applies where, post-transfer, a debtor is left technically solvent, but doomed to fail. Determining capital adequacy is a question of fact, and the burden of proof is on the party seeking to establish the debtor had unreasonably small capital during the period in which the transfer(s) occurred.

A debtor's debt to equity ratio, historical capital cushion, and the need for working capital in the specific industry at issue are considered in the company's projected cash inflows (also referred to as working capital or operating funds) with the company's capital needs through a reasonable period of time after the transfer. When determining capital adequacy, one must evaluate the reasonableness of a company's cash flow projections objectively so as to balance what might be considered management's optimism with the company's actual performance.

It is the Debtor's view that it was not insolvent under a capital adequacy test until at least August 31, 2017, because of reduced expenses through the partner departures and the reduced draws by the equity partners that stayed at the firm, accounts receivable continuing to come into the firm, and seasonal variations in cash on hand.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Committee asserts that the Debtor was on its deathbed and doomed to fail when the partner departures occurred in January 2017 (or possibly earlier, when it was determined that they would occur). Again, in order to preserve all arguments against Non-Settling Partners for the benefit of the Estate post-confirmation, the Debtor and Committee do not set forth their views on this issue in full.

**D.      The Claw-Back Analysis**

There are few if any cases that analyze the solvency of law firms or constructively fraudulent transfer claims against former equity partners. However, one of the cases that analyze constructive fraudulent transfer claims against equity partners of an insolvent law firm is *Annod Corp. v. Hamilton & Samuels*, 100 Cal. App. 4th 1286 (Cal. App. Ct. 2002), which the Debtor utilizes for purposes of showing that the settlement discussed herein is reasonable.  In *Annod*, the debtor's former landlord sought to avoid distributions of cash made to the debtor's Partners after it became insolvent.  *Id.* at 1291 and 1292.  The court found that the distributions to Partners were not avoidable because: (a) they were made in good faith because had they not been made the partners would have left the firm and not continued working and generating revenue for the firm; (b) the draws paid to the partners were substantially less than paid to partners in prior years; (c) the draws represented under market values for the services provided by the partners; (d) the partners were not personally liable for the firm's financial obligations; and (e) the distributions were offset by revenue generated by the partners thereby providing reasonably equivalent value.  *Id.* at 1295.

The Committee does not agree that *Annod*, a California state court decision, is binding on an action brought in Bankruptcy Court under section 548 of the Bankruptcy Code.  However, the Debtor, using some of the principles from *Annod*, prepared a detailed clawback analysis described in great detail in the stand-alone *Motion for Order Approving the Compromise of a Controversy Among the Debtor and Certain Former Equity Partners of the Debtor* [Docket No. 234] (the "Original Settlement Motion") filed by the Debtor in support of its original settlement with most of the Settling Partners.  The Committee also prepared a detailed clawback analysis, which is based upon a different assumption and metrics that ultimately shows larger clawback claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

In the Original Settlement Motion, the Debtor attached its clawback analysis using May 31, 2019 and August 31, 2019 as proposed insolvency proxies. Again, the Committee does not agree with these analyses or that the insolvency dates of May 31 or August 31 are correct. In any event, the Debtor's clawback analyses attached to and described in the Original Settlement Motion reflect a total liability of $1,848,599 for the Settling Former Partners on the May 31, 2017 insolvency date and $1,121,035 on the August 31, 2017 insolvency date.[2] Any party wishing to review the Debtor's clawback analysis in detail, or to read a detailed description of the assumptions that formed a part of that analysis, can do so by reviewing the Original Settlement Motion that the Debtor will provide upon request or can be downloaded from the public docket maintained on PACER [Docket No. 234] for this Bankruptcy Case.

### E. The Settlement Agreement Was Entered Into in Good Faith

As set forth in the Settlement Agreement, the Debtors and the Committee are seeking approval to settle the claw-back claims (and any other claims) against the Settling Former Partners in exchange for a lump sum Settlement Payment of $1,931,500. The Debtor and Committee believe that the Settlement Payment represents a reasonable recovery on account of such claims because, and from the Debtor's perspective, it is equal to 172.3% of the claims against such partner using August 31, 2017 as a proxy for when the firm became insolvent. Even if May 31, 2017 were used as an insolvency proxy, the Settlement Payment still represents a reasonable recovery against the Settling Partners because it is equal to 104.5% of the claims against such partners using that date, according to the Debtor's analysis. As noted above, the Committee believes that the Debtor became insolvent as early as January 2017, which if true would enable the Debtor's estate to seek more from the Partners. However, in the context of settlement, the Committee sees that it would be time consuming and expensive to litigate this issue to finality and it makes sense to reach a settlement that brings funds into the estate so that the Liquidating Trustee can determine the best course of action against the Non-Settling Partners.

---

[2] It should be noted that the amounts stated above are slightly larger than the amounts in the Original Settlement Motion because the settlement under the Plan includes forty-seven partners and the Original Settlement Motion forty-five.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   The Debtor and the Committee believe that the Settlement Agreement was entered into in

2   good faith and represents a fair bargain for the Debtor's estate as well as its general unsecured

3   creditors. The Settlement Agreement will avoid unnecessary and protracted litigation involving

4   bankruptcy law, various state law issues, and the difficulty of determining when the Debtor became

5   insolvent.  The Debtor's solvency can be established in at least three ways (as noted above) and

6   each of them are dependent upon a host of various facts that are not always applied in the same

7   manner.  Any contested matter or trial over the Debtor's solvency will not only be time consuming

8   but the outcome will be uncertain. In addition, a settlement avoids any issue of collectability,

9   however minor of a concern this may be.

10   Second, the Settlement Agreement guarantees that the Debtor's estate will receive

11   $1,931,500 by the Settling Partners voluntarily contributing their share towards the Settlement

12   Payment.  The Settlement Agreement not only avoids the uncertainty of prevailing against the

13   Settling Partners but also avoids the costs of contingency counsel and the incurrence of other

14   expenses that could very well exceed the net benefits of the Settlement Agreement.

15   Third, the Settlement Agreement brings closure to the last major part of this chapter 11 case.

16   As the Court is aware, the Debtor has been collecting accounts receivable subject to certain pre-

17   approved settlement procedures and the oversight of the Committee.  Also, the Debtor is nearing

18   the end of the long and tedious process of notifying former clients about their files and arranging

19   for their return.

20   Fourth, the Settlement Agreement is the product of several months of intensive negotiations

21   involving the Debtor, the Committee, and the Settling Former Partners, including one formal

22   mediation session, multiple settlement meetings, and extensive ongoing negotiations involving

23   dozens of parties.

24   For all the foregoing reasons, the Debtor and the Committee support the Settlement

25   Agreement and asks that the Court approve the compromise embodied therein.

26   **F.**      **Standard for Approval of Compromise Under Bankruptcy Rule 9019**

27   Bankruptcy Rule 9019(a) provides in relevant part that "[o]n motion by the trustee and after

28   notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr.

P. 9019(a). In reviewing proposed settlements, the standard that courts applied under the former Bankruptcy Act also applies under the Bankruptcy Code. *See In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985). The U.S. Supreme Court stated in *Protective Committee v. Anderson*, 390 U.S. 414 (1968), that in order to approve a proposed settlement under the Bankruptcy Act, a court must have found that the settlement was "fair and equitable" based on an "educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Carla Leather*, 44 B.R. at 466.

A court, however, should not substitute its own judgment for the judgment of a trustee or a debtor. *Id*. at 465. In reviewing a proposed settlement, a court is not "to decide the numerous questions of law and fact . . . but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983). "When assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required." *In re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997) (citations omitted).

The Ninth Circuit has held that in considering a proposed compromise, the Court must evaluate the following factors: (i) the probability of success; (ii) the difficulties, if any, of collection; (iii) the complexity of litigation involved, and the expense, inconvenience and delay in necessarily attending to it; and (iv) the paramount interests of creditors. *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988) (quoting *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), *cert. denied sub nom*).

Many issues arise in evaluating whether a settlement is appropriate, including bankruptcy issues, collectability issues, and whether better alternatives exist. Those issues are discussed below.

## G. The Probability of Success Factor Favors a Compromise

The determination of the Debtor's solvency, or insolvency, as of a specific date will be a long, expensive, and uncertain process with no guarantee that the Court will determine that the Debtor became insolvent prior to May 31, 2017. The Debtor believes that it was balance sheet

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    solvent at least through August 2017 (which the Committee disputes) and the Debtor continued to

2    pay its debts as they came due through the same period in time (but only after borrowing $3 million

3    from Citibank). The only other solvency test involves analyzing the Debtor's capitalization, which

4    again is subject to more facts, interpretation, and assessing whether, when, and to what extent

5    certain long-term liabilities should be accelerated and discounted. As discussed above, the

6    Committee believes the insolvency date was earlier, likely in January 2017, but agrees with the

7    Debtor that the issue is subject to a number of disputed points of fact, law, and interpretation, and

8    there is uncertainty as to what the litigated outcome would be as to the precise date of the Debtor's

9    insolvency for the purposes of Section 548.

10          In addition, the analysis of the clawback claims by the Debtor referred to above made

11   certain assumptions that both the Settling Partners and the Committee could dispute. For example,

12   the Debtor's analysis involves certain assumptions for the reasonably equivalent value credit given

13   for receivables generated by the departing partner. The Debtor's analysis gave credit until the end

14   of 2017. The Settling Partners could argue that credit should be given up to the present time, and

15   the Committee could argue that no reasonably equivalent value credit at all should be given because

16   these are equity distributions, or that if any credit is given, it should stop on the date the Settling

17   Partner left the firm. While changes in the way reasonably equivalent value is calculated in the

18   Debtor's analysis could increase the claims against the Settling Partners if the Committee's

19   arguments were accepted, it could also decrease the claims against the Settling Partners if the

20   Settling Partners' arguments were accepted.

21          Accordingly, the Debtor and the Committee believe that the benefits under the Settlement

22   Agreement far outweigh the risk of litigation of trying to establish an earlier insolvency date or

23   being challenged by an alternative recovery analysis that reasonably fit within the analysis of

24   applicable case law, including the *Annod case, supra, relied upon by the Debtor*. The Debtor

25   submits that the first factor of the traditional test under *A & C Properties* supports approval of the

26   compromise reflected in the Settlement Agreement.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### H. The Difficulties of Collection are Not Relevant

The Debtor and Committee do not believe this factor supports or is against the approval of the Settlement Agreement. If the Debtor or its estate obtained judgments against any of the Settling Partners the Debtor does not have any reason to believe that it would have difficulties collecting from most of the Settling Partners. In the end, the irrelevance of this factor is not determinative.

### I. The Expense, Inconvenience, and Delay of Further Litigation

The third prong of the test under *A & C Properties* is the complexity of litigation involved, and the expense, inconvenience, and delay in attending to it. This factor unquestionably supports approval of the Settlement Agreement. As discussed above regarding the probability of success, the adjudication of the Debtor's solvency, or insolvency, will be a long and expensive process that will involve competing financial advisors preparing valuation reports, who will each be deposed about their evaluation of the Debtor's financial wherewithal during 2017. The process will not only be expensive but will also consume a substantial amount of time and further delay confirmation of a liquidating plan, the claim reconciliation process, and distributions to the holders of allowed unsecured claims. Thus, approval of the Settlement Agreement will avoid the expense and uncertainty of litigation, which has been kept at a minimum to date, and also guarantee a reasonable and immediate recovery on account of these claims thereby paving the way for the Debtor to propose a plan of liquidation. For the foregoing reasons, the Debtor and Committee submit that the third factor under *A & C Properties* favors approval of the Settlement Agreement.

### J. The Settlement Agreement Serves the Interests of Creditors

The Debtor and Committee believe that the deal embodied in the Settlement Agreement serves the interests of creditors. The Settlement Agreement will avoid unnecessary and potentially protracted litigation, immediately increase the pool of cash that can be used to administer the case and pay creditors, and bring an end to the last remaining piece of the wind down of the firm. Accordingly, the Settlement Agreement is in the best interests of the Debtor's estate and its creditors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### K. Good Faith Approval Under Section 877.6 of California Code of Civil Procedure

The claims being resolved against the Settling Partners not only include the claw-back claims but also any other claim that the Debtor might have against the Settling Partner, which includes breach of fiduciary duty claims. The Debtor does not believe that the firm has claims arising from breach of fiduciary duty or other claims against the Settling Partners. Absent a global settlement, the Settling Partners would not agree to participate in this settlement if it were not for the global, mutual releases.

The pertinent portion of Section 877.6 of the California Code of Civil Procedure provides:

> (a) Any party to an action wherein it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors . . . . [para. ] (c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault. [para. ] (d) The party asserting the lack of good faith shall have the burden of proof on that issue.

California Code of Civil Procedure § 877.6.

As the California Supreme Court has determined,

> [T]he intent and policies underlying section 877.6 require that a number of factors be taken into account including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants.

*Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*, 38 Cal. 3d 488, 499 (1985).

The Debtor believes that standard of good faith set under *Tech-Bilt* has been satisfied here. First, the Settling Partners (those that were still equity partners and had not previously left the firm prior to the events in January 2017) remained at the firm after the January 2017 departures and were compensated in an amount that was substantially less than they were entitled to for the purpose of putting the firm back on track after the January 2017 departures. To this end, the management of the Debtor, along with the remaining equity partners, reacted to the changes caused by the January

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

2017 departures and attempted to adjust the Debtor's business model and look for merger or acquisition opportunities. It is the Debtor's view that while saving or reorganizing the firm was not ultimately successful, management's efforts, of other equity partners that remained at the firm, did not breach their duty to the firm as they were taking reasonable action to preserve and reorganize the Debtor (at their own expense).

If the Debtor has claims for breach of fiduciary duty against any of the Settling Partners such claim have little or no value. Accordingly, the Debtor believes that the releases by the Debtor of the Settling Partners is fair, reasonable, and justified under the circumstances (as with any settlement). In addition, the Debtor and the Committee believe that it is reasonable to allocate a portion of the $1,931,500 settlement payment towards any breach of fiduciary duty claims that the Debtor might be releasing against the Settling Partners.

The Debtor expects that certain Non-Settling Partners will object as shown by the objection of certain Non-Settling Partners filed in response to prior settlement motion. *See* [Docket No. 276]. There, the Non-Settling Partners assert that a good-faith finding under Section 877.6 is not appropriate because the Debtor admits that it does not believe it has breach claim against the Settling Partners. This argument collapses on itself because these Non-Settling Partners obviously do believe that at least certain of the Settling Partners did breach their duty to the firm because they do not want any good faith finding to prevent them from seeking contribution or indemnification when if and when they are sued by any liquidating trustee.

In the end, the Settling Partners will never agree to pay their share of the Settlement Payment without also receiving a full general and mutual release from the Debtor (that must include breach claims), which is the only path that will give them finality, as any reasonable settling party would and should expect.

## VI.

## SUMMARY DESCRIPTION OF THE PLAN

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan which follows constitutes a summary only and should not be relied upon for voting purposes. You are urged to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Proponents. If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

### A.  Description of Classes

The Plan divides Creditors and Interest Holders into Classes.  Creditors with similar Claims are placed in the same Class.  There are two (2) Classes of Claims and one (1) Class of Interests under the Plan as follows:

1.  **Class 1 Claims.**  Class 1 shall consist of Insured Malpractice Claims.

2.  **Class 2 Claims.**  Class 2 shall consist of general Unsecured Claims.

3.  **Class 3 Interests.**  Class 3 shall consist of the Interests held by the Interest Holders.

### B.  Treatment of Unclassified Claims

Article III of the Plan provides for the treatment of unclassified claims.  The Plan sets forth the treatment of Administrative Claims (including Claims for Professional Fees) and Priority Tax Claims, which are not classified under the Plan.

1.  **Administrative Claims.**  The Plan contemplates that Allowed Administrative Claims will be paid in full by the Liquidating Trust.  Allowed Administrative Claims will be accorded the treatment specified in Article 3.1 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § A.  The Plan also provides for an Administrative Claims Bar Date, which requires that all requests for payment of Administrative Claims, other than Claims for Professional Fees, must be filed by thirty-five (35) days after the Effective Date for claims arising between October 2, 2018 and the Effective Date.  If an Administrative Claim is not filed by the Administrative Bar Date, the holder thereof shall be forever barred from asserting such Administrative Claim against the Debtor or the Liquidating Trust or from sharing in any distribution under the Plan.  Holders of Administrative Claims based on liabilities incurred in the ordinary course of the Debtor's business following the Petition Date shall not be required to comply with the Administrative Claim Bar Date, provided that, (i) such holders have otherwise submitted an invoice, billing statement or other evidence of indebtedness to the Debtor in the ordinary course

of business, and (ii) such Claims are not past due according to their terms. The Debtor estimates that Allowed Claims in this category will total approximately $60,000.

**2.** **Administrative Claims (Professionals).** The Plan contemplates that Allowed Claims for Professional Fees shall be paid in full by the Liquidating Trust. Allowed Claims of Professionals will be accorded the treatment specified in Article 3.3 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § B. Each party seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Administrative Claims Bar Date; and (b) if the Bankruptcy Court grants such an award, each such party will be paid in full in Cash by the Liquidating Trust in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order, and the Bankruptcy Court's Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees. The Debtor estimates that Allowed Claims in this category will total approximately $785,000.

**3.** **Priority Tax Claims.** The Debtor anticipates that the estate will be obligated to satisfy certain tax claims entitled to priority under section 507(a)(8) of the Bankruptcy Code. Allowed Priority Tax Claims will be accorded the treatment specified in Article 3.4 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § C. The Debtor estimates that Allowed Claims in this category will total approximately $0.00.

**C.** **Treatment of Classified Claims and Interests**

Article IV of the Plan sets forth the treatment of classified Claims and Interests. A summary of the treatment of classified Claims and Interests is also provided in the chart set forth in Section I of this Disclosure Statement. As set forth in the Plan and previously herein, Classes 1 and 2 are impaired and are entitled to vote on the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    **1.    Unsecured Claims.**

2    The Plan creates two Classes of non-priority unsecured claims: Class 1 (Insured Malpractice

3    Claims) and Class 2 (General Unsecured Claims).  The Plan treats these Claims as follows:

4    (a)    Class 1 (Insured Malpractice Claims)

5    Insured Malpractice Claims are classified as Class 1 Claims under the Plan.  The Debtor has

6    malpractice insurance policies as set forth in Exhibit D to the Plan.  It had primary coverage with an

7    independent insurer, such as Certain Underwriters at Lloyd's, London and Aspen Specialty

8    Insurance Company.  Within each primary policy, the applicable insurer required the Debtor to

9    reimburse it the amount of the Insurance Deductible on any claim.  The obligation of the applicable

10   insurer remains unchanged except that to the extent that Class 1 accepts or is crammed down, the

11   applicable insurer will only be required to pay the amount of the Malpractice Claim that is in excess

12   of the amount of the Insurance Deductible.  Nothing herein or in the Plan provides any obligation or

13   intent to incur or pay amounts that fall within the amount of the Insurance Deductible.  Through the

14   Plan, the Liquidating Trustee and the applicable insurer will determine whether or not to incur

15   Malpractice Claim Expenses, and act accordingly, without any obligation to pay any of the

16   Insurance Deductible or to comply with any other obligations under the insurance policies.

17   The Debtor is treating the Insured Malpractice Claims as follows.  Such claims are impaired.

18   Each holder of an Insured Malpractice Claim shall receive the following treatment:  (a) the

19   automatic stay under Section 362 of the Bankruptcy Code shall be deemed modified to permit the

20   holder of a Class 1 Claim to prosecute its claim to judgment in any applicable court of competent

21   jurisdiction; (b) the holder shall be deemed to waive its Class 1 Claim against the Debtor and the

22   Estate and shall not be entitled to any distribution under the Plan, (c) the holder shall limit its

23   recourse on account of its Class 1 Claim solely to the proceeds payable by any insurer under any

24   applicable Malpractice Policy; and (d) any recovery obtained by the holder on account of its Class 1

25   Claim shall (i) in the event of a judgment, be deemed reduced by the amount of any Insurance

26   Deductible applicable to such Claim under any applicable Malpractice Policy, or (ii) in the event of

27   a settlement, be deemed to satisfy the amount of any Insurance Deductible applicable to such Claim

28   under any applicable Malpractice Policy.  In the alternative, at the election (as defined below) of the

holder of a Class 1 Claim, such holder shall instead receive the treatment provided by the Plan for the holders of Allowed Unsecured Claims under Class 2 of the Plan. For purposes of this Section 4.1 of the Plan, an election shall mean the written acceptance submitted by the holder of a Class 1 Claim accepting the Plan on the Ballot in connection with solicitation of votes under the Plan.

There is no guarantee that the applicable insurer(s) will provide the insurance coverage necessary to create a recovery on an Allowed Class 1 Claim. It is possible that the applicable insurer(s) will deny coverage or that the insurer will otherwise be unable or unwilling to satisfy an Allowed Class 1 Claim. Nevertheless, Creditors with Class 1 Claims shall have no recourse to Class 2 for amounts unpaid on account of an Allowed Class 1 Claim.

(b)      Class 2 (General Unsecured Claims)

Class 2 shall consist of Unsecured Claims. Class 2 Claims are impaired and holders of Class 2 Claims are entitled to vote. Each holder of an Allowed Class 2 Claim shall receive, a Pro Rata Share of Net Available Cash after deductions for the payment (or appropriate reserve for) the Allowed Claims of senior classes of Claims and reserves for Disputed Claims, Professional Fees and/or Plan Expenses. To the extent that all Allowed Class 2 Claims have been paid in full, including post-petition interest, any remaining funds in the Claims Reserve Account shall be used by the Liquidating Trust to fund distributions to the holders of Allowed Interests in Class 3.

**2.**      **Class 3 (Interest Holders)**

Class 3 consists of the Interests held by the Interest Holders. On the Effective Date, the Interest Holders shall have no ability to direct or control the affairs of the Debtor or the Liquidating Trust, but shall retain an interest in the Liquidating Trust to the extent the Allowed Claims of Class 2 is paid in full, including postpetition interest, at which point all Net Available Cash, net of amounts reserved for Disputed Claims, Professional Fees and/or Plan Expenses, shall be paid to the Interests Holders consistent with the extent of their Interests. Unless and until the forgoing has been satisfied, Interest Holders shall receive nothing under the Plan. Allowed Class 3 Interests will be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

accorded the treatment specified in Article 4.3 of the Plan, which terms are reprinted in the Treatment of Claims Chart, *supra*, at § F.

### D.    Implementation of the Plan.

Article VI of the Plan provides the principal means for the implementation of the Plan. The Plan shall be implemented on the Effective Date as set forth in the Plan. The Plan provides for, among other things, Former Settling Partner Settlement (Section 6.2 of the Plan), dissolution of the Debtor (Section 6.3 of the Plan), resignation of the Dissolution Committee (Section 6.4 of the Plan), formation of Liquidating Trustee and management of estate assets and claims (Sections 6.5 and 6.6 of the Plan) , the rights of the Liquidating Trustee to prosecute, investigate, liquidate and/or settle for Retained Claims and Defenses and Avoidance Actions for the benefit of the Estate (Section 6.7 of the Plan), avoidance actions (Section 5.8 of the Plan), claim reserves (Sections 6.9 and 6.18-6.23 of the Plan), dissolution of the Committee (Section 6.12 of the Plan), distribution procedures and resolution of disputed claims (Sections 6.16 and 6.17 of the Plan), maintenance of insurance policies (Sections 6.24 and 6.25 of the Plan).

### E.    Executory Contracts.

Article VII of the Plan sets forth procedures governing the assumption and rejection of the Debtor's executory contracts and unexpired leases. The Plan provides that, on the Effective Date, the Debtor will reject each of the Rejected Contracts except for any Assumed Contracts identified on Exhibit A to the Plan. The Debtor reserves the right to make additions to Exhibit A to the Plan up to 14 days prior to the date on which objections must be filed to the Plan with respect to the Confirmation Hearing. The Debtor does not anticipate there will be any Assumed Contracts. In the event there is, the Liquidating Trust shall satisfy any Cure Obligations for the Assumed Contracts by making a Cash payment equal to the lesser of the amount: (a) set forth on Exhibit A to the Plan, (b) set forth in any other notice, motion or supplement to the Plan filed and served in connection with the Confirmation Hearing or as may be determined in an Assumption and Cure Order, or (c) agreed to in writing between the Liquidating Trust and the non-debtor parties to such contracts or leases. The Liquidating Trust shall satisfy the Cure Obligations within (14) days from the date from which an Assumed Contract is assumed pursuant to section 365(b) of the Bankruptcy Code.

The Plan also addresses the treatment of the Debtor's postpetition executory contracts and agreements.

**F.      Conditions to Confirmation of the Plan.**

Article VIII of the Plan provides a list of conditions that must occur in order for the Plan to be confirmed. In addition, the Plan identifies conditions to the effectiveness of the Plan.

**G.      Effects of Confirmation.**

Article VIII of the Plan sets forth certain effects of Confirmation of the Plan and the parties that will be bound by the Plan, once confirmed. As noted above, the Plan provides for the revesting of Estate Assets in the Liquidating Trust. The Plan further provides that all Unsecured Claims against the Debtor or the Estate shall be of no further force or effect except with respect to the rights of holders of Allowed Claims to receive payments or distributions as set forth in the Plan. The Plan also sets forth certain injunctive provisions that will go into effect on the Effective Date (Section 9.3 of the Plan) and provides for the limitation of certain liabilities for certain parties (Section 9.5 of the Plan).

**H.      Sources of Funding for the Plan.**

The Liquidating Trust will be capitalized with Available Cash, the Former Partner Settlement Payments ($1,931,500), the proceeds from the U.K. LLP Equity (approximately $700,000), Accounts Receivable (face value of approximately $1.6 million), and the proceeds from any Retained Claims and Avoidance Actions. In addition, Class 1 Insured Malpractice Claims shall be fully satisfied from the proceeds of any applicable Malpractice Policy.

**I.      Post Effective Date Employment and Compensation of Professionals.**

After the Effective Date, the Liquidating Trustee may retain any existing Professionals of the Committee or the Debtor without further employment agreements or orders. Additionally, after the Effective Date, the Liquidating Trustee may hire other professionals without the requirement that such professionals file employment applications for Bankruptcy Court approval of their employment, whether on an hourly, contingency fee or other basis, and without requirement that such professionals file applications for payment of post-Effective Date fees and expenses on an interim basis.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# VII.

## TAX DISCLOSURE

Implementation of the Plan may have federal, state, local and foreign tax consequences to the Debtor, Creditors and Interest Holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure (the "**Tax Disclosure**") does not constitute and is not intended to constitute either a tax opinion or tax advice to any person. Rather, the Tax Disclosure is provided for informational purposes only.

Moreover, the Tax Disclosure summarizes only certain of the federal income tax consequences under the Internal Revenue Code of 1986, as amended ("**IRC**") associated with the Plan's implementation, and does not attempt to comment on all such aspects of the Plan's implementation.  In addition, certain of the federal income tax consequences described in the Tax Disclosure are dependent on factual determinations that are subject to uncertainties.  Similarly, the Tax Disclosure does not attempt to consider any facts or limitations applicable to any particular creditor or interest holder which may modify or alter the consequences described below.  The Tax Disclosure also does not address state, local, or foreign tax consequences or the consequences of any federal tax other than the federal income tax.  No assurance can be given that legislative, judicial, or administrative changes will not be forthcoming that would affect the accuracy of the discussion below.  Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof.  Finally, the tax consequences of certain aspects of the Plan are uncertain due to a lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.  The discussion contained in this Tax Disclosure is not binding on the IRS or any other governmental tax authority.

Creditors, therefore, are advised to consult with their own tax advisors regarding the tax consequences to them of the transactions contemplated by the Plan, including federal, state, local, and foreign tax consequences.

**A.     Tax Consequences to Creditors**

Pursuant to the Plan, holders of allowed claims will receive distributions of cash in exchange for their allowed claims.  Whether and the extent to which such a payment to a creditor holding an allowed claim is includible in the holder's gross income will be determined by reference to the claim in respect of which the distribution is made.  The holder may recognize ordinary income in respect of such payment if the claim is in respect of an item generating ordinary income, such as wages, to such holder.  Similarly, if a claim is held as part of a trade or business, the holder of such claim may recognize ordinary loss to the extent that such holder's adjusted basis in the claim exceeds the amount received by such holder with respect to such claim.  If a claim is held in respect of a capital asset, the holder may recognize a capital gain or loss.  However, any distribution attributable to accrued but unpaid interest may be treated as ordinary income, regardless of whether the origin of the claim is capital in nature or whether gain or loss is otherwise recognized on the Claim.

EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE CONSEQUENCES FOR SUCH CREDITOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

**B.     Tax Consequences to Holders of Interests**

Pursuant to the Plan, Interests will be retained on the Effective Date.  However, it is anticipated that each holder of Interests shall receive no distribution or any other consideration on account of such Interests.  In general, assuming that a holder has not previously treated the Interests as worthless for tax purposes, the holder should recognize loss equal to the difference between the amount of consideration received by such holder (in this case, none) and the adjusted tax basis in the Interests of such holder.

EACH HOLDER OF AN INTEREST IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## VIII.

## LIQUIDATION ANALYSIS

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtor must demonstrate, and the Bankruptcy Court must determine, with respect to such Class, each holder of a Claim or Interest will receive property of a value, as of the Effective Date of the Plan that is not less than the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This requirement is commonly referred to as the "Best Interests Test." For the reasons set forth below, the Debtor submits that it easily satisfy the "Best Interests Test" and therefore should be approved.

As the Liquidation Analysis attached hereto as **Exhibit C** demonstrates, the Debtor estimates that in chapter 11, General Unsecured Creditors will receive a dividend of 12.8% on Allowed Claims where as a Chapter 7 dividend would be only 5.5%. The Debtor believes there are a number of reasons why the recovery to Creditors would be reduced in a chapter 7 liquidation.

The trustee in a chapter 7 case will likely employ legal counsel and accountants, which would add additional administrative expenses that would be paid ahead of Class 2 General Unsecured Creditors. The Debtor and the Committee already have legal counsel with extensive knowledge of the complexities of this case. The learning curve for the trustee, new counsel, and the new staff that would likely need to be hired due to the attrition caused by the appointment of a trustee, would simply increase expense and reduce the recoveries to Creditors. The Debtor's estimate to get a new chapter 7 staff up to speed would be approximately $350,000 more than

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

projected, post-Confirmation staffing costs in chapter 11.[3]  Finally, the Debtor, its staff and its advisors have been working diligently to settle a number of matters that may result in substantial recoveries to the Estate, and believe that a chapter 7 trustee might not be able to realize on these assets.  For example, if the Former Partner Settlement is not approved, the Debtor does not believe that a chapter 7 trustee will realize the same recovery without incurring expenses far excess of the recovery contemplated by such motion.

Because the Plan implements the priorities set forth in the Bankruptcy Code, each Creditor will receive under the Plan proposed by the Debtor property of a value that is not less than the amount such Creditor would receive in a chapter 7 case.  The Plan proposed by the Debtor and Committee presents a better alternative to Creditors than a chapter 7 liquidation because the Plan provides a substantial recovery to Unsecured Claims and gives their representatives oversight and control over the liquidation process post-confirmation.

## IX.

## RISK ANALYSIS

The Plan is conditioned on the Debtor's and Liquidating Trustee's fulfillment of their responsibilities under the Plan and the Bankruptcy Court's confirmation of the Plan.  Although the Debtor currently expects that all of the transactions required under the Plan shall be consummated, there is always a risk that an unforeseen development could affect either the confirmation or the implementation of the Plan or affect the transactions contemplated under the Plan after confirmation.  In addition, the Plan contains several conditions precedent to the confirmation of the Plan and it is possible that one or more of these conditions may not be satisfied.  Finally, while the Debtor believes that the Plan satisfies all of the confirmation requirements under section 1129 of the Bankruptcy Code, there is no guarantee that the Bankruptcy Court will concur with this analysis and necessarily confirm the Plan.  In addition, recovery by Creditors is tied, in part, to the Debtor's recovery from the Retained Claims and Defenses and Avoidance Actions, which amount is

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

---

[3]  These adjustments are reflected in the Liquidation Analysis on the line items for "Trustees Professionals Under Chapter 11" and "Staffing Costs" respectively.

presently unknown.  Thus, the recovery by Creditors may vary based upon the collections to be used to fund payments to Creditors under the Plan.

## X.

## **FEASIBILITY**

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation is proposed in the Plan.  As is set forth on the cash forecast attached hereto as **Exhibit D**, the Debtor will have sufficient cash on hand to meet all of the Debtor's Effective Date obligations under the Plan.  Accordingly, the Plan proposed by the Proponents satisfies the requirements of Section 1129(a)(11)and is "feasible."

## XI.

## **CONFIRMATION OF THE PLAN**

The Proponents will seek confirmation of the Plan at the Confirmation Hearing, pursuant to applicable provisions of the Bankruptcy Code.  If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives include (i) liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code; or (ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code.  If the Plan is not confirmed, the Proponents will decide which alternative to pursue by weighing each of the available options and choosing the alternative or alternatives that are in the best interests of the Debtor, its Creditors and other parties in interest. However, the Proponents believe that the Plan, as proposed, provides the greatest possible return currently available for the holders of Claims in this chapter 11 case.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# XII.

## **RECOMMENDATION AND CONCLUSION**

Based on the foregoing, the Debtor and Committee believe that the Plan is in the best interests of Creditors and urge Creditors to vote to accept the Plan.

Dated: December 12, 2019        PACHULSKI STANG ZIEHL & JONES LLP

By: _/s/ John Lucas_ _____
    John W. Lucas

Attorneys for Sedgwick, LLP

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

Dated: December 12, 2019

By: _/s/ Michael M. Lauter_ _____
    Michael M. Lauter

Attorneys for Committee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# EXHIBIT A

## (Plan)

**EXHIBIT B**

**(Revised 2017 Budget)**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# Sedgwick LLP

## Profit & Loss - Budget vs Actual

| | | |
|---|---|---|
| Book: | 1 ( Firm - Master Book ) | Offices: All |
| Budget: | Sedgwick Budget 2017 Post Dallas/Newark | Departments: All |
| Run By: | FIRM\JDL3 | Profit Centers: All |
| Display Currency: | System | Supress Zeros: Yes |

| Account Description | Currency | Budget | Actual (2017) | Actual (2016) | Actual (2015) | Actual (2014) |
|---|---|---|---|---|---|---|
| Income Statement | USD | (11,925,602.83) | (964,589.52) | (31,593,045.66) | (38,186,815.64) | (32,629,701.56) |
| Fee Income | USD | (142,792,284.33) | (6,796,043.53) | (170,608,552.83) | (183,065,508.67) | (190,160,115.97) |
| 600 - Professional Service Income | USD | (141,229,971.33) | (6,783,875.99) | (165,721,079.97) | (180,661,458.70) | (187,240,476.33) |
| 620 - Miscellaneous Income | USD | (1,559,093.00) | (12,146.13) | (4,866,937.80) | (2,396,162.94) | (2,904,009.08) |
| 640 - Interest Income | USD | (3,220.00) | (21.41) | (19,603.14) | (4,620.16) | (13,561.09) |
| 642 - Interest (NET) Income | USD | 0.00 | 0.00 | (931.92) | (3,266.87) | (2,069.47) |
| Expenses | USD | 130,866,681.49 | 5,831,454.01 | 139,015,507.17 | 144,878,693.02 | 157,530,414.42 |
| Advances to Non-Equity Partners | USD | 14,100,330.50 | 353,893.69 | 17,515,398.83 | 16,154,460.52 | 17,619,811.04 |
| Associate Compensation | USD | 29,781,425.25 | 1,277,136.76 | 32,161,073.35 | 31,301,145.96 | 37,080,058.93 |
| Legal Staff Compensation | USD | 4,742,618.80 | 184,480.37 | 7,351,606.42 | 7,653,236.32 | 8,486,517.89 |
| Support Staff Compensation | USD | 20,991,477.23 | 766,325.54 | 20,104,501.74 | 20,256,743.11 | 24,197,197.45 |
| Employee Benefits and Taxes | USD | 9,783,845.41 | 403,900.55 | 10,990,637.91 | 11,894,403.18 | 11,708,064.07 |
| Other Employee Costs | USD | 3,277,038.00 | 219,436.30 | 2,892,275.92 | 3,413,675.85 | 3,997,007.37 |
| Occupancy Expense | USD | 16,306,582.00 | 1,468,206.53 | 18,125,483.10 | 21,614,683.54 | 21,219,732.34 |
| Equipment Costs | USD | 9,824,517.00 | 72,530.47 | 7,993,139.10 | 8,089,202.37 | 8,727,757.86 |
| Office Supplies | USD | 270,124.00 | 8,288.23 | 341,138.24 | 438,686.60 | 509,352.35 |
| Office Activity Expense | USD | 2,023,036.00 | 67,666.81 | 2,125,287.43 | 2,589,229.75 | 2,728,824.88 |
| Knowledge Management | USD | 2,619,182.25 | 47,777.15 | 2,132,417.79 | 2,355,538.52 | 2,107,217.99 |
| Photocopying | USD | 284,686.50 | 36,242.19 | 349,203.85 | 402,926.19 | 405,026.09 |
| Communications | USD | 1,470,988.00 | 84,006.62 | 1,717,250.76 | 1,744,164.21 | 1,679,321.23 |
| Delivery | USD | 367,792.00 | 59,594.63 | 371,886.27 | 444,119.56 | 391,684.64 |
| Business Development | USD | 1,617,575.00 | 46,340.38 | 1,314,652.28 | 1,285,100.03 | 1,352,819.57 |
| Marketing | USD | 923,800.00 | 47,142.56 | 989,809.88 | 939,158.27 | 1,182,483.91 |
| Recruiting | USD | 738,303.00 | 17,382.25 | 368,122.08 | 763,068.11 | 566,409.32 |
| Other Professional Activities | USD | 412,656.00 | 27,903.79 | 433,649.49 | 401,879.31 | 451,024.34 |
| Insurance | USD | 5,739,291.00 | 368,420.97 | 4,907,904.45 | 4,485,898.97 | 4,889,933.56 |
| Taxes Other Than Payroll | USD | 899,194.55 | 61,715.94 | 904,476.98 | 1,162,869.49 | 1,687,706.70 |
| Outside Professional Services | USD | 2,138,092.00 | 159,210.36 | 2,735,795.81 | 3,634,580.87 | 3,101,428.73 |
| Interest Expense | USD | 320,250.00 | 26,383.48 | 300,655.47 | 306,891.90 | 180,190.70 |
| Miscellaneous Expense | USD | 147,021.00 | 10,436.63 | 134,108.24 | 386,772.56 | 148,526.72 |
| Administrative Overhead | USD | 0.00 | (33,675.29) | (2,156.13) | (40,000.01) | 52,059.42 |
| Unbilled/Uncollected Client Costs | USD | 677,533.00 | 28,123.08 | 648,517.22 | 834,617.86 | 780,731.22 |
| Payments to Retired Partners | USD | 1,027,617.00 | 0.00 | 1,805,370.01 | 1,896,025.10 | 1,766,963.92 |
| Professional Development | USD | 381,706.00 | 22,584.02 | 303,300.66 | 469,614.91 | 512,562.19 |

Case: 18-31087   Doc# 309   Filed: 12/12/19   Entered: 12/12/19 16:04:57   Page 58 of 62

**EXHIBIT C**

**(Liquidation Analysis)**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

*In re* Sedgwick, LLP, Debtor
Case No. 18-31087 (HLB)
Liquidation Analysis as of 1.31.2020

| Assets | Chapter 11 | Chapter 7 |
|---|---|---|
| **Total Estimated Cash on Effective Date** | $ 1,890,000 | $ 1,890,000 |
| | | |
| **Post Effective Date Income and (Expenses)** | | |
| Partner Settlement (under Plan) | $ 1,921,000 | $ - |
| Partner Clawback Recoveries - Litigation | 683,000 | 2,000,000 |
| Contingent Counsel Fees | (239,000) | (800,000) |
| Contingent Accounts Receivable Collections | 100,000 | 100,000 |
| Hourly Accounts Receivable Collection | 150,000 | 150,000 |
| Partner Clawback Litigation Costs | (100,000) | (350,000) |
| Expert Costs | (150,000) | (350,000) |
| Staffing Costs | (50,000) | - |
| Tax Preparation | (50,000) | (100,000) |
| Taxes and Tax Refunds | 100,000 | 100,000 |
| Operating Costs and Services | (25,000) | (25,000) |
| US Trustee Fees | (50,000) | - |
| **Total Post Effective Date Income and (Expenses)** | $ 2,290,000 | $ 725,000 |
| | | |
| **Net Proceeds Available for Distribution** | $ 4,180,000 | $ 2,615,000 |
| | | |
| **Estimated Allowed Secured Creditors** | | |
| Distribution to Secured Creditors | - | - |
| | | |
| **Net Available for Administrative Creditors** | $ 4,180,000 | $ 2,615,000 |
| | | |
| **Administrative Creditors** | | |
| Liquidating Trustee Costs Under Plan | $ (250,000) | $ - |
| Liquidating Trustee Counsel and Accountant | (300,000) | - |
| Professional Fees Due at Confirmation | (785,000) | (785,000) |
| Document Retention and Destruction | (25,000) | (25,000) |
| Trustee Compensation | - | (135,000) |
| Trustee Professionals - Chapter 7 | - | (350,000) |
| US Trustee Fees Due at Confirmation | (1,000) | - |
| **Total Administrative Claims** | $ (1,361,000) | $ (1,295,000) |
| | | |
| **Net Proceeds Available for Priority Creditors** | $ 2,819,000 | $ 1,320,000 |
| | | |
| **Estimated Allowed Priority Claims** | | |
| Distribution to Priority Creditors | (205,000) | (205,000) |
| | | |
| **Net Proceeds Available for Unsecured Creditors** | $ 2,614,000 | $ 1,115,000 |
| | | |
| Estimated Allowed Unsecured Creditors | $ 20,400,000 | $ 20,400,000 |
| | | |
| **Distribution to Unsecured Creditors** | $ 2,614,000 | $ 1,115,000 |
| | | |
| **Return to Unsecured Creditors** | 12.8% | 5.5% |

# EXHIBIT D

## (Cash Forecast)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**In re** **Sedgwick, LLP, Debtor**
**Case No. 18-31087 (HLB)**
**Cash Forecast**

|  | Estimated |
| --- | --- |
| **Total current cash as of 12.10.2019** | $ 1,051,000 |
|  |  |
| **Estimated income prior to confirmation** |  |
| Partner settlements (9019 Motion) | $ 1,921,000 |
| Contingent accounts receivable collections | 15,000 |
| Taxes and tax refunds | 100,000 |
| **Total estimated income prior to confirmation** | $ 2,036,000 |
|  |  |
| **Estimated costs prior to confirmation** |  |
| Liquidating trustee costs under plan | $ (250,000) |
| Professional fees due at confirmation | (760,000) |
| Document retention and destruction | (25,000) |
| Dissolution committee members | (15,000) |
| Miscellanous costs | (20,000) |
| UST Trustee fees due at confirmation | (11,000) |
| **Total estimated costs prior to confirmation** | $ (1,081,000) |
|  |  |
| **Total estimated cash at confirmation** | $ 2,006,000 |